FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

2012 APR 10 P 1: 38

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| MARK DILLON<br>11730 Stuart Mill Road<br>Oakton, Virginia 22124 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| SAIC, INC.<br>1710 SAIC Drive<br>McLean, Virginia 22102 | )<br>)<br>)<br>) |
| Serve: CT Corporation System<br>4701 Cox Road, Suite 301<br>Glen Allen, Virginia 23060 | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

Civil Action No. 1: 12cv390
LO/TRJ

## COMPLAINT

COMES NOW THE PLAINTIFF, MARK DILLON, by counsel, and moves this Court

for entry of judgment in his favor, and against the Defendant, SAIC, INC., and in support of such

motion alleges and avers as follows.

### NATURE OF ACTION

1.    This is a civil action alleging retaliation in violation of the False Claims Act, 31

U.S.C. § 3730(h).

2.    This action also states a common law claim for defamation and defamation *per se*.

### PARTIES

3.    The Plaintiff, Mark Dillon ("Mr. Dillon") is a resident and citizen of Fairfax

County, in the Commonwealth of Virginia.

4.     Mr. Dillon was an executive-level employee at SAIC Inc. ("SAIC"), originally known as Science Applications International Corporation, Inc.) at the time of his termination.

5.     SAIC is a Delaware corporation registered to do business, and in good standing, in the Commonwealth of Virginia.

6.     SAIC is headquartered in this judicial district, in McLean, Virginia.

7.     SAIC provides scientific, engineering, systems integration, and technical services, and solutions to all branches of the U.S. military, agencies of the U.S. Department of Defense ("DOD"), the intelligence community, the U.S. Department of Homeland Security ("DHS"), and other U.S. Government civil agencies, state and local government agencies, foreign governments and customers in selected commercial markets.  SAIC's business is centered upon solving issues of national and global importance in the areas of defense, intelligence, homeland security, logistics and product support, energy, environment and health.

8.     SAIC maintains that it intends to focus its investments intended to expand its business on areas such as: intelligence, surveillance, and reconnaissance; cyber security; logistics; energy; and health technology.

**JURISDICTION**

9.     This Court has jurisdiction over Mr. Dillon's claims pursuant to 31 U.S.C. § 3730, *et seq.* and 28 U.S.C. § 1331.

10.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

11.     SAIC is present in, maintains its corporate headquarters, and regularly conducts business, in this judicial district.

2

12.     The causes of action alleged in this action arose within the Eastern District of

Virginia.

13.     SAIC is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-

328.1 (A)(1), (2), (3) and (4).

## VENUE

14.     SAIC is present in and regularly conducts affairs and business activities in this

judicial district.

15.     The causes of action alleged in this action arose or originated in this judicial

district.

16.     The unlawful employment practices committed by SAIC occurred or originated in

this judicial district, employment records relevant to such practices are maintained and

administered in this judicial district, and Mr. Dillon would have been employed in this judicial

district but for the unlawful practices of SAIC.

17.     Venue over Mr. Dillon's claims is proper in this Court pursuant to 28 U.S.C.

§ 1331.

## BACKGROUND

18.     Mr. Dillon has over forty years of experience in Information Technology.  During

his career, he earned numerous awards and recognitions within the Military and in the private

sector.  Mr. Dillon has a history of outstanding performance.

19.     In 1969, Mr. Dillon graduated from the United States Military Academy, West

Point.  In 1980, he earned a Masters of Science from George Washington University.

20.     Mr. Dillon is a certified Project Management Professional ("PMP"), and an

Information Technology Infrastructure Library ("ITIL") Expert.

3

21.     Mr. Dillon started his Active Duty service immediately after his graduation from West Point. He served in the U.S. Army Signal Corps, worldwide as a Platoon Leader, Communications Staff Officer, Company Commander, and a Group Communications Officer. Mr. Dillon was decorated for his achievements during this period, including the Army Commendation Medal and Meritorious Service Medal.

22.     Following Mr. Dillon's Active Duty service, he served as a Federal civilian employee of the Veterans Affairs ("VA") Central Office, as a Senior Communications Specialist and a Contracting Officer's Technical Representative ("COTR"). Mr. Dillon was decorated for his achievements during this period, including a Special Achievement Award for modernizing technology at more than 200 VA locations. Mr. Dillon also served the Department of Transportation, Federal Aviation Administration, and again received Special Achievement recognition awards, one of which was for innovative response to the national air traffic controller's unlawful strike.

23.     Mr. Dillon spent several years concentrating on Information Technology with private sector entities such as Northern Telecom, Inc., the IBM Complex Systems Organization, and Communications Satellite Corporation. At each of these entities, Mr. Dillon was recognized for his outstanding contributions to business operations and revenue growth.

24.     From 1991-96, Mr. Dillon served as Vice-President Operations of Network Management Services Inc. Mr. Dillon was also part-owner of Network Management Services, Inc. and was a Member of its Board of Directors.

25.     On January 29, 1996, SAIC acquired Network Management Services Inc., and Mr. Dillon became an SAIC employee, and designated a "key" employee awarded a substantial share of the SAIC stock exchanged in the acquisition. During his SAIC employment, Mr. Dillon

4

received excellent annual performance evaluations, promotions, raises, equity awards, and bonuses.

26. Mr. Dillon's initial area of concentration was in the Aviation Technology SubGroup.

27. In the summer of 2000, Mr. Dillon transferred to the SAIC Healthcare Solutions Group (group organizations later became reorganized into "Business Units" or "BU"). Mr. Dillon became an Officer, SAIC Assistant Vice-President, and Director of Business Development.

28. In 2002 Mr. Dillon transferred a second time to his current Business Unit, currently referred to within SAIC as the Enterprise & Mission Solutions BU.

29. Mr. Dillon's position was Business Development Manager Level IV. From 2002 through 2009, he successfully completed numerous cycles as a business developer and project leader.

30. In the spring of 2009, Mr. Dillon participated in an SAIC bid proposal as a major content and solution contributor (for organization, Work Breakdown Structure, and narrative). The work involved the National Science Foundation ("NSF") Data Center Infrastructure Support Services ("DCISS"). SAIC successfully won the bid. Teresa Albo ("Ms. Albo"), the Capture Manager on the bid, invited Mr. Dillon to join the project team as a "Key Person" because his ITIL and PMP qualifications were significant in securing SAIC's win.

31. Mr. Dillon served as a named Key Person on the project, with 40 members of SAIC's staff reporting to him through two team leaders. Sixty percent of the total number of individuals on the entire DCISS program reported to Mr. Dillon, which included staff from SAIC's Data Center Operations team and the Networks team.

32.     In Mr. Dillon's 2009 performance evaluation, his supervisor, Richard Reynolds ("Mr. Reynolds"), Director of Business Development, gave Mr. Dillon an overall performance rating of "Frequently Exceeds" expectations. In several categories, Mr. Reynolds rated Mr. Dillon as "Far Exceeds" expectations, and provided Mr. Dillon a merit bonus, merit stock bonuses, and a salary increase.

33.     In February 2010, Harold Dobbs ("Mr. Dobbs"), Program Manager, DCISS contract, became Mr. Dillon's direct supervisor.

34.     On March 2, 2011, Mr. Dobbs provided Mr. Dillon his annual review for 2010, Mr. Dillon's first full year on the DCISS contract, and evaluated Mr. Dillon's performance with an annual overall rating of "Frequently Exceeds" expectations," and, in several categories, "Far Exceeds" expectations.

35.     Mr. Dobbs further praised Mr. Dillon's performance in the narrative portion of the evaluation:

> When Mark speaks, people listen. This reputation has been established by Mark through many years of consistent judgment, fairness, values, and solid execution of wires and pliers tasks. Mark always makes a favorable impression and easily gains acceptance by others as he deals with complex technical issues, without intimidating or focusing his point of view. Mark prepares concise and meaningful reports, and excels in converting complex information into simple, readable form. This was readily demonstrated in the preparation of deliverables to the client.

36.     The only criticism of Mr. Dillon's work offered was that Mr. Dillon occasionally converts "complex information into more complex information."

37.     In Mr. Dobbs' summary of Mr. Dillon's performance, he commended Mr. Dillon's management of staff and all aspects of Mr. Dillon's project management responsibilities:

Mark has been able to step up to the plate when the project needed seasoned and mature leadership. Mark has done an outstanding job of managing and supporting complex changes in infrastructure requirements. Through Mark's effort, the customer was able to refine requirements and set the course for ITIL best practices and tools. He has done an outstanding job in managing and assisting with changes in staff positions, and kept an eye in satisfying the customer.

Mark's advisory role helped to overcome some of the difficulty associated with finding critical skills, such as a storage expert. Mark's technical performance is truly untouchable and worthy of emulation. The customer expressed a high level of satisfaction with Mark's performance. This was particularly noted in previous Client Assessments that discussed SAIC heroic efforts to respond to crisis and out of our control outages. All deliverables were on time and exceedingly high quality.

38.     Mr. Dobbs awarded Mr. Dillon a merit cash bonus and vesting stock bonuses.

39.     After Mr. Dillon's outstanding review, he was given an additional mission to assist in an eight week initiative to move DCISS and Research.gov (another program) closer procedurally.

40.     Beginning just a few weeks after Mr. Dobbs' review, Mr. Dillon began to raise serious accounting and technical issues related to timekeeping and contracting, which he discovered, researched, and reported to SAIC senior management on numerous occasions.  In the months that followed, Mr. Dillon expressed his concerns to, among others, Mr. Dobbs, Scott Sorensen, Donald Dixon, Lisa Daniels and Ashley Marshall.

41.     As a result of his work, Mr. Dillon became increasingly concerned regarding profound technical and operational issues within SAIC that were not being reported to the Government.

42.     On April 13, 2011, Mr. Dobbs sent the first of two emails to SAIC staff, advising them to post non-billable overhead charges to the customer as billable charges.

43.     Mr. Dillon responded that he was concerned about Mr. Dobbs' timekeeping directions.

44.     Mr. Dobbs immediately responded to Mr. Dillon by questioning Mr. Dillon's own timekeeping and accusing him of other items never discussed between the two:

> Please see me about 'timekeeping' overhead charges. My general impression is that it is unnecessary overhead charge. This taken with your frequent floor check failures is alarming and requires immediate attention. Typically, accounting for your time charging is part of the task . . . I don't understand how you can use 1 to ¾ hours to charging your time daily? We need to discuss.

45.     In Mr. Dillon's evaluation just a few weeks prior to Mr. Dobbs' April 13, 2011 email, Mr. Dobbs did not reference any problems or concerns with Mr. Dillon's timekeeping or any alleged floor check failures.

46.     Mr. Dillon has extensive experience and training in Federal billing and invoicing guidelines, from both his formal Government training as a Contracting Officers Technical Representative while a Federal employee, and his participation 16 annual training cycles from SAIC regarding appropriate and inappropriate billing charges.

47.     To confirm his own experience and knowledge Mr. Dillon emailed SAIC's Corporate Executive who oversees Timekeeping, Vice President for Finance, and Deputy Director of Accounting, Scott Sorensen, explaining his work, projects, billing practices and the instructions from Mr. Dobbs. Mr. Dillon explained his timekeeping practices, and asked, "Can you confirm that this is correct policy?" Mr. Sorensen responded, "You have been correctly charging your time to overhead for the time spent on the timesheet administration tasks."

48.     Mr. Dillon reported the above issues to Mr. Sorensen because he was specifically vested with the authority to monitor and administer timekeeping, and to ensure accuracy with respect to SAIC's internal financial reporting relating to Timekeeping. Mr. Sorensen had both the capability and the duty to ensure true and accurate financial reporting, and to remedy the billing of false or misleading information.

8

49.     Moreover, SAIC recognizes in its SEC reports to shareholders that, "[Its] business is heavily regulated and we must comply with and are affect by law and regulations relating to the formation, administration and performance of U.S. Government and other contracts."

50.     Annually, SAIC provides separate but closely related ethics and timecharging training to its employees, a portion of which focuses on billing and procedures for accurately recording time when an employee is working on multiple contracts. Periodically, SAIC provides additional ethics and timekeeping training, as was done for DCISS managers by the BU Director of Contracts in the wake of other legal problems relating to billing.

51.     On April 28, 2011, Mr. Dobbs once again instructed Mr. Dillon to bill his administrative time direct to the customer. Mr. Dobbs wrote:

> I'm still having issues with why you charge OH [overhead] to complete you[r] (sic) timecard? Accounting for you[r] (sic) time is part of the task area you work. That time to record your effort can be invoiced. We need to review you[r] (sic) rationale for using OH to complete your timecard. Let's discuss and fix.

52.     Upon receiving Mr. Dobbs' email, Mr. Dillon approached Mr. Dobbs to discuss timekeeping and allocating time to overhead per Mr. Sorensen's direction. Mr. Dobbs was visibly displeased. When Mr. Dillon offered to provide Mr. Dobbs a copy of Mr. Sorensen's email, Mr. Dobbs emphatically stated that he did not want a copy. The discussion ended with Mr. Dillon indicating he had no choice but to follow correct timekeeping policy

53.     The following day, on April 29, 2011, without warning and despite Mr. Dillon's outstanding review in the previous month commending his project management achievements, Mr. Dobbs demoted Mr. Dillon from a his managerial position on the project. He told Mr. Dillon that his sole assignment was now to create a "Single Integrated Operations" project and an accompanying Concept of Operations ("CONOPS") document. This unjustified demotion was communicated to Mr. Dillon in front of Carsten Schmid, the Deputy Program Manager.

54.     Mr. Dillon's 40 staff members, and two Managers, were reassigned. Mr. Dillon was stripped of his primary operational ("Key Person") duties other than to prepare the CONOPS document.

55.     The sudden removal of Mr. Dillon, without any announcement to his staff, SAIC's business partners on the project, or the customer, portrayed to the business community that Mr. Dillon had done something inappropriate warranting his immediate reassignment or that he had otherwise abandoned the project.

56.     On May 2, 2011, Mr. Dillon suggested to Mr. Dobbs that they announce Mr. Dillon's reassignment. Reassignments and promotions of executives at Mr. Dillon's level were regularly announced at SAIC. Yet, Mr. Dobbs refused Mr. Dillon's suggestion to announce the reassignment and never formally announced the position change.

57.     That same day, Mr. Dillon met with Donald Dixon ("Mr. Dixon"), Deputy Human Resources Director of the Business Unit at SAIC. Mr. Dillon advised Mr. Dixon that he was demoted shortly after raising a concern regarding billing and time charges on a project. Mr. Dillon stated that he believed he was being subjected to hostility, but did not know what action would be appropriate, as there was no overt evidence. Mr. Dixon advised Mr. Dillon to "keep good records."

58.     During the eight week period from early March to early May 2011, Mr. Dillon completed a largely clerical assignment of managing the reporting of input of accomplishment of work of other employees towards integrating operations for DCISS and Research.gov. During this period Mr. Dillon also completed the draft of the CONOPS document, as directed. When he completed the work assigned to him, Mr. Dobbs ignored it for weeks, demonstrating that the CONOPS document was not a priority. When Mr. Dillon invited Mr. Dobbs to comment or

participate in the formation of the document over the course of several review sessions, Mr. Dobbs was unresponsive.

59.     On June 5, 2011, in response to a request for a status update, Mr. Dobbs advised the Government customer, Colleen Coyne ("Ms. Coyne"), that the CONOPS draft document (which Mr. Dillon had prepared weeks earlier) was complete, and that Mr. Dobbs would review it, update it, and provide it to Ms. Coyne. As of Mr. Dillon's termination, any formal comments Mr. Dobbs had on the draft had not been provided, and a review draft had not yet been delivered by Mr. Dobbs to Ms. Coyne.

60.     On June 22, 2011, as part of the monthly program status review with the NSF customer, Mr. Dobbs prepared organizational charts indicating to the customer that Mr. Dillon had been demoted and that his supervisory authority had been removed. When Mr. Dillon questioned Mr. Dobbs, in the presence of Mr. Schmid, regarding this issue, Mr. Dobbs became visibly annoyed, denying that Mr. Dillon had been demoted, stating "no one's getting fired."

61.     Again, Mr. Dobbs offered no formal explanation to the customer for Mr. Dillon's removal and likely did not inform the customer regarding Mr. Dillon's continued involvement in the project or the work Mr. Dillon was performing.

62.     Mr. Dobbs informed Mr. Dillon that he was moving a portion of another ongoing project's responsibilities (previously assigned to Mr. Dillon) to Glenn Collier ("Mr. Collier"), of Compuware, a subcontractor on the DCISS program. However, Mr. Dillon continued to provide the majority of the detailed technical and financial input required for that portion of the project throughout 2011. Mr. Dobbs also failed to reassign other portions of the project, saying he had taken them on himself, but leaving them unresolved for several months.

63.     In the Spring/Summer of 2011, Mr. Dobbs appointed himself as the Program Manager for one of SAIC's contracts, Research.gov (also referred to as "NSF Ashburn" and "R.gov").

64.     During this same timeframe, because of commonly observed lack of control over Research.gov configurations and capacity, Mr. Dobbs assigned Mr. Collier as "Ashburn Advisory Board" Chairman with final control of all changes at Research.gov.

65.     Previously, when SAIC's former Research.gov Project Manager left SAIC, John Dart, II, SAIC's Infrastructure Operations Manager for Research.gov, was elevated temporarily to Research.gov Project Manager, was later superseded by Mr. Dobbs, then put onto a DCISS Organizational Chart as Process Manager, but only permitted by Mr. Dobbs to bill the portion of the Research.gov that SAIC was billing as firm fixed price – illegally accomplishing work of principal benefit to DCISS while directed to record costs to Research.gov.

66.     Shortly thereafter, in August 2011, at the conclusion of a Service Recovery ("SR") exercise Mr. Dillon referred an invoice for contractor-provided meals to Mr. Dobbs, and the Project Controller, Ashley Marshall, for discussion, before taking any action. Mr. Dillon took this action because Mr. Dobbs reserved all subcontracts dealings with vendors for himself. Following a brief discussion, Mr. Dobbs directed Mr. Dillon to have no further contact with the vendor at issue, RPS.  Mr. Dobbs then removed Mr. Dillon from responsibility for SR exercises, where he had been the lead since September 2010.

67.     On August 22, 2011, Mr. Dillon again met with Mr. Dixon advising him that he was continuing to experience negative treatment, as the result of the transfer of further individual project responsibilities to the subcontractor, and demotion from SR responsibility.

12

68.     Following September 30, 2011, Mr. Dillon learned from Mr. Dart that Mr. Dobbs had SAIC employees providing marginal labor to replace the previous Research.gov subcontractors, with one predictable result being to increase the overall profit margin on the Research.gov project.  Mr. Dobbs had referred to the WebLogic team on the DCISS contract the "NSF Ashburn" support team.

69.     The SAIC employees had charge numbers to bill the Research.gov contract, a process about which Mr. Dart, Research.gov operations, and the DCISS Process Manager had raised concerns because of less than strict enforcement.

70.     Mr. Dillon subsequently learned that Mr. Dobbs instructed DCISS subcontractors, including Mr. Collier, to supply services in support of "NSF Ashburn" without discrete charge numbers for the Research.gov contract.

71.     In addition, Mr. Dobbs did not add the DCISS subcontractors to the Research.gov contract, as required by the Government and which the Government must first approve.

72.     In the fall of 2011, on four separate occasions, Mr. Dobbs delayed a CONOPS project briefing to Lisa Daniels.  On November 1, 2011, just forty minutes prior to the time the briefing was finally scheduled to occur, Mr. Dobbs attempted to reschedule the meeting saying he had not reviewed the brief. Mr. Dobbs was not well-prepared to discuss the CONOPS document or properly prepared to discuss the contents therein.

73.     On this same date, Mr. Dillon met with Mr. Dixon yet again advising he was concerned about the retaliation and hostility he was experiencing after his complaints regarding the time charging on the projects and the resulting removal of his project leadership.

74.     On November 21, 2011, Mr. Dobbs removed the capacity and performance management project from Mr. Dillon, to whom Mr. Dobbs had assigned it in September 2011,

despite acclaim from other NSF Subject Matter Experts ("SME") within and outside of DCISS for Mr. Dillon's plan.

75.     Following a major IT failure at Research.gov on November 22, 2011, which negatively affected NSF services to users, Mr. Dobbs also assigned Mr. Collier, already Ashburn Advisory Board Chair, to the lead position on "Ashburn Remediation," a project to correct the "concerns" expressed by the Government over the failure, and to stabilize operations.

76.     In a conference call at the kickoff of this effort, Ms. Daniels stated that this work was to be unbillable (not directly charged to a contract), but no unbillable charge numbers were issued to SAIC employees for several weeks. In the interim, the employees had no choice other than to charge the unbillable work directly to the contract.

77.     Mr. Dillon was assigned to a distinct "remediation" task by Ms. Daniels, reviewing the existing Research.gov contract, all modifications for compliance, and Service Level Agreements for which SAIC is responsible. During that December 2011 time period, Mr. Dillon discovered additional false timecharging practices.

78.     In response to a verbal request from Mr. Dillon, Mr. Dobbs, in front of "remediation" team members directed that the contract/SLA/compliance review be billed to the DCISS project as chargeable time, claiming "it will be to the customers' benefit." The result of following this direction was that Mr. Dobbs and/or Ms. Daniels were able to shift expense to DCISS and reduce unbillable charges, which would otherwise have negatively affected Research.gov and reduce profit.

79.     Uncomfortable with that direction, on December 29, 2011, Mr. Dillon made his first request in email to Mr. Dobbs requesting a remediation charge number for the contract compliance review (which he had not received - four weeks after being assigned the work).

14

80.     Subsequently, while Mr. Dobbs was out on leave, Mr. Dillon made additional requests for appropriate charge numbers from Mr. Schmid, acting Program Manager, and Lisa Daniels. This issue directly impacted the work Mr. Dillon was tasked to perform.

81.     Ms. Daniels responded January 18, 2011 with direction to use the unbillable timecharging code but strongly suggesting that the hours recorded be minimized.

82.     During this same period between December 29, 2011 and mid-January 2012, Mr. Dillon completed SAIC's annual Ethics and Time charging training, which confirmed that he had been appropriately billing his time, but raised questions about practices on the program in general. In particular, he began to investigate a concern highlighted for him during the training by an example of unlawfully working one contract while charging another (in SAIC corporate lore, supposedly based upon a real historical incident).

83.     Based upon what Mr. Dillon came to understand from Mr. Dart about the substitution of DCISS staff for the former Research.gov subcontractors, Mr. Dillon asked Mr. Collier whether he separated his charges across the various contracts on which Mr. Collier was working. Mr. Collier replied forthrightly that he did not separate his time.

84.     Mr. Dillon confirmed with Mr. Dart that he had direction to only bill the Fixed Price portion of Research.gov, although he was assigned to DCISS as Process Manager.

85.     Throughout January 2012, Mr. Dillon continued to raise his concerns regarding the time charging and the treatment to which he was being subjected. Mr. Dillon then suggested to Mr. Dixon that Mr. Dillon may be compelled to initiate an SAIC Ethics Committee inquiry regarding the time charging issues. Mr. Dillon initially did initiate this inquiry, anonymously, for fear of further retaliation. Mr. Dixon again repeated, "Make certain you keep good records."

86.     On January 19, 2012 and January 26, 2012, Mr. Dillon met with Mr. Dixon and informed him that Ms. Daniels had directed Mr. Dobbs to tell Mr. Dillon that SAIC was planning remove him from his current program. There was no justification for this removal.

87.     In the discussion which Mr. Schmid attended, Mr. Dobbs stated that Ms. Coyne did not see value coming from Mr. Dillon's work related to the CONOPS (which Mr. Dobbs had not delivered to Ms. Coyne as of the time of Mr. Dillon's termination). Mr. Dillon had had very little discussion with either Ms. Coyne or her supervisor regarding the work he had been performing, and, thus, they had no basis on which to base their opinion regarding Mr. Dillon's value other than discussions they had with Mr. Dobbs.

88.     Mr. Dobbs also claimed the customer thought Mr. Dillon's work was too "complex." This alleged claim that Mr. Dillon's work was "complex" mirrored words Mr. Dobbs previously used to describe Mr. Dillon and demonstrated that he had originated these thoughts in the customer's mind – that is, assuming the customer ever expressed such a concern. Mr. Dobbs' 2010 evaluation belies this statement.

89.     Mr. Dobbs further stated that other customers within NSF did not feel that way, and that he felt Mr. Dillon had performed projects "brilliantly."

90.     In fact, it would violate Federal Acquisition Regulations for a customer representative to, without approval or cause, to request and require the removal of Mr. Dillon, especially because he is a "Key Person" on the DCISS contract. SAIC, in the person of Mr. Dobbs, had given in to this sort of unlawful behavior on one previous occasion on the DCISS contract.

91.     Mr. Dillon was never given any performance improvement plan to correct any alleged deficiencies in his work – none existed.  A PIP is considered SAIC's HR "best practice" to be followed for underperforming staff members.

92.     On January 27, 2012, SAIC issued Mr. Dillon a formal notice of termination, citing an absence of other positions available.  SAIC's fabricated justification for Mr. Dillon's termination was untrue, because another Senior Program Manager working for Ms. Daniels had resigned and left SAIC that same week.  Mr. Rick Reynolds, acting BU General Manager repeated SAIC's sham and fabricated reason for termination in a meeting with Mr. Dillon, and offered to be a reference for Mr. Dillon in his search for future employment.

93.     Mr. Dillon requested through the Ethics Committee that he be given whistleblower protection, verbally and by email, in accordance with SAIC published Corporate Policy.  The Ethics Committee did not take any action in response to Mr. Dillon's request.

94.     Within days of receiving his termination notice, Ms. Daniels, through Mr. Dobbs and in the presence of Mr. Dart, ordered Mr. Dillon to appear in SAIC's McLean offices and continue work billable to NSF.  This was inconsistent with SAIC's own notice of termination, which indicated that Mr. Dillon could work from his residence while seeking other employment: "If you have Internet access from a home computer you may also obtain information on SAIC job opportunities by accessing the SAIC website…"

95.     The basis for Mr. Dillon's termination was false and pretextual to cover up the true reasons for terminating Mr. Dillon, which were illegal.  The termination, and the events leading up to it, were orchestrated by Mr. Dobbs (and Ms. Daniels) with that specific intent.

96.     The value of the projects and business lines to which Mr. Dillon was assigned and about which he complained exceeds $20 million.

97.     Given the billing issues on the Research.gov and NSF DCISS cases, it is reasonable to conclude that any other projects under the purview of or involving Mr. Dobbs and Ms. Daniels and/or the Enterprise & Mission Solutions Division may also have billing irregularities.

98.     Moreover, the revenue from the Enterprise & Mission Solutions Division exceeds $600 million.

99.     In 2010, SAIC made $10,390 billion in revenues from its work in the Government sector.  In 2010, SAIC also reported that its Government sector revenues increased $808 million, 8%, including internal revenue growth of 6%, from 2009.

100.     Mr. Dillon objectively believed billing irregularities of the kind he reported should be disclosed to the Government.  In fact, SAIC reports to its shareholders regarding disputes for which, in comparison to the false billing on Research.gov and DCISS, significantly lower levels of economic exposure are possible or likely.

101.     SAIC has had billing irregularities in the past.  SAIC is currently involved in an indictment involving its work with the City of New York for systems development and implementation relating to an automated time and attendance and workforce management systems (CityTime) for city agencies of the City of New York (the "City").

102.     The indictment alleges that individuals from SAIC worked with a second-tier subcontractor to defraud the City by overbilling and inflating the price paid by the City under the subcontract.

103.     This apparent lack of internal controls at SAIC is alleged to have caused the City of New York losses in excess of $600 million dollars.

104.    While SAIC claims that in response to the CityTime issues, it has engaged an outside law firm to undertake a review of key policies and practices at SAIC and recommend changes to strengthen SAIC's ethics infrastructure, accountability and compliance, that review is/was either very isolated or ineffective, no substantive action has been taken in response to any of Mr. Dillon's complaints regarding billing on Research.gov or NSF DCISS.

105.    Nothing has been done to reverse or remedy Mr. Dillon's unjustified and unlawful termination from SAIC.

106.    Routinely, SAIC corporate officers who are terminated (especially under the guise of position elimination), receive severance pay -- historically one month per year of service, per SAIC Policy SH-7.  Mr. Dillon, an SAIC Assistant Vice President and upper-level manager, received no severance, although he served SAIC successfully for more than twenty years (including the bridged service years).  The E&MS BU to which Mr. Dillon belongs has previously provided as much as 17 months of severance to non-officers.

107.    In light of Mr. Dillon's sudden dismissal and SAIC's refusal – and inability – to explain the removal of his management responsibilities and diminishment of his role on projects, Mr. Dillon was humiliated.

108.    Mr. Dobbs' retaliatory actions portrayed to the customer and business community that Mr. Dillon's performance was substandard or in some way unprofessional.  Mr. Dillon's sudden removal and termination also caused fear in Mr. Dillon that members in the business community would receive a negative, albeit unfounded, impression of his work.

109.    Mr. Dillon's fears were confirmed when Mr. Dobbs reported that the single customer – with whom Mr. Dobbs was in close contact – had allegedly said Mr. Dillon's work was "too complex."  Not only was this completely false, but the use of Mr. Dobbs' previous

language indicates this conduct was all part of a dishonest scheme to pretextally justify termination for cause.

110.   Despite Mr. Dillon's outstanding career with SAIC, when he applied for SAIC positions through its internal redeployment system, he was rejected for each one within 48 hours. Mr. Dillon then applied for most of the same positions as an external (non-SAIC) candidate, and is still under consideration for those.

111.   Mr. Dobbs' false statements and representations regarding Mr. Dillon's work performance duties tarnished Mr. Dillon's performance record and blemished his professional reputation.

112.   Prior to the chain of events described herein, Mr. Dillon's performance and work were never the subject of criticism.  During his tenure with SAIC, Mr. Dillon received stellar performance ratings and significantly and substantially exceeded his goals.

113.   No one at SAIC ever criticized Mr. Dillon's work on the DCISS program until Mr. Dillon voiced his concerns about false billing.

114.   Within weeks of Mr. Dillon's complaint, SAIC imposed numerous unfavorable personnel actions on him, including threatening to demote him, demoting him, disparaging Mr. Dillon and/or his work to the customer, and ultimately terminating him from employment.

115.   The stressful aftermath of attempting to survive with significantly less income has caused emotional and mental distress as well as considerable financial strain.  Furthermore, Mr. Dillon will be forced to repair the damage to his reputation caused by a dismissal shrouded in false insinuations of poor performance.

COUNT ONE –
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT

116.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

117.    SAIC had a duty under the False Claims Act, 31 U.S.C. §3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section.

118.    Mr. Dillon in good faith believed that serious illegal accounting issues existed in the DCISS and Research.gov projects that were not being reported to the Government.

119.    Mr. Dillon has extensive experience and training in Federal billing and invoicing guidelines, and received annual training from SAIC regarding appropriate and inappropriate billing charges. On April 13, 2011, when Mr. Dobbs sent the first of two emails to SAIC staff, advising them to post non-billable overhead charges to the customer as billable charges, Mr. Dillon responded that he was concerned about Mr. Dobbs' timekeeping directions. Mr. Dillon's concerns were confirmed by SAIC's Corporate Vice President of Finance, and Deputy Accounting Director, Scott Sorensen.

120.    Mr. Dillon in good faith believed that employees were being instructed to falsely and fraudulently bill non-billable overhead charges to the client (the Federal government). Mr. Dillon reported the above issues to Mr. Sorensen because Mr. Sorensen was specifically vested with the authority to monitor and administer timekeeping, and to ensure accuracy with respect to SAIC's internal financial reporting relating to Timekeeping. Mr. Sorensen had both the capability and the duty to ensure true and accurate financial reporting, and to remedy the billing of false or misleading information.

21

121.    Notwithstanding the concerns raised by Mr. Dillon, and reported to Mr. Sorenson, on April 28, 2011, Mr. Dobbs instructed Mr. Dillon to bill his administrative time directly to the customer.

122.    The following day, on April 29, 2011, without warning and in retaliation for Mr. Dillon raising his billing concerns, Mr. Dobbs demoted Mr. Dillon from a his managerial position on the project, reassigned Mr. Dillon's 40 staff members and two Managers, and stripped Mr. Dillon of the majority of his duties.

123.    Upon this occasion Mr. Dillon reported his concerns about demotion and feeling of a hostile work environment to Mr. Dixon, BU Deputy HR Director.

124.    Mr. Dillon completed the single project assigned to him, but Mr. Dobbs ignored it for weeks, demonstrating that the project (the CONOPS document) was not a priority.

125.    In further retaliation for raising concerns of illegal and false billing practices, Mr. Dobbs informed Mr. Dillon that he was moving a portion of the project responsibilities (previously assigned to Mr. Dillon) to Glenn Collier, of Compuware.

126.    In the Spring/Summer of 2011, Mr. Dobbs appointed himself as the Program Manager for one of SAIC's contracts, Research.gov (also referred to as "NSF Ashburn" and "R.gov"). Mr. Dart, who had been elevated temporarily to Research.gov PM, was then put onto a DCISS Organizational Chart as Process Manager, but only permitted by Mr. Dobbs to bill Research.gov at the firm fixed price - illegally.

127.    On August 22, 2011, Mr. Dillon again met with Mr. Dixon advising him that he was continuing to experience negative and retaliatory treatment as a result of his lawful reporting of his concerns.

22

128.    Shortly thereafter, following a System Recovery ("SR") exercise Mr. Dillon referred an invoice for contractor-provided meals to involving Mr. Dobbs, and the Project Controller, Ashley Marshall for discussion, before taking any action,. Following the meeting, in retaliation for Mr. Dillon inquiring about the invoice, Mr. Dobbs directed Mr. Dillon to have no further contact with the vendor at issue, RPS. Mr. Dobbs then removed Mr. Dillon from responsibility for SR exercises, in further retaliation.

129.    From this same period, but particularly after September 30, 2011, Mr. Dart reported that Mr. Dobbs had SAIC employees providing marginal labor to replace the former subcontractors on the Research.gov contract, increasing overall profit margin on the Research.gov project. Mr. Dobbs referred to the WebLogic team on the DCISS contract the "NSF Ashburn" support team.  The SAIC employees had charge numbers to bill the Research.gov contract, a process about which Mr. Dart, Research.gov operations, and the DCISS Process Manager had already raised concerns, due to laxity in separating charges between the two contracts.

130.    Mr. Dillon subsequently learned that from Mr. Collier that Mr. Dobbs instructed DCISS subcontractors, including Mr. Collier, to supply services in support of "NSF Ashburn" without discrete charge numbers for the Research.gov contract, and that Mr. Dobbs did not add the DCISS subcontractors to the Research.gov contract, as required by the Government and which the Government must first approve.

131.    On November 21, 2011, Mr. Dobbs removed yet another project from Mr. Dillon, in further retaliation.

132.   On December 29, 2011, Mr. Dillon made his first request in email to Mr. Dobbs requesting a specific remediation charge number for his completed contract compliance review to address the issues and in order to bring the Research.gov contract into (legal) compliance.

133.   Mr. Dobbs, in front of "remediation" team members directed that the contract/SLA/compliance review be billed to the DCISS project as chargeable time, claiming "it will be to the customers' benefit." The result of following this direction was that Mr. Dobbs/Ms. Daniels would shift this expense to DCISS billable accounts and reduce unbillable charges (that negatively affect Research.gov overhead).

134.   Between December 29, 2011 and mid-January 2012, Mr. Dillon completed SAIC's annual ethics training, which confirmed that he had been appropriately billing his time. Consequently, Mr. Dillon initiated an Ethics Committee inquiry regarding the time charging issues.

135.   Throughout January 2012, Mr. Dillon continued to raise his concerns regarding the time charging and the treatment to which he was being subjected with peers on the DCISS team and with SAIC HR.

136.   On January 19, 2012 and January 26, 2012, Mr. Dillon met with Mr. Dixon to inform him that Ms. Daniels had directed Mr. Dobbs to inform Mr. Dillon that SAIC was planning to remove him from the DCISS program. There was no justification for this removal, and it was retaliatory in nature.

137.   On January 27, 2012, SAIC gave Mr. Dillon a formal notice of termination, citing an absence of other positions available, which was untrue, because another Senior Program Manager working for Ms. Daniels had just resigned and left SAIC that same week.

138.    Mr. Dillon took lawful action in furtherance of a False Claims Act action by investigating and raising concerns to SAIC's officers, his good faith belief that SAIC was deliberately attempting to defraud the government with the falsified billing and invoices.

139.    A reasonable employee in the same or similar circumstances as Mr. Dillon might believe that SAIC was possibly committing fraud against the government.

140.    After learning of Mr. Dillon's protected activities, SAIC took no action to address the situation despite Mr. Dillon's reporting of the illegal acts to numerous SAIC officers, including Mr. Dobbs, Scott Sorensen, Donald Dixon, Lisa Daniels, and Ashley Marshall, and instead reassigned Mr. Dillon, diminished his responsibilities, excluded him from communications, fabricated false allegations against Mr. Dillon, and terminated him, in retaliation for his reporting of the illegal acts, requesting a contract compliance review and initiating and Ethics investigation.

141.    SAIC would not have taken these retaliatory actions against Mr. Dillon had Mr. Dillon not engaged in the protected activities.

142.    Mr. Dillon acted beyond the scope of his ordinary duties by investigating, analyzing and reporting the illegal actions.

143.    Pursuant to 31 U.S.C. §3730(h)(2), Mr. Dillon is entitled to reinstatement plus double back pay, with interest, as well as compensation for attorneys' fees and costs.

## COUNT TWO –
## DEFAMATION AND DEAMATION *PER SE*

144.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

145.    The sudden removal of Mr. Dillon from a project, without any announcement to his staff, SAIC's business partners on the project, or the customer, portrayed to the business

community that Mr. Dillon had done something inappropriate warranting his immediate reassignment or that he had otherwise abandoned the project.

146.    SAIC perpetuated the negative implications by instructing Mr. Dillon, in the presence of other SAIC employees, not to have any further contact with a project vendor.

147.    Furthermore, when Mr. Dillon suggested to Mr. Dobbs that they announce Mr. Dillon's reassignment as was customary at SAIC, Mr. Dobbs refused, cloaking Mr. Dillon's reassignment with an air of secrecy suggesting that Mr. Dillon was reassigned for negative reasons or as punishment.

148.    As set forth in detail throughout the complaint and in particular ¶¶ 54, 56-57, 67, 78 and 89, SAIC's retaliatory actions portrayed to the customer and business community that Mr. Dillon's performance was substandard or in some way unprofessional.  Mr. Dillon's sudden removal and termination also caused fear in Mr. Dillon that members in the business community would receive a negative, albeit unfounded, impression of his work.

149.    Mr. Dillon's fears were confirmed when he learned that a customer – with whom Mr. Dobbs was in close contact on behalf of SAIC – had allegedly said Mr. Dillon's work was "too complex." Mr. Dobbs' comment was completely false, and Mr. Dobbs knew it to be false at the time he made it, but made the comment as part of a dishonest scheme to discredit and defame Mr. Dillon, and to fabricate a reason to terminate Mr. Dillon.

150.    Mr. Dobbs' false statements and representations regarding Mr. Dillon's work performance duties, both internally and to an outside customer, tarnished Mr. Dillon's performance record and blemished his professional reputation.

151.    Prior to the chain of events described herein, Mr. Dillon's performance and work were never subjects of criticism.  During the span of his employment, Mr. Dillon received stellar

performance ratings and significantly and substantially exceeded his goals.   No one at SAIC ever criticized Mr. Dillon's work until he voiced his concerns about accounting and billing violations.

152.    The defendant's statements and conduct assert that Mr. Dillon was unfit to perform the duties of his employment, that he lacked integrity in his profession.  The effect of Defendant's words and actions was prejudicial to Mr. Dillon in his professional reputation, and his legacy of performing excellent work for SAIC.

153.    Any privilege connected to these statements was waived because (a) SAIC knew these statements were false or made these statements with reckless disregard as to whether the statements were false or not; (b) the statements were deliberately made in such a way that they were heard by persons having no interest or duty in the subject of the statement; (c) the statements were unnecessarily insulting; (d) the language used was stronger or more violent than was necessary under the circumstances; (e) Defendant made the statements because of ill will or a desire to injure Mr. Dillon, rather than a fair comment on the subject; and/or (f) the statements were made because of personal spite, or ill will, independent of the occasion on which the communication was made.

154.    Any privilege connected to these statements is overcome by the Defendant's malice in making these statements for personal motive of ill-will, spite, hostility, vengeance, or a deliberate intent to harm the plaintiff.

155.    Defendant acted with malice and with willful, wanton or reckless, and a conscious disregard for Mr. Dillon's rights.

156.    The Defendant repeated these defamatory statements to third parties (at least one customer).

157.    As a direct and proximate result of the defamation, Mr. Dillon has suffered and will in the future suffer great damages, including injury to his personal and professional reputation, loss of income, lost career and business opportunities and advancement, embarrassment, humiliation, inconvenience, severe mental anguish, stress, pain and suffering.

158.    Due to the severity of the Defendant's defamatory conduct, Mr. Dillon is also entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mark Dillon requests this Court enter judgment in his favor and against Defendant SAIC, Inc. on the above counts, and on each of them, and further:

(a)    Award Mr. Dillon compensatory damages of $20,000,000 on each of the Counts One and Two; and in addition

(b)    Award Mr. Dillon reinstatement plus double back pay, with interest, as well as compensation for attorneys' fees and costs on Count One; and in addition

(c)    Award Mr. Dillon punitive and exemplary damages as restricted by the statute or statutory cap of $350,000 on Counts One Two; and in addition

(d)    Award Mr. Dillon such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

**PLAINTIFF MARK DILLON DEMANDS A TRIAL BY JURY.**

April 10, 2012                    Respectfully submitted,

Carla D. Brown
Virginia Bar No. 44803
CHARLSON BREDEHOFT COHEN
 BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile

*Counsel for Plaintiff, Mark Dillon*