**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| Mark Dillon,<br><br>          Plaintiff,<br><br>    v.<br><br>SAIC, Inc.,<br><br>       Defendant. | Civil Action No. 1:12-cv-390 (LO/TRJ) |

**DEFENDANT SAIC, INC'S MEMORANDUM
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Jason C. Schwartz, Va. Bar No. 43635
Greta B. Williams,
    (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
jschwartz@gibsondunn.com
gbwilliams@gibsondunn.com
Telephone:  202.955.8500
Facsimile:   202.467.0539

*Attorneys for Defendant SAIC, Inc.*

**TABLE OF CONTENTS**

**Page**

**INTRODUCTION**................................................................................................ 1

**STATEMENT OF UNDISPUTED MATERIAL FACTS**.................................... 2

**STANDARD OF REVIEW** ................................................................................ 13

**ARGUMENT** ....................................................................................................... 13

I.  Plaintiff Did Not Engage In Protected Activity, Nor Was SAIC On Notice
Of A Potential FCA Claim.............................................................................. 15

    A.  Mr. Dillon Did Not Engage in Protected Activity By Asking
Routine Questions About Accounting For Timekeeping Activities
And Did Not Put SAIC On Notice Of A Potential FCA Claim........................... 17

        1.  Communications with Scott Sorensen ..................................... 17

        2.  Communications with Harold Dobbs........................................ 18

    B.  Dillon's Remediation Charging Questions Involved No Protected
Activity And Did Not Put SAIC On Notice Of A Potential FCA
Claim.................................................................................................. 22

    C.  Mr. Dillon's Post-Removal Complaints Could Not, Of Course,
Have Caused His Removal, And Therefore Need Not Be
Analyzed. ........................................................................................... 24

II.  Mr. Dillon Suffered No Adverse Employment Actions As A Result Of
Any Protected Activity. ................................................................................. 25

    A.  Mr. Dillon's "Demotion" Was Not An Adverse Employment
Action And, In Any Event, It Occurred Before Mr. Dillon
Approached Mr. Dobbs About Timecharging For Timekeeping
Activities............................................................................................ 26

    B.  The Decision To Remove Mr. Dillon From The NSF Program
Was In No Way Connected To Mr. Dillon's Alleged Protected
Activity. ............................................................................................. 27

**CONCLUSION** .................................................................................... 30

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .......................................................................................... 13

*Drewitt v. Pratt,*
  999 F.2d 774 (4th Cir. 1993) ........................................................................... 13

*Eberhardt v. Integrated Design & Constr., Inc.,*
  167 F.3d 861 (4th Cir. 1999) .......................................................... 15, 16, 21, 22

*Glynn v. Impact Sci. & Tech., Inc.,*
  807 F. Supp. 2d 391 (D. Md. 2011) ........................................................... 15, 23

*Halasa v. ITT Educational Services, Inc.,*
  690 F.3d 844 (7th Cir. 2012) ........................................................................... 28

*James v. Booz-Allen & Hamilton, Inc.,*
  368 F.3d 371 (4th Cir. 2004) ........................................................................... 26

*Mann v. Heckler & Koch Def., Inc.,*
  630 F.3d 338 (4th Cir. 2010) ..................................................... 14, 15, 16, 20, 21, 24

*Othentec Ltd. v. Phelan,*
  526 F.3d 135 (4th Cir. 2008) ........................................................................... 30

*Tolman v. Am. Red Cross,*
  --- F.Supp.2d ----, No. 10-628, 2012 WL 892312 (D. Idaho Mar. 14, 2012) ......................... 25

*United States ex rel. Martinez v. Va. Urology Ctr., P.C.,*
  No. 09-442, 2010 WL 3023521 (E.D. Va. July 29, 2010) ...................................... 21

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.,*
  612 F.3d 724 (4th Cir. 2010) .................................................... 14, 17, 21, 23, 27

*United States ex rel. Parks v. Alpharma, Inc.,*
  No.11-1498, 2012 WL 3291705 (4th Cir. Aug. 14, 2012) ........................... 17, 20, 24

*United States ex rel. Scott v. Metro. Health Corp.,*
  375 F. Supp. 2d 626 (W.D. Mich. 2005) ...................................................... 25

*United States ex rel. Yesudian v. Howard Univ.,*
  153 F.3d 731 (D.C. Cir. 1998) ................................................................. 16

*Zahodnick v. IBM,*
  135 F.3d 911 (4th Cir. 1997) .................................................... 16, 17, 22, 23

**TABLE OF AUTHORITIES**

(continued)

**Page**

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ................................................................................................. 14

31 U.S.C. § 3730(h)(1) ..................................................................................................... 14

Pub.L. No. 99–562, § 4, 100 Stat. 3153, 3157-58 (1986) ............................................... 14

**Other Authorities**

S. Rep. No. 99–345, at 34 (1986) ..................................................................................... 15

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................... 14

## INTRODUCTION

> *"[Mark Dillon] was removed after I went to [SAIC Deputy Program Manager] Carsten [Schmid], after having talked to [SAIC Program Manager] Harold Dobbs several times as well, and specifically said to him, Mark [Dillon] needs to be taken off this project."*   Colleen Coyne, IT Project Manager, National Science Foundation.  Schwartz Decl. Ex. 1 (excerpts of deposition of Colleen Coyne) 26:9-17.

This is a simple case:  Plaintiff Mark Dillon was removed from SAIC's team working on a government contract for the National Science Foundation ("NSF") and laid off from SAIC after the government customer insisted that he be removed because the customer believed he added no value to the contract.  Approximately nine months prior to his layoff, Mr. Dillon was removed from his supervision of two subordinates and detailed to another project after he and the two subordinates indicated that his supervision was unnecessary.  Mr. Dillon's layoff and his prior reassignment—which he incorrectly characterizes as a demotion—had nothing to do with any protected activity under the False Claims Act ("FCA").  Indeed, Mr. Dillon now admits that the allegations in his Complaint that he complained about timekeeping instructions from his supervisor before his reassignment are not accurate, and that, in fact, he did not engage in any such activity until <u>after</u> he was notified of his layoff.

This Court was justifiably skeptical of Mr. Dillon's FCA retaliation claim at the motion to dismiss stage, observing that "there is not a lot there."  June 1, 2012 Hr'g Tr. 24:18 (O'Grady, J.).[1]  Now that discovery has concluded, and Mr. Dillon himself conceded in deposition that several of the critical allegations of his Complaint are untrue[2]—it is clear that there was no

---

[1]  The Court dismissed Plaintiff's claims for defamation and defamation *per se* by Order dated June 1, 2012.

[2]  In addition to his admissions that he did not complain about timekeeping instructions prior to his reassignment or layoff (*see* Schwartz Decl. Ex. 2 (excerpts of deposition of Mark Dillon) 137:14-17, 161:10 – 163:18, 197:18-20, 198:21 – 199:4, 199:11-16), Plaintiff also acknowledged at deposition that several of the other allegations in the Complaint are inaccurate, including his allegations that he "reported" allegedly improper timecharging

protected activity and that, in any event, Mr. Dillon's layoff and the earlier change in his responsibilities were justified by legitimate business reasons.  Accordingly, his claim should not proceed to a jury.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In 2009, Mr. Dillon participated in SAIC's successful bid for the NSF's Data Center Infrastructure Support Services ("DCISS") contract.  Schwartz Decl. Ex. 2 (excerpts of deposition of Mark Dillon) 56:6-13.

2. Mr. Dillon was assigned as Infrastructure Manager on the NSF DCISS contract.  *Id.* 56:6-16.

3. In or around February 2010, Harold Dobbs, the Program Manager on the NSF DCISS contract, became Mr. Dillon's supervisor.  *Id.* 56:17-21.

4. Mr. Dillon was initially responsible for supervising Rusty Pasini and Paul Lipscomb, both of whom had worked at the NSF under the predecessor contractor.  *Id.* 107:13-18; *id.* Ex. 3 (excerpts of deposition of Harold Dobbs) 94:3-16; *id.* Ex. 1 27:4-14.

5. Messrs. Pasini and Lipscomb informed Mr. Dobbs and Carsten Schmid, SAIC's Deputy Program Manager, that they did not need Mr. Dillon's supervision.  *Id.* Ex. 2 166:6 – 167:13; *see also id.* 76:7-20.

6. In addition, Mr. Dillon complained to Caroline McConnell, the Human Resources Director for his business unit, that he felt underutilized supervising Messrs. Pasini and Lipscomb.  *Id.* 77:6-9.

7. In order to provide Mr. Dillon with more time to undertake a new assignment, Mr. Dobbs relieved Mr. Dillon of the responsibility of managing Messrs. Pasini and Lipscomb in April 2011.  *Id.* 166:3-5; *id.* Ex. 3 123:14 – 124:9.

8. In order to provide Mr. Dillon with a greater challenge for which Mr. Dobbs believed he would be well-suited, and to help facilitate a new business priority, Mr. Dobbs assigned Mr. Dillon to lead the Single Integrated Operations project, an initiative aimed at integrating the operations of the NSF data centers, and to take responsibility for drafting the accompanying Concept of Operations ("CONOPS") document.  *Id.* Ex. 2 161:10 – 163:14; *id.* Ex. 3 120:21

---

instructions from his supervisor Harold Dobbs to Scott Sorensen (*id.* 134:20 – 135:22, 137:14-17), that Mr. Dobbs "refused" his suggestion to announce his reassignment to the Single Integrate Operations/CONOPS project (*id.* 175:11 – 179:16), and that the Single Integrated Operations/CONOPS project was his "sole assignment" after that time (*id.* 173:4 – 175:6).  As a result of these admissions, on October 11, 2012, Plaintiff's counsel conceded, "[c]learly, we will need to amend." *Id.* Ex. 4 (October 11, 2012 e-mail from C. Brown to J. Schwartz) at 1; *see also id.* Ex. 5 (November 3, 2012 e-mail from C. Brown to U.S. Department of Labor investigator S. Owen) (acknowledging that the Complaint was inaccurate and would be amended).  To date, however, no amendment has been offered.

– 123:13, 189:8-22.  Mr. Dobbs informed Mr. Dillon of this new assignment on or before April 27, 2011.  *Id.* Ex. 2 163:1-18; *id.* Ex. 6.

9.  Mr. Dobbs granted Mr. Dillon permission to make an announcement drafted by Mr. Dillon about his new assignment, and on May 2, 2011, Mr. Dillon made this announcement to his SAIC colleagues, as well as to several NSF staff members.[3]  *Id.* Ex. 2 175:11 – 179:16; *id.* Ex. 7; *id.* 8; *id.* Ex. 9.

10.  Neither Mr. Dillon's new assignment nor the removal of his direct reports affected his Infrastructure Manager or SAIC Assistant Vice President titles—he retained both until his separation from SAIC.  *Id.* Ex. 2 164:21 – 165:4; *id.* Ex. 3 240:1-4.

11.  In addition, Mr. Dillon's salary remained unchanged after his new assignment and the removal of his direct reports—he continued to earn $172,850 per year.  *Id.* Ex. 2 164:7-20; *id.* Ex. 3 240:1-4.

12.  Mr. Dillon continued to work on other projects after he was assigned to the Single Integrated Operations and CONOPS projects; for example, he worked on the Backups, Performance Management and Capacity Planning projects.  *Id.* Ex. 2 173:4 – 175:6.[4]

## SAIC Timekeeping Policy

13.  SAIC timekeeping policy requires employees to charge their time daily and to accurately record all time worked by 10:00 a.m. the following day.[5]  *Id.* 95:3-7, 95:22 – 96.5.  Failure to submit one's timesheet on time can result in a "floor check failure."  *See id.* 129:4-18.

14.  Mr. Dillon was late in submitting his timesheet, in violation of SAIC policy, at least 60 times during his time on the NSF contract, despite acknowledging that it was "important" to submit timesheets by the deadline required by company policy.  *Id.* 99:21 – 100:3, 105:7-10.

15.  As Mr. Dillon's supervisor, Mr. Dobbs received e-mails notifying him when Mr. Dillon had failed to submit his timesheet on time.  *See, e.g.*, McConnell Decl. Exs. 1-4.

16.  As early as March 2010, Mr. Dobbs followed up with Mr. Dillon about his delinquent timesheets.  *See, e.g.*, *id.* Exs. 5-7.

---

[3]  Although Mr. Dillon alleged in Paragraph 56 of his Complaint that "Mr. Dobbs refused Mr. Dillon's suggestion to announce the reassignment," he admitted in deposition that this was "an inaccurate statement."  Schwartz Decl. Ex. 2 178:6 – 179:16.

[4]  Although Mr. Dillon alleged in Paragraph 53 of his Complaint that his "sole assignment" was to "create a Single Integrated Operations project and an accompanying CONOPS document" after being assigned to this project, he admitted in deposition that he "continued to work on several projects."  Schwartz Decl. Ex. 2 173:4 – 175:6

[5]  Although Mr. Dillon testified that employees must complete their timecards by 9:00 a.m. each day, they actually have until 10:00 a.m.

**Accounting for Timekeeping Activities**

17. SAIC employees working on government contracts like the NSF DCISS contract account for their time in 15-minute increments.  Schwartz Decl. Ex. 10 (excerpts of deposition of Scott Sorensen) 55:2-6.

18. Most SAIC employees complete their daily timesheets in less than 15 minutes.  *Id.* Ex. 2 117:11-13; *id.* Ex. 11 (excerpts of deposition of Maura Rush) 97:19-22.  As Mr. Dillon testified, it is appropriate to include time of less than 15 minutes spent completing daily timesheets within the tasks being recorded, and this time is "appropriately charged to a chargeable code."  *Id.* Ex. 2 113:7-12, 125:18 – 126:2; *accord id.* Ex. 10 54:22 – 55:3; *id.* Ex. 11 92:8-10.

19. The process of reviewing the timesheets of Mr. Dillon's two direct reports, and of talking to them about any discrepancies with their timesheets, took him anywhere from 15 minutes to half a working day.  *Id.* Ex. 2 118:1 – 120:2.  According to Mr. Dillon, this time spent approving and reviewing timesheets for his direct reports should not be billed to a chargeable billing number.  *Id.* 125:18 – 126:12.  When Mr. Dillon charged this time to a nonbillable overhead number, however, he typically did not indicate whether the time was spent completing his own daily timesheet or reviewing and discussing the timesheets of his direct reports.  *See, e.g.*, McConnell Decl. Ex. 8.

20. During the period from January 1, 2011 through April 13, 2011, Mr. Dillon had charged overhead for "timekeeping" on 23 days and for "timekeepin" on 1 day.  *Id.*

21. An examination of the timesheets for eight other SAIC employees – Mr. Dobbs, Mr. Schmid, John Dart, Leroy Dominique, Ron Nicholas, Paul Lipscomb, Rusty Pasini and Ashley Marshall – reveals that none of these other employees had any "timekeeping" overhead charges during this period, or at any point during 2011.  *Id.* Exs. 9-16.

22. Throughout his career at SAIC, Mr. Dillon "never improperly billed [his] time," and "never would have knowingly permitted anyone else to mischarge their time."  Schwartz Decl. Ex. 2 106:9 – 107:3.

**April 2011 Communications Regarding Mr. Dillon's Timekeeping**

23. On April 13, 2011, Mr. Dobbs e-mailed Mr. Dillon and stated as follows:

> Mark, Please see me about 'timekeeping' overhead charges. My general impression is that this is an unnecessary overhead charge. This taken with your frequent floor check failures is alarming and requires immediate attention. Typically, accounting for your time charging is a part of the task...meaning 'I've worked these number of hours to be invoiced.' I don't understand how you can use one to ¾ hours to charging your time daily? We need to discuss. The amount of time you are charging to PMO should be sufficient?

*Id.* Ex. 12.

24. Mr. Dobbs' April 13 e-mail addressed only time spent by Mr. Dillon on his own timesheets; it did not address time spent by Mr. Dillon in overseeing his subordinates' timekeeping. Schwartz Decl. Ex. 2 131:7-9 (Mr. Dillon admitting that Mr. Dobbs does not "refer to anybody else's time" but Dillon's in this e-mail). Mr. Dobbs did not instruct Mr. Dillon to charge the time spent "chasing down other people" about their timesheets to a client-billable number. *Id.* 126:15-20.

25. Mr. Dillon acknowledged that there was "nothing wrong" with Mr. Dobbs asking Mr. Dillon to discuss these timekeeping issues. *Id.* 131:10-13. It is part of an SAIC manager's job to maintain oversight of his direct reports and to follow up with them if they are late in submitting their timesheets. *Id.* 105:11-21. Mr. Dillon himself "regularly" followed up with his own direct reports when they failed to submit their timesheets on time. *Id.* 108:7-20, 109:1-7. And in his experience, Mr. Dillon had never seen his own direct reports record 45 minutes to an hour to overhead for timekeeping activities. *Id.* 131:14-20.

26. On April 14, 2011, Mr. Dillon e-mailed Scott Sorensen, SAIC's Deputy Director for Strategic Regulatory Finance, to confirm whether it was proper for him to charge overhead for any period of *15 minutes or more* in which he was performing timekeeping duties, including time spent administering his own timecard, and administering the timesheet process for his direct reports. *Id.* Ex. 13. Mr. Sorensen replied, "You have been correctly charging your time to overhead for the time spent on the timesheet administration tasks." *Id.*

27. In this e-mail to Mr. Sorensen, Mr. Dillon did not explain any timecharging instructions he had received from management, nor did he even mention Mr. Dobbs. *Id.*; *id.* Ex. 2 134:4-11, 135:4-18; *id.* Ex. 10 115:20 – 116:4. He also did not complain in this e-mail that he believed he had received improper timecharging instructions. *Id.* Ex. 2 137:14-17; *id.* Ex. 13; *see also id.* Ex. 10 116:5-13 (Mr. Sorensen explaining that he did not interpret Mr. Dillon's April 14, 2011 e-mail as one in which he was "expressing a concern" or "making a complaint" about timecharging). This was Mr. Dillon's "one and only communication" with Mr. Sorensen.[6] *Id.* Ex. 2 133:6-9.

28. On April 28, 2011, Mr. Dobbs wrote two e-mails to Mr. Dillon with the subject line "Time Charging." The first, sent at 6:00 p.m., stated:

> I'm still having issues with why you charge OH [overhead] to complete you[r] timecard? Accounting for you[r] time is part of the task area you work. That time to record you[r] effort can be invoiced. We need to review you[r] rationale for using OH to complete your timecard. Let's discuss and fix.
>
> Please review https://issaic.saic.com/policy/ah/SC/02.html

---

[6] Although Mr. Dillon alleged in Paragraph 47 of his Complaint that he e-mailed Mr. Sorensen, "explaining . . . the instructions from Mr. Dobbs," Mr. Dillon admitted in deposition that this was "not an accurate statement," and that he did not "complain[] to Mr. Sorensen that [he] believed [he was] receiving improper instructions." Schwartz Decl. Ex. 2 134:17 – 135:18, 137:14-17.

*Id.* Ex. 14.  The hyperlink provided in Mr. Dobbs' e-mail was a link to the SAIC timekeeping policy on the company's intranet site.  *Id.* Ex. 2 144:8-12; McConnell Decl. Ex. 17.  Dobbs' second e-mail, sent at 6:05 p.m., stated:

> Just clarification .... I noted that part of you[r] time was cleaning up e-mail ... How much of that was related to NSF related or PMO related activities? Training is ok .... Is this mandatory training? BD [business development] is BD.

Schwartz Decl. Ex. 14.

29. Like the April 13 e-mail, there is nothing in the text of either of these April 28 e-mail messages from Mr. Dobbs that instructs Mr. Dillon to charge time incorrectly.  *Id.* Ex. 2 143:3-5.  And, Mr. Dobbs' instruction that the "time to record your effort can be invoiced" is a correct statement of policy.  *Id.* 141:12-17.

30. Mr. Dillon could not recall any other written communications he had with Mr. Dobbs regarding timekeeping issues, aside from Mr. Dobbs' e-mails of April 13 and 28, 2011.  *Id.* 196:15-21.

31. On the morning of April 29, 2011, after receiving Mr. Dobbs' e-mail of April 28, Mr. Dillon approached Mr. Dobbs and offered to show him Mr. Sorensen's April 14 e-mail stating that Mr. Dillon's overhead charges for timekeeping activities in excess of 15 minutes were consistent with SAIC policy.  *Id.* 146:20 – 147:17, 196:22 – 197:7.  Mr. Dobbs told Mr. Dillon that he did not need to see the e-mail from Mr. Sorensen (*id.* 197:8-10; *see also id.* Ex. 3 87:3-6, 101:4-19), and according to Mr. Dillon, Mr. Dobbs "made a face like he was displeased."[7]  *Id.* Ex. 2 197:19-20.  Mr. Dobbs "was fine with" the guidance Mr. Dillon had received from Mr. Sorensen; "I accepted [Mr. Dillon's] explanation and that was the end of the question. It ended the question I had about his personal timekeeping."  *Id.* Ex. 3 101:4-19.  During this conversation, Mr. Dobbs did not instruct Mr. Dillon to disregard Mr. Sorensen's timecharging guidance, nor did Mr. Dobbs give Mr. Dillon any improper timekeeping instructions.  *Id.* Ex. 2 199:11-16.

32. Mr. Dillon could not recall any other conversations with Mr. Dobbs about how to account for time spent on timecharging activities.  *Id.* 198:21 – 199:4; *see also id.* Ex. 3 106:3-20 (Mr. Dobbs testifying that this was the only conversation he and Mr. Dillon had about timecharging).

33. Following the above exchange with Mr. Dobbs, Mr. Dillon went to Donald Dixon, SAIC's Deputy Human Resources Director for the business unit, and told him that he thought his purported "demotion" was related to the "timecharging controversy" he had with Mr. Dobbs.  *Id.* Ex. 2 185:2-10, 186:13-19.  Mr. Dillon does not recall what he told Mr. Dixon about Mr. Dobbs' timecharging instructions, and does not recall telling Mr. Dixon that Mr. Dobbs had given him "unlawful instructions."  *Id.* 189:7-18.

---

[7] SAIC disputes that Mr. Dobbs made a face expressing displeasure during this conversation with Mr. Dillon, but SAIC will assume he did for purposes of this Motion.

34. Dorothy Aronson, then the acting Division Director for the National Science Foundation, observed Mr. Dobbs and Mr. Dillon interact on a daily basis between April 2011 and January 2012 and did not see any change in their interactions during this time period. *Id.* Ex. 15 (excerpts of deposition of Dorothy Aronson) 28:1-10.

**Ashburn Remediation Project**

35. On November 22, 2011, there was a major failure at the Research.gov data center in Ashburn, Virginia. *Id.* Ex. 2 234:18-21. There had been a similar failure at Research.gov in November of 2010. *Id.* 234:22 – 235:2. SAIC was "on thin ice" with the customer as a result of these failures. *Id.* 235:4-12.

36. After the November 22, 2011 outage at Research.gov, and in the interests of repairing the customer's view of SAIC, Lisa Daniels, SAIC Senior Vice President and Operations Manager responsible for the NSF program (who was Mr. Dobbs' supervisor, Daniels Decl. ¶ 3), announced that the work to remediate the outage (the "Ashburn Remediation" project) would not be charged to the NSF customer. *Id.* ¶ 4; Schwartz Decl. Ex. 2 236:17 – 237:1. Ms. Daniels' instruction was "perfectly appropriate and lawful." Schwartz Decl. Ex. 2 239:10-13.

37. Consistent with Ms. Daniels' instruction, Mr. Dobbs also instructed Mr. Dillon that remediation work was nonbillable. *Id.* Ex. 16; *id.* Ex. 2 244:9-14.

38. Mr. Dillon worked on a project related to contract compliance. *Id.* Ex. 2 241:19 – 242:14. According to Mr. Dillon, Mr. Dobbs subsequently told him that because "contract compliance [] would be of benefit to the government that we should charge it direct and not to the [nonbillable] remediation . . . project." *Id.* 245:7-17. Mr. Dillon testified that he told Mr. Dobbs that he "disagreed and thought it should be charged to the remediation number."[8] *Id.* 246:13-15. Mr. Dillon "didn't use the term 'improper'" with Mr. Dobbs, and does not recall Mr. Dobbs pressing the point after Mr. Dillon told him he disagreed. *Id.* 246:8 – 247:15.

39. Mr. Dillon stated in deposition that in early January 2012 he told Mr. Dixon that Mr. Dobbs had told him orally to charge direct for his contract compliance review in connection with the Ashburn remediation project. *Id.* 259:3-14, 260:9-16. And, while Mr. Dillon testified that he "generally discussed" during this conversation with Mr. Dixon "[g]etting defective direction on time charging," he could not say that he ever told Mr. Dixon that he had received "unlawful direction" from Mr. Dobbs. *Id.* 257:11-18.

40. Ms. Daniels did not immediately provide an unbillable charge number for the Ashburn Remediation project. *Id.* 239:17-19. Per SAIC policy, however, employees could hold time

---

[8] Mr. Dobbs denies that he ever instructed Mr. Dillon (or anyone else on the contract) to charge the customer for remediation work, but SAIC will assume Mr. Dobbs did so for purposes of this Motion.

worked on the project in suspense, or charge it to the contract and correct it later.  *Id.* 240:5-11.  Mr. Dillon chose the latter option.  *Id.* 240:16-20.

41. Mr. Dillon asked for an unbillable charge number that he could use for the Ashburn Remediation project.  *Id.* Exs. 17-19.  Ms. Daniels provided an unbillable number to him.  *Id.* Ex. 19; *id.* Ex. 2 241:2-4.  Neither Mr. Dobbs nor Ms. Daniels viewed Mr. Dillon's request for a charge number as a complaint about timecharging.  *See id.* Ex. 3 111:7-12 (Mr. Dobbs testifying that "[i]t wasn't a complaint. It was a request for a charge number."); Daniels Decl. ¶ 10 (explaining that Mr. Dillon never complained to her about timecharging).

42. Mr. Dillon never complained—orally or in writing—to Mr. Dobbs or Ms. Daniels that any directions related to timecharging for the Ashburn Remediation project were illegal or otherwise improper.  Schwartz Decl. Ex. 2 246:2-15, 247:9-12, 249:10-21, 251:14 – 252:6; *see also id.* Ex. 3 108:13-15 (Mr. Dobbs testifying that "Mark Dillon did not express concern about time charging and remediation to me"); *id.* 109:12-14 ( Mr. Dobbs testifying that "there was no expression or concern about time-charging irregularities to me prior to Mark Dillon being removed from the project"); Daniels Decl. ¶ 10.

**NSF Customer Complaints About Mr. Dillon's Performance on the Contract**

43. Colleen Coyne, an NSF IT Project Manager responsible for overseeing Mr. Dillon's work, thought that his work was of "[g]enerally poor quality."  Schwartz Decl. Ex. 1 6:5-13.  According to Ms. Coyne, Mr. Dillon "failed to produce documents on a regular basis, any artifacts that were requested of him.  He belabored points.  He fell asleep during meetings.  He was not a productive employee."  *Id.* 6:16-20.  She further testified that Mr. Dillon's "products were insufficient [and] his attention was lacking."  *Id.* 7:6-9.

44. Ms. Coyne "asked Harold [Dobbs] on several occasions to remove Mark [Dillon] from the project," "[b]ecause Mark's performance never improved. He continued to spend time in our meetings doodling.  He continued to not produce anything.  He continued to push work onto other people.  He continued to fail to produce."  *Id.* 7:6-17; *see also id.* 26:9-17.

45. Ultimately, Ms. Coyne asked Mr. Schmid to remove Mr. Dillon from the NSF engagement after her boss, Ms. Aronson, advised her to share her concerns with Mr. Schmid.  *Id.* 8:1-5; *see also id.* 25:10-21, 26:9-17; *id.* Ex. 15 44:4-13, 44:19-46:9; *id.* Ex. 20 (excerpts of deposition of Carsten Schmid) 210:10 – 211:16 (explaining that Ms. Coyne told him she "had enough of what Mark [Dillon] was working on," and that it was "clear to [Mr. Schmid] that she wanted Mr. Dillon off the NSF program.").

46. Mr. Dillon himself admitted to sleeping on several occasions during what he described as "repetitive, monotonous meetings" in which Ms. Coyne was present.  *Id.* Ex. 2 156:19 – 157:9, 280:4-20.  He further admitted to doodling during such meetings, though attempted to defend this conduct by saying doodling had "been shown by a journaled study of English medicine that when you're faced with repetitive, monotonous meetings, that doodling actually helps with your memory retention."  *Id.* 157:4-10; *see also id.* Ex. 3 242:16-19 (Mr. Dobbs noting that "[Mr. Dillon] was a habitual doodler. And he completely covered the agenda that I issued in doodles before the end of the meeting. Completely covered.").

47. Ms. Coyne testified that Mr. Dillon showed up to a meeting with her and two SAIC performance engineers, Christi Stanca and Dennis Legget, regarding the Capacity Plan and "[h]e did not have the capacity plan done. He wanted to talk about how he could use Christi and Dennis to get his capacity plan completed, that . . . he needed their help in order to do his job.  So we spent the next hour talking to Mark about when was the capacity plan going to be done.  And Mark spent the entire hour not answering that question." *Id.* Ex. 1 15:3-12.

48. After this meeting, Ms. Coyne "was absolutely frustrated, not only because the plan wasn't completed, the fact that he couldn't answer the question, and that he also wasted an entire hour of my time and two other contractors' time that NSF had to . . . pay for." *Id.* 15:14-19. She therefore approached Mr. Dobbs and told him she did not want Mr. Dillon working on Capacity Planning any longer, because "he had caused us an undue amount of money and time, and I wanted somebody else put on this project and Mark to be removed." *Id.* 18:9-15; *see also id.* Ex. 3 222:21 – 223:6 (Mr. Dobbs testifying that he removed Mr. Dillon from the Capacity Planning project in November 2011 after Ms. Coyne told him she thought Mr. Dillon "was delivering no value" and "did not want to work with him" on the project); *id.* Ex. 20 142:9-13 (Mr. Schmid testifying that Ms. Coyne told him that "she was very displeased with Mark's productivity," and that she did "not want him working on the capacity plan any longer."); *id.* Ex. 21.  Mr. Dillon himself acknowledged that he was removed from the Capacity Planning project in November 2011, because Ms. Coyne had been dissatisfied with his work on this project.  *Id.* Ex. 2 230:11-16, 274:22 – 275:5, *see also id.* Ex. 3 222:21 – 223:6.  And Mr. Dillon acknowledged that he would "butt heads" with Ms. Coyne regarding how best to accomplish this project.  *Id.* Ex. 2 45:20 – 46:15.

49. Ms. Coyne was also frustrated with Mr. Dillon's lack of progress on the CONOPS document. *Id.* Ex. 1 21:3-5.  As she explained, Mr. Dillon "produced several drafts along the way, which were incomplete or barely started . . . I was constantly bugging him to provide the document," because "it was overdue for so long." *Id.* 11:12-16.

50. Ms. Daniels was similarly frustrated by Mr. Dillon's lack of progress on the CONOPS document.  In a November 29, 2011 e-mail to Mr. Dillon, who by that time had been working on the CONOPS for seven months, Ms. Daniels noted that the CONOPS "seems to be taking considerably longer than expected[,]" and advised Mr. Dillon to "keep [the CONOPS] as simple as possible … and to complete the next phase as quickly as you can." *Id.* Ex. 22; Daniels Decl. ¶ 5.

51. In reflecting on the CONOPS himself, Mr. Dillon admitted that "under ideal circumstance[s] . . . it would have been done much sooner."  Schwartz Decl. Ex. 2 214:1-13.

52. Ms. Coyne also was unsatisfied with the draft of the CONOPS that Mr. Dillon submitted to NSF on January 11, 2011 (*see id.* Ex. 23), because, it was "a cut and paste from the statement of work and a cut and paste from the WBS, which is the work breakdown structure.  It does not go into detail about how anything is going to be done.  It just is an outline of what we asked him to provide." *Id.* Ex. 1 13:8-16.  Ms. Coyne was "extremely frustrated" to receive this draft, given how long Mr. Dillon had been working on this assignment. *Id.* 13:20 – 14:1.

53. Ms. Daniels also reviewed Mr. Dillon's final January 11, 2012 draft CONOPS and believed it was "worthless," and "nothing more than a cut-and-paste job." Daniels Decl. ¶ 8.

54. Mr. Dillon was in charge of the Backups project. Schwartz Decl. Ex. 2 173:20 – 174:3; *id.* Ex. 1 22:12-18. Ms. Coyne testified that he was involved in a "very contentious" meeting about the project with her and Ed Lubniewski, another Information Technology project manager at NSF who had responsibility for overseeing Mr. Dillon's work. *Id.* Ex. 1 21:13 – 22:8, 22:19-20. "Mark was pushing the solution that he was offering. Ed was rejecting it very specifically what he didn't like about it, which included RPS itself. He didn't support using RPS because they were too small of a company and Mark was insisting that this was the best solution." *Id.* 24:8-13. According to Ms. Coyne, it was not appropriate for Mr. Dillon to continue to argue with Mr. Lubniewski, who was the customer. *Id.* 24:17 – 25:5.

55. Several other NSF customers complained about Mr. Dillon's work on the contract.

    a)  Nikolas Ipiotis, the NSF Branch Chief, complained to both Mr. Dobbs and Mr. Schmid about Mr. Dillon. In particular, he told Mr. Schmid that he "did not appreciate receiving phone calls from third-party vendors such as Symantec citing to Mr. Ipiotis that they did not like the way Symantec employees were being talked to by Mr. Dillon. They quoted it lacked professionalism." *Id.* Ex. 20 142:17 – 143:5. Mr. Ipiotis also asked Mr. Dobbs to remove Mr. Dillon from technical discussions between several of the vendors, because he was "causing problems and contentions between the engineers in getting the backup problem resolved," and "hindering the work being done." *Id.* Ex. 3 178:9-16. Mr. Ipiotas also told Mr. Dobbs that "we won't need [Mr. Dillon] any more on the program." *Id.* 178:16-18.

    b)  Dorothy Aronson, then-Acting Director of IT Services at NSF, complained to Mr. Dobbs about Mr. Dillon. *Id.* Ex. 15 46:8-11 (Ms. Aronson explaining that she "had expressed frustration to Harold . . . about Mark's participation"); *see also id.* Ex. 3 177:8-20, 175:13-22, 176:7-21. Ms. Aronson also complained to Mr. Schmid in January 2012 that she was "not seeing the value" coming from Mr. Dillon. *Id.* Ex. 20 211:21 – 212:10. Ms. Aronson characterized working with Mr. Dillon on the data storage back up and recovery project as a "frustrating experience," *id.* Ex. 15 25:14-22, and noted his "pattern of not completing projects," *id.* 64:10-11. She also described the "continuous need to follow-up on taskings . . . in [Mr. Dillon's] court," *id.* 67:20 – 68:4, and the consistent pattern of Mr. Dillon failing to deliver satisfactory work product on time for longer term projects. *Id.* 60:15-20.

    c)  Ed Lubniewski, an IT Project Manager at NSF, complained to Mr. Dobbs that "Mark is not answering my questions. We've been talking about Backup As A Service and he's not giving me any additional information. He's not -- he's being very contentious. He's not answering my questions in terms of capacity." *Id.* Ex. 3 180:10-16; *see also id.* 181:1-16.

**Mr. Dillon's Removal from the NSF Program**

56. Mr. Dobbs was out of the office on vacation from approximately January 9-16, 2012. *Id.* Ex. 2 260:14-16. During that time, Mr. Schmid was the SAIC employee in charge of the NSF program. *Id.* Ex. 20 210:5-9.

57. In January 2012, Ms. Coyne told Mr. Schmid that she wanted Mr. Dillon removed from the NSF engagement: "And that's where I said, Carsten, get Mark off the project." *Id.* Ex. 1 8:1-5; *see also id.* Ex. 20 210:5 – 211:16 (Mr. Schmid explaining that Ms. Coyne "indicated to me that she had had enough of what Mark had been working on," that she was "talking to [her] contract folks about what [she could] do to have Mark removed from the program," and that it was "clear to him that she wanted Mr. Dillon off the NSF program."). This conversation took place on or about January 13, 2012. *See id.* Ex. 20 214:14-21.

58. The same day, Ms. Aronson told Mr. Schmid that she was "not seeing the value" coming from Mr. Dillon. *Id.* 211:21 – 212:15.

59. The following day, Mr. Schmid communicated to Ms. Daniels "exactly the sentiments that Ms. Coyne and Ms. Aronson shared with" him, including that the customer wanted Mr. Dillon "off the contract." *Id.* 214:22 – 215:3; 216:7-10; Daniels Decl. ¶ 7.

60. Ms. Daniels decided to remove Mr. Dillon based upon the customer complaints and after she herself reviewed the CONOPS document. Daniels Decl. ¶¶ 7-8 ("After hearing about the customer's specific request for Mr. Dillon's removal from the NSF program, their dissatisfaction with Mr. Dillon's performance on the program more generally, and reviewing Mr. Dillon's latest draft of the CONOPS document—a project on which he had been working since April 2011—which I deemed to be a worthless, and no more than a cut-and-paste from the Statement of Work, I decided to have Mr. Dillon removed from the program and to lay him off from SAIC.").

61. On January 17 or 18, 2012, Ms. Daniels told Mr. Dobbs to tell Mr. Dillon that he was being removed from the NSF program at the request of the customer and that he would be receiving a layoff notice. *Id.* ¶ 9.

62. Upon Mr. Dobbs' return from vacation, Mr. Dobbs told Mr. Dillon he was being laid off the program because the customer wanted him removed and because the customer did not see value in his work. Schwartz Decl. Ex. 2 303:19 – 304:4 (Mr. Dillon explaining that Mr. Dobbs said "that Ms. Daniels . . . had directed him to tell me that I would be laid off the program because the customer wanted me off," and because "the customer didn't see value in [my] work."); Daniels Decl. ¶ 8. This conversation occurred on either January 17 or 18, 2012. Daniels Decl. ¶ 8.

63. On January 19 and 26, 2012, Mr. Dillon told Mr. Dixon, the Deputy Human Resources Director for the business unit, that Ms. Daniels had directed Mr. Dobbs to tell him that SAIC was planning to remove him from the NSF program. Schwartz Decl. Ex. 2 271:2-10. Mr.

Dixon played no role in the decision to remove Mr. Dillon.  *Id.* Ex. 24 (excerpts of deposition of Donald Dixon) 172:8-11.

64. On January 27, 2012, Mr. Dobbs provided Mr. Dillon with a Notification of Layoff, indicating that "the customer has requested that you be removed from the program therefore your position is no longer available due to lack of work."  *Id.* Ex. 25. The Notification advised Mr. Dillon that unless he was able to secure another position within SAIC, his layoff would be effective February 24, 2012.  *Id.*  SAIC later agreed to delay his layoff date until April 9, 2012.  *Id.* Ex. 2 304:5-10.

65. Ms. Daniels was solely responsible for the decision to remove Mr. Dillon from the NSF program and to lay him off from SAIC.  Daniels Decl. ¶ 10; Schwartz Decl. Ex. 3 265:3-13; *see also id.* Ex. 24 172:12-14.

66. At the time Ms. Daniels made the decision to remove Mr. Dillon from the NSF program and to lay him off from SAIC, she was unaware of any complaints or concerns Mr. Dillon had purportedly raised previously to others at SAIC.  Daniels Decl. ¶ 10.

**Mr. Dillon's Post-Removal Complaints**

67. On January 25, 2012, after being notified of his removal from the NSF program, Mr. Dillon called Joel Andrews, the Deputy Chairman of the SAIC Employee Ethics Council, and raised concerns about timecharging practices on the NSF program.  Schwartz Decl. Ex. 2 306:2-6.

68. That same day, Mr. Dillon sent Mr. Andrews an e-mail detailing all of his purported concerns about timecharging.  *Id.* Ex. 26; *id.* Ex. 2 307:7-22.  These concerns fell in three main categories:  (1) alleged improper cross-charging between DCISS and Research.gov by SAIC employees and subcontractors, (2) Mr. Dobbs' alleged instruction to charge time spent on overhead to a billable number, and (3) timecharging for remediation, and, specifically, the alleged instruction from Mr. Dobbs that this work "was to be charged to DCISS 'because it would benefit' the [g]overnment," and Ms. Daniels' alleged instruction to minimize the number of unbillable hours on the project.  *Id.* Ex. 26 at SAIC_0099039.

69. Mr. Dillon did not raise any concerns about cross-charging (category 1) until after he had been told he was being removed.  *Id.* Ex. 2 259:20 – 260:8, 308:1 – 310:15.

70. Mr. Dillon alleged in his January 25, 2012 e-mail to Mr. Andrews that previously, he "ha[d] brought up the subject of proper timecharging on two occasions," referring to overhead timecharging (category 2) and timecharging for remediation (category 3).  *Id.* Ex. 26 at SAIC_0099039; *id.* Ex. 2 309:18 – 310:5.  But, he never actually complained about anything purportedly improper or illegal with respect to either of these issues before this January 25 e-mail.  *See supra* ¶¶ 27, 38, 42.

71. This was the first time Mr. Dillon had raised these timecharging concerns to anyone on SAIC's Employee Ethics Council.  Schwartz Decl. Ex. 2 306:15 – 307:6.  In addition, Mr. Dillon never complained about timecharging to the NSF.  *Id.* Ex. 15 28:11-14.

72. The Employee Ethics Council subsequently initiated an investigation into the concerns raised by Mr. Dillon.  Maura Rush investigated Mr. Dillon's purported concerns of retaliation, unfair termination and hostile work environment, and Lynn Oakes investigated the allegations concerning contractual aspects of Mr. Dillon's time charging complaints.  *Id.* Ex. 11 25:5 – 19, 26:21 – 27:5, 27:16-21; McConnell Decl. Ex. 18.  Ms. Rush found Mr. Dillon's concerns to be invalid, as did Mr. Oakes.  Schwartz Decl. Ex. 11 103:17 – 104:3,110:1-3; McConnell Decl. Exs. 18-19.

73. The NSF did not find any discrepancies in SAIC's invoices.  Schwartz Decl. Ex. 27 (excerpts of deposition of Paul Hughes) 25:4 – 26:2.

**Mr. Dillon's Search for New Employment**

74. There is "no evidence" that any of the hiring managers for the SAIC jobs to which Mr. Dillon applied after his removal from the NSF program had any knowledge of the alleged "complaints" he had made or "concerns" he had raised about timecharging, or that they rejected him on that basis.  *Id.* Ex. 2 295:6-18.

75. On March 23, 2012, Mr. Dillon accepted a new job with STG, making $170,000 per year.  *Id.* Ex. 28; *id.* Ex. 2 328:3-14, 329:17-19.  Mr. Dillon did not inform SAIC until April 9, 2012, the day he began work at STG, that he had another job; he "wanted to stay on paid leave from SAIC while [he] traveled out of the country."  *Id.* Ex. 2 325:22 – 326:12, 328:15-22; *id.* Ex. 29.

## STANDARD OF REVIEW

Summary judgment is warranted when there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the summary judgment stage, the district court has "the affirmative obligation [ ] to prevent factually unsupported claims and defenses from proceeding to trial," and must ask, when an issue is contended to be in dispute, "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

Plaintiff claims to have been discharged or otherwise discriminated against in retaliation for engaging in protected activity under the FCA.  The FCA is a statutory scheme designed to

discourage fraud against the United States government.  *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 342 (4th Cir. 2010).  The "cornerstone provision" of the FCA makes it unlawful for any person to present "'a false or fraudulent claim for payment or approval'" to the United States.  *Id.* at 342-43 (quoting 31 U.S.C. § 3729(a)(1)(A)).

Congress amended the FCA in 1986, adding an anti-retaliation provision to protect whistleblowers.  False Claims Amendments Act of 1986, Pub.L. No. 99–562, § 4, 100 Stat. 3153, 3157-58 (1986).  The anti-retaliation provision prevents employees from being "discharged, . . . suspended, . . . or in any other manner discriminated against" by an employer because of "acts done by the employee [ ] . . . in furtherance of [a qui tam ] action under this section."  31 U.S.C. § 3730(h)(1).  The purpose of this provision is to promote FCA enforcement by "assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts."  *Mann*, 630 F.3d at 343 (quoting S. Rep. No. 99–345, at 34 (1986), *reprinted in* 1986  U.S.C.C.A.N. 5266, 5299.  Activities protected include "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section."  S. Rep. No. 99–345, at 34.

As the Fourth Circuit has explained, to defeat summary judgment on his FCA anti-retaliation claim, Mr. Dillon must establish a genuine issue of material fact such that a reasonable jury could find (1) that he took acts in furtherance of a *qui tam* suit (the "protected activity" element); (2) that SAIC knew of those acts (the "notice" element); and (3) that SAIC took adverse action against him as a result of these acts.  *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010); *see also Mann*, 630 F.3d at 343.

Mr. Dillon cannot meet his burden with respect to any of these three elements.  As outlined below, it is abundantly clear, to the point that no reasonable jury could find otherwise, that, prior to being notified of his removal from the NSF contract, Mr. Dillon did not engage in protected activity, nor did SAIC officials have any notice that Mr. Dillon was acting in furtherance of a potential FCA claim.  Furthermore, even if Mr. Dillon could somehow satisfy the protected activity and notice elements, SAIC did not take any adverse actions against Mr. Dillon *as a result of* his purported protected activity.  As the record evidence makes demonstrably clear, Mr. Dillon's purported "demotion"—which, in actuality was a reassignment to lead the Single Integrated Operations project—was based on legitimate business reasons, and his removal from the NSF program and his layoff were driven entirely by the customer's request to have Dillon removed.

Mr. Dillon's claims have no merit, and SAIC is entitled to summary judgment.

## I.    Plaintiff Did Not Engage In Protected Activity, Nor Was SAIC On Notice Of A Potential FCA Claim.

To constitute protected activity under the FCA, an employee must meet what the Fourth Circuit refers to as "the distinct possibility standard."  *Mann*, 630 F.3d at 344.  "Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'"  *Id.* (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999).  "The relevant facts under the distinct possibility standard are not what [the plaintiff] now knows.  Rather, they are what [the plaintiff] knew at the time of the protected conduct."  *Id.* at 345.

The "'distinct possibility' standard serves a gatekeeping function" (*Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 403-04 (D. Md. 2011)); it includes only "situations in which

15

litigation could be filed legitimately" and excludes those in which "an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof." *Mann*, 630 F.3d at 344 (internal quotation marks omitted) (elipses in original); *see also Eberhardt*, 167 F.3d at 868 ("The investigation must concern false or fraudulent claims, or it does not fall under the False Claims Act.").

In order to meet the notice element of an FCA retaliation claim, an employee must show that the employer was "on notice that a *qui tam* suit under section 3730 [was] a reasonable possibility." *Eberhardt*, 167 F.3d at 868; *see also Mann*, 630 F.3d at 344; *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998) ("[u]nless the employer is aware that the employee is investigating fraud, ... the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h).") (alteration in original).

To satisfy the protected activity and notice elements, which are closely related,[9] Plaintiff must demonstrate that he has done more than "[s]imply report[] his concern of a mischarging to the government to his supervisor . . . ." *Zahodnick v. IBM*, 135 F.3d 911 (4th Cir. 1997).  He must exhibit some external expression of his belief that he was investigating or internally reporting an *illegal* or *fraudulent* charge by SAIC.  *See Eberhart*, 167 F.3d at 868.  One way an employee shows this is to outwardly "characterize[e] the employer's conduct as illegal or fraudulent or recommend[] that legal counsel become involved," which shows both that the employee believed something illegal or fraudulent might be occurring *and* would put a reasonable employer on notice of such a distinct possibility.  *Id.*  The Fourth Circuit recently

---

[9] The Fourth Circuit has approved of addressing the protected activity and notice elements together, where both elements are in dispute, as they are in this case.  *Mann*, 630 F.3d at 344. The Fourth Circuit explained, however, that approaching these two elements together involves examining the same actions under two separate lenses—the perspective of the employee (for the protected activity element) and the employer (for the notice element).  *Id.*

distinguished between the situation where an employee's complaints "were clearly couched in terms of *concerns* and *suggestions*," and thus did not qualify protected activity, and one in which there were "threats or warnings of FCA litigation" sufficient to satisfy the protected activity element. *United States ex rel. Parks v. Alpharma, Inc.*, No.11-1498, 2012 WL 3291705, at *8 (4th Cir. Aug. 14, 2012) (emphases added) (citing *Zahodnick*, 135 F.3d at 914).

Mr. Dillon's pre-layoff conduct never rose to the level of protected activity, nor did his actions put SAIC on notice of that he was acting in furtherance of a potential FCA claim. Indeed, a careful examination of Plaintiff's factual allegations reveals that at most, Plaintiff raised nothing more than "concerns and suggestions" (*see Parks*, 2012 WL 3291705, at *8) about SAIC's time charging practices; there is no evidence in the record that would plausibly support the conclusion that he was acting "in furtherance of" a *qui tam* action by reporting fraud against the Government.  In fact, the evidence "provides every indication that [Mr. Dillon] was not thinking about fraud and that his actions were entirely quotidian." *Owens*, 612 F.3d 736. There is similarly no evidence that Mr. Dillon put the company on notice that FCA litigation was a "distinct possibility."

Below, SAIC details Mr. Dillon's alleged protected activity.

**A.     Mr. Dillon Did Not Engage in Protected Activity By Asking Routine Questions About Accounting For Timekeeping Activities And Did Not Put SAIC On Notice Of A Potential FCA Claim.**

**1.     Communications with Scott Sorensen**

In his Complaint, Mr. Dillon alleged that he "report[ed] . . . illegal acts" (Compl. ¶ 140) and "expressed his concerns" about "serious accounting and technical issues related to timekeeping and contracting" to Mr. Sorensen (*id.* ¶ 40).  In deposition, however, Mr. Dillon admitted that he had only one communication with Mr. Sorensen, an April 14, 2011 e-mail, and that this e-mail did not explain to Mr. Sorensen any timecharging instructions he had received from

management, nor did he even mention Mr. Dobbs, much less offer any complaints. *See supra* ¶¶ 26-27.  It is now undisputed that Mr. Dillon did not complain in his April 14, 2011 e-mail to Mr. Sorensen that he believed he had received improper timecharging instructions; instead, he simply asked an innocuous question. *See supra* ¶ 27.  Accordingly, there is no possible way a jury could find that this e-mail communication qualified as protected activity.

Because Mr. Dillon admitted that this April 14, 2011 e-mail was his "one and only communication" with Mr. Sorensen, and that in this e-mail he did not "report" or "express[] his concerns" about any timecharging instructions, it is not surprising that Mr. Sorensen did not view Mr. Dillon's April 14, 2011 e-mail as one in which he was "expressing a concern" or "making a complaint" about timecharing. *See id*.  For the same reasons, no reasonable jury could find that this e-mail was sufficient to put Mr. Sorensen or SAIC on notice that Mr. Dillon was contemplating or acting in furtherance of a *qui tam* action; there is not even the faintest suggestion of that.

### 2.    Communications with Harold Dobbs

Mr. Dillon's purported concerns about Mr. Dobbs' instructions related to accounting for timecard administration activities fall into two categories:  (1) three e-mails from Mr. Dobbs to Mr. Dillon—one on April 13, 2011 and two on April 28, 2011—and (2) one oral conversation between them on April 29, 2011.

Mr. Dillon now concedes that Mr. Dobbs' April 13 and 28, 2011 e-mails (the only e-mails from Mr. Dobbs that Mr. Dillon alleged in his Complaint contain improper timekeeping instructions) do not contain any improper instructions. *See supra* ¶¶ 24-25, 29.  In the April 13 e-mail, Mr. Dobbs was simply raising his concern about Mr. Dillon's perpetually late timesheets, and asking why he was charging 45 minutes to an hour each day to overhead to complete his personal timecard. *See supra* ¶ 23.  Indeed, by Mr. Dillon's own admission, there was "nothing

wrong" with Mr. Dobbs asking Mr. Dillon to discuss these timekeeping issues. *See supra* ¶ 25.

Mr. Dillon himself "regularly" followed up with his own direct reports when they failed to

submit their timesheets on time, and never saw his direct reports take 45 minutes to an hour to

complete their timesheets each day. *See id.* In Mr. Dobbs' April 28 e-mails, he provided Mr.

Dillon with a hyperlink to the SAIC timekeeping policy on the company's intranet site,

suggesting that Mr. Dillon review that policy to ensure compliance. *See supra* ¶ 28. Nothing in

any of these e-mails instructs Mr. Dillon to charge the customer for time spent administering

timesheets for his direct reports; Mr. Dobbs' e-mails refer only to the time it was taking Mr.

Dillon to complete his personal timecard. *See supra* ¶ 29. And, Mr. Dillon himself admits that

he spent less than 15 minutes doing his personal timecard, and that the time spent on this is

properly charged to the customer. *See supra* ¶ 18. Thus, there is nothing improper about Mr.

Dobbs' April 13 and April 28 e-mails to Mr. Dillon.

In the one and only conversation Mr. Dillon had with Mr. Dobbs about how to account

for time spent on timecharging activities, Mr. Dillon does not even allege facts that would

amount to protected activity, nor is there any such evidence in the record. *See supra* ¶¶ 31-32.

After receiving Mr. Dobbs' April 28, 2011 e-mail about overhead charges for timekeeping

activities, Mr. Dillon approached Mr. Dobbs and offered to show him Mr. Sorensen's April 14,

2011 e-mail stating that Mr. Dillon's overhead charges for timekeeping activities taking 15

minutes or longer were consistent with SAIC policy. *See supra* ¶ 31. Mr. Dobbs said there was

no need for him to see the e-mail, and according to Mr. Dillon, Mr. Dobbs "made a face like he

was displeased." *Id.* Even if Mr. Dobbs did make a face at Mr. Dillon, which SAIC disputes,

Mr. Dillon concedes that Mr. Dobbs did not instruct him to disregard Mr. Sorensen's guidance,

nor did Mr. Dobbs instruct Mr. Dillon to do anything improper with respect to timekeeping. *Id.*

Further, Mr. Dillon alleges that "the discussion ended with Mr. Dillon indicating he had no choice but to follow correct timekeeping policy." Compl. ¶ 52. Indeed, Mr. Dobbs felt he did not need to see the e-mail from Mr. Sorenson because he accepted Mr. Dillon's explanation and considered the issue to have been resolved. *See supra* ¶ 31.

Plaintiff fails to allege, nor is there any evidence to even suggest, that he complained to Mr. Dobbs that charging the customer for timecard administration was illegal or fraudulent. Even under the most generous reading of the interaction described above, Mr. Dillon never took a step over the line from "concerns" to the "threat[ening]" of FCA implications. *Parks*, 2012 WL 3291705, at *8.

Furthermore, since Mr. Dobbs was not giving improper instructions in the first instance, Mr. Dillon could not be engaging in protected activity by questioning it, as there was no "distinct possibility" of litigation flowing from a non-fraudulent instruction from his supervisor. As the Fourth Circuit has explained: "The FCA's scope is commensurate with its purpose. It covers only fraudulent claims against the United States; without fraud, there can be no FCA action." *See Mann*, 630 F.3d at 345-46. In *Mann*, the Court affirmed summary judgment for the employer, holding that plaintiff did not engage in protected activity by voicing his opposition to his employer's non-fraudulent bid strategy. *Id.* at 345-47. Because there was no fraud, "there was no reasonable possibility that his efforts could lead to a viable FCA action." *Id.* at 345. Likewise, "[i]t was unreasonable . . . to expect opposition to such a bid to lead to a viable FCA action." *Id.*

Because Mr. Dobbs' e-mails were perfectly appropriate, *see supra* ¶¶ 24-25, 29, Mr. Dillon has "simply fail[ed] to tie his opposition to fraudulent behavior" on the part of Mr. Dobbs or SAIC. *Mann*, 630 F.3d at 347. Accordingly, Mr. Dillon cannot meet the protected activity

element of an FCA anti-retaliation claim because there was no distinct possibility of a claim arising from non-fraudulent actions by his employer. *See id.* at 345; *Eberhardt*, 167 F.3d at 868; *supra* ¶ 73 (the NSF found no discrepancies in SAIC's invoices); *supra* ¶ 72 (explaining that Mr. Oakes, who investigated the concerns about improper timecharging Mr. Dillon raised with the Employee Ethics Council, concluded in a written report that no improper timecharging occurred and that Mr. Dillon's concerns were invalid).[10]

Plaintiff also cannot meet the notice element. "This Court has focused on whether an employee specifically warned an employer of the possibility of a civil action, as opposed to merely highlighting illegal behavior." *United States ex rel. Martinez v. Va. Urology Ctr., P.C.*, No. 09-442, 2010 WL 3023521, at *6 (E.D. Va. July 29, 2010). Here, Mr. Dillon was not even "highlighting illegal behavior"; there is no evidence that he even *suggested* or *implied* illegality or fraud on the government, let alone warn anyone that he was contemplating initiating a *qui tam* suit. *See supra* ¶ 39 (Mr. Dillon admitting that he could not recall ever telling Mr. Dixon that Mr. Dobbs' timecharging instructions were "unlawful"). Furthermore, as in *Owens*, there is no evidence that Mr. Dobbs or SAIC believed that Mr. Dillon was attempting to uncover a fraud. 612 F.3d at 736 (affirming summary judgment for employer). In fact, all evidence on this point is to the contrary, as Mr. Dobbs did not even view Mr. Dillon as making a complaint about

---

[10] Mr. Oakes concluded that Mr. Dillon's concerns about inappropriate timecharging on the NSF program—including his concerns about alleged cross-charging and timecharging on the Ashburn Remediation project—were "not valid." Schwartz Decl. Ex. 19 at SAIC_0098903, SAIC_0098906 – 0098909. Mr. Oakes did find that, to the extent Mr. Dillon contended that Mr. Dobbs instructed him to charge time of 15 minutes or more spent on timecard maintenance to a billable number, this was not correct. *Id.* at SAIC_0098903 – 0098904, SAIC_0098908 - 0098909. Mr. Oakes, however, reviewed Mr. Dillon's timecharges and did not find any inappropriate timecharging. *Id.* at SAIC_0098903 – 0098905, 0098909. Moreover, as noted above, Mr. Dillon admitted that Mr. Dobbs' April 2011 e-mails to him about accounting for timecard administration did not contain "improper" instructions, and further admitted that Mr. Dobbs never gave him any "improper" instructions about this orally. *See supra* ¶¶ 24-25, 29.

timecharging (*see supra* ¶ 42); he could not have reasonably believed that Mr. Dillon was investigating a fraud.

Accordingly, Mr. Dillon could not plausibly convince a jury that Mr. Dobbs or SAIC were on notice that he was investigating a potential fraud on the government by offering to show Mr. Dobbs the workaday e-mail Mr. Dillon received from Mr. Sorenson. *Cf. Eberhardt*, 167 F.3d at 869 (concluding that the notice element was met where the evidence showed that plaintiff had characterized the billings at issue as illegal during the course of his investigation, and that he advised his employer's majority owner to obtain counsel for himself and the company). And, "[w]ithout evidence of any knowledge on the part" of Mr. Dobbs or SAIC, Mr. Dillon "cannot establish the necessary causal connection between the alleged protected activity" and any adverse employment action. *Zahodnick*, 135 F.3d at 914.

     **B.**     **Dillon's Remediation Charging Questions Involved No Protected Activity And Did Not Put SAIC On Notice Of A Potential FCA Claim.**

Mr. Dillon's deposition testimony similarly demonstrates that he did not engage in any conduct with respect to timecharging on the Ashburn Remediation project that rose to the level of protected activity or that could have put SAIC on notice that *qui tam* litigation was a reasonable possibility.

After the November 22, 2011 outage at Research.gov, both Ms. Daniels and Mr. Dobbs told employees that the time spent remediating the outage would not be charged to the customer. *See supra* ¶ 35. This was a customer relations decision—SAIC would fix the problems at its own expense—and there is no evidence to suggest that, if it had chosen to do so, SAIC would have been legally prohibited from charging for its remediation work. *See supra* ¶ 36. Mr. Dillon said that SAIC's direction was a "perfectly appropriate and lawful" instruction. *See id.* However, Mr. Dillon testified that Mr. Dobbs later told him orally to charge the client for the

contract compliance review with which he assisted, and that Mr. Dillon told Mr. Dobbs he disagreed with this instruction.  *See supra* ¶ 38.

It is important to remember that the "FCA is intended to protect the treasury against the claims of unscrupulous contractors, not to penalize employee disagreements over matters of commercial judgment."  *Glynn*, 807 F. Supp. 2d at 407 (citing *Owens*, 612 F.3d at 734).  And, while SAIC disputes that Mr. Dobbs ever instructed Mr. Dillon to charge for Mr. Dillon's work on the contract compliance review, even assuming he did, the dispute is immaterial because Mr. Dillon concedes that during this purported exchange he never told Mr. Dobbs that this instruction was "improper," and does not recall what Mr. Dobbs said when he raised it.  *See supra* ¶ 38. Mr. Dillon further admitted that he *never* complained to Mr. Dobbs or Ms. Daniels that any of the directions regarding remediation timecharging were illegal or otherwise improper.  *See supra* ¶ 42.  By Mr. Dillon's own admission, therefore, he failed to engage in protected activity here. *See Owens*, 612 F.3d at 735 ("For activity to rise above the level of ordinary critique and constitute a step in preparation for an FCA claim, there must be some suggestion of impropriety or illegality by the employer that the employee is attempting to uncover.").

Mr. Dillon also stated in deposition that in early January 2012 he told Mr. Dixon that Mr. Dobbs had told him to charge the customer for his contract compliance review on the Ashburn Remediation project.  *See supra* ¶ 39.  But, Mr. Dillon admitted that he had never mischarged his time, *see supra* ¶ 22, and could not say that he ever told Mr. Dixon that he had received "unlawful direction" from Mr. Dobbs.  *See supra* ¶ 39.  And, in the Fourth Circuit, "[s]imply reporting [a] concern of a mischarging to the government" does not amount to protected activity. *Zahodnick*, 135 F.3d at 914.

Mr. Dillon's requests to Mr. Dobbs, Mr. Schmid and Ms. Daniels for an unbillable charge number for remediation work could not possibly qualify as protected activity; they were merely routine questions about the correct way to charge his time.  Mr. Dillon does not even allege, nor is there any evidence, that Mr. Dillon was complaining to his superiors about anything here; he was merely asking an innocuous question, to which he received a perfectly appropriate answer— i.e., he asked for the nonbillable number and it was provided to him.  *See supra* ¶¶ 41-42.  Such questions do not come close to even hinting at fraud and thus cannot plausibly qualify as protected activity under the FCA's anti-retaliation provision.  *See Mann*, 630 F.3d at 345-46.

For the same reasons, neither Mr. Dillon's "disagreement" with Mr. Dobbs about his alleged instruction to charge for remediation work, his conversation with Mr. Dixon about  Mr. Dobbs' alleged instruction, nor his request to Mr. Dobbs, Mr. Schmid and Ms. Daniels for an unbillable charge number could reasonably have put SAIC on notice that *qui tam* litigation was a reasonable possibility.  And there is no evidence whatsoever that Mr. Dobbs, Ms. Daniels, Mr. Dixon or anyone else at SAIC actually believed that Mr. Dillon was attempting to uncover a fraud by these workaday communications.  *See supra* ¶ 42.  Indeed, Mr. Dillon's "complaints"— to the extent he made any—were clearly couched in terms of "concerns and suggestions," not "threats or warnings of FCA litigation."  *Parks*, 2012 WL 3291705 at *8-9 (affirming summary judgment for employer where plaintiff failed to satisfy the notice prong of her FCA retaliation claim).  Mr. Dillon cannot possibly satisfy the notice element here.

### C.    Mr. Dillon's Post-Removal Complaints Could Not, Of Course, Have Caused His Removal, And Therefore Need Not Be Analyzed.

Although Mr. Dillon expressed concerns about timecharging in his January 25, 2012 complaint to SAIC's Employee Ethics Council (*see supra* ¶¶ 67-68), the Court need not perform an analysis of whether this complaint rose to the level of protected activity or put SAIC on notice

that *qui tam* litigation was a reasonable possibility.  *See, e.g.*, *United States ex rel. Scott v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 646 (W.D. Mich. 2005), *aff'd*, 234 F. App'x. 341 (6th Cir. 2007 (holding that Plaintiff did not satisfy the protected activity prong, because what would otherwise have qualified as protected activity admittedly occurred after the decision to terminate her).  Because Mr. Dillon admits that he knew he was being removed from the NSF contract at the time he complained to the Employee Ethics Council, *see supra* ¶ 67, it is a factual impossibility for his removal to have happened "as a result of" his complaint to Ethics.  *See Tolman v. Am. Red Cross*, --- F.Supp.2d ----, No. 10-628, 2012 WL 892312, at *6 (D. Idaho Mar. 14, 2012) (dismissing plaintiff's FCA whistleblower claim, because, *inter alia*, the plaintiff could not have been fired as a result of complaining about missing funds, given that he did not make any such complaint until after he was fired).

## II.    Mr. Dillon Suffered No Adverse Employment Actions As A Result Of Any Protected Activity.

Mr. Dillon's Complaint identifies two adverse employment actions which he alleges were retaliatory:  (1) his "demotion" when his two subordinates (Messrs. Pasini and Lipscomb) were re-assigned and he was tasked with leading the Single Integrated Operations project and accompanying CONOPS, *see* Compl. ¶¶ 53-54, and (2) his removal from the NSF contract, *see id.* ¶¶ 86-87.  The undisputed facts establish that even assuming Mr. Dillon engaged in protected activity and did provide notice of potential FCA litigation (which he did not), neither his "demotion" nor his removal had anything whatsoever to do with such protected activity.  Mr. Dillon was no victim of retaliation.

**A.     Mr. Dillon's "Demotion" Was Not An Adverse Employment Action And, In Any Event, It Occurred Before Mr. Dillon Approached Mr. Dobbs About Timecharging For Timekeeping Activities.**

As an initial matter, Mr. Dillon's reassignment was not an adverse employment action.  It is undisputed that Mr. Dillon received the same salary and had the same title, and he received the same benefits:  all that he has pointed to is that he felt like it was a demotion.[11]  *See supra* ¶¶ 10-11; *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004) (holding that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position") (internal quotation marks and alteration omitted).

Moreover, Mr. Dillon's reassignment was justified by legitimate business reasons.  While Mr. Dillon had some responsibilities shifted, he acknowledged that this was a temporary re-assignment, and otherwise that there were business justifications for it:  Mr. Dillon's subordinates suggested that they need not be under his supervision and Mr. Dillon had complained about being underutilized.  *See supra* ¶¶ 5-6.  Mr. Dobbs also believed Mr. Dillon was the best person to take on the Single Integrated Operations project and accompanying CONOPS, an important new initiative on the NSF program.  *See supra* ¶ 8.  And there is no evidence of retaliatory animus on the part of Mr. Dobbs.  Indeed, NSF Acting Division Director Dorothy Aronson, who observed Mr. Dobbs interact with Mr. Dillon on a daily basis, saw no change in their interactions during this time period.  *See supra* ¶ 34.

Finally, Mr. Dillon's argument for causation fails by its own terms.  In his Complaint, Mr. Dillon alleged that "on April 29, 2011, without warning … Mr. Dobbs demoted Mr. Dillon

---

[11]   Furthermore, Mr. Dillon has not offered and could not offer any evidence that any change in his responsibilities had "a 'significant detrimental effect' on his opportunities for promotion or professional development."  *James*, 368 F.3d at 376.

from his managerial position on the project. He told Mr. Dillon that his sole assignment was to create a 'Single Integrated Operations' project and an accompanying Concept of Operations ('CONOPS') document."  Compl. ¶ 53.  At his deposition, however, Mr. Dillon admitted that this allegation was untrue and that he was not surprised by receiving this reassignment on April 29, because, he had actually discussed his reassignment with Mr. Dobbs and Mr. Schmid on April 27, prior to his April 29 conversation with Mr. Dobbs regarding Mr. Sorenson's e-mail about overhead timekeeping charges.  *See supra* ¶ 8.  Therefore, the decision to task him with the Single Integrated Operations and CONOPS projects came *before* the April 29 exchange with Mr. Dobbs, making it impossible for that exchange to have motivated Mr. Dobbs' decision to give him that assignment.  *Id*.  It is therefore demonstrably clear that Mr. Dillon's purported "demotion" did not occur "as a result of" any protected activity, and no reasonably jury could find otherwise.  *See Owens*, 612 F.3d 724, 735.

### B.      The Decision To Remove Mr. Dillon From The NSF Program Was In No Way Connected To Mr. Dillon's Alleged Protected Activity.

Mr. Dillon has not a shred of evidence to support a finding that he was removed from the NSF contract in retaliation for making complaints about timecharging.  Rather, the overwhelming evidence adduced in discovery plainly establishes that Mr. Dillon was removed from the NSF at the request of a government customer that had grown increasingly frustrated and disappointed with Mr. Dillon's performance on the contract.  There is plainly no triable issue of material fact on this issue either.

Ms. Daniels made the decision to remove Mr. Dillon from the contract after the following series of events.  On or about January 13, 2012, while Mr. Dobbs was out on vacation, Mr. Schmid told Ms. Daniels that two government customers had separately complained about Mr. Dillon; Ms. Coyne had made it very clear that she wanted Mr. Dillon removed from the contract

altogether, and Ms. Aronson openly questioned the value Mr. Dillon was adding to the program. *See supra* ¶¶ 56-59.  Ms. Daniels also saw for herself the glaring deficiencies in Mr. Dillon's final draft of the CONOPS.  *See supra* ¶ 60.  Ms. Daniels, and Ms. Daniels alone, then decided she had no choice but to heed the request of her customer and to remove Mr. Dillon from the contract.  *See supra* ¶¶ 60, 65.

There are at least two reasons why this decision could not have been retaliatory.

*First*, Mr. Dillon cannot prove causation as a factual matter.  Mr. Dillon's only direct communications with Ms. Daniels related to timecharging were in connection with the Ashburn Remediation project, and those communications—an e-mail in which Mr. Dillon asked Ms. Daniels for an unbillable charge number and Ms. Daniel's reply in which she provided him with one—do not come close to amounting to protected activity.  *See supra* ¶ 41.  Notably, too, Mr. Dillon admitted that he never complained to Ms. Daniels that any directions related to timecharging for the Ashburn Remediation project were illegal or otherwise improper.  *See supra* ¶ 42.  Thus, by Mr. Dillon's own admission, he did not engage in any protected activity with respect to Mr. Daniels.

Because Mr. Dillon has no evidence that he made complaints about fraudulent timecharging to Ms. Daniels, Mr. Dillon would have to show that Ms. Daniels, who was the decisionmaker here, was aware of the other protected activity he alleges, for example, his purported complaints to Messrs. Dobbs, Dixon and Sorensen.

A recent decision from the Seventh Circuit is instructive here.  In *Halasa v. ITT Educational Services, Inc.*, 690 F.3d 844, 848 (7th Cir. 2012), also an FCA retaliation case, the record was clear that Mr. Halasa had not reported his concerns to any of the people involved in the decision to terminate him, but solely to three other individuals.  Because there was "no

indication that any of these people passed along Halasa's findings to the decisionmakers," or that the decisionmakers otherwise knew about his complaints, the Court held that Mr. Halasa could not have been fired "because of" his protected activity, and affirmed summary judgment for ITT. *Id.* The same is true in this case. There is absolutely no evidence that, even if Mr. Dillon had engaged in protected activity (which he did not), Messrs. Dobbs, Dixon or Sorensen (or anyone else) shared with Ms. Daniels the concerns Mr. Dillon claims to have raised, or that she was otherwise aware of them. *See supra* ¶ 66. Accordingly, Mr. Dillon could not have been removed from the NSF program "because of" his alleged protected activity.

*Second*, the overwhelming evidence demonstrates that Ms. Daniels had a perfectly legitimate reason for removing Mr. Dillon from the NSF program. As detailed in the Statement of Undisputed Material Facts, two different NSF witnesses have testified about Mr. Dillon's substandard performance on the contract. *See supra* ¶¶ 43-45, 47-49, 52, 54, 55(b). Mr. Dobbs and Mr. Schmid have separately testified about receiving complaints about Mr. Dillon from these two customers, as well as from others. *See supra* ¶¶ 45, 48, 55, 57-58. And it is undisputed that Ms. Daniels was not advised of these complaints. *See supra* ¶ 66. Indeed, Mr. Dillon himself concedes that he "butt[ed] heads" with the government customer and otherwise failed to perform in accordance with the government customer's expectations. *See supra* ¶ 48. The record evidence makes unmistakably clear—to the point that no jury could possibly find any pretext— that at the time Mr. Dillon was removed from the NSF program, his performance had been the source of increasing frustration and dissatisfaction among numerous NSF customers, and that Ms. Coyne of the NSF had specifically requested his removal. *See supra* ¶¶ 43-45, 47-49, 52, 54-55, 57-58.

There is simply no evidence to support a finding that Ms. Daniels had a retaliatory motive here.  Not only has SAIC provided legitimate, non-pretextual reasons for Mr. Dillon's removal, which would rebut the prima facie case that his protected activity led to his removal, Mr. Dillon's prima facie case is fatally flawed, because he has no viable causation theory.  Mr. Dillon's retaliation theory is wholly speculative, and speculation is not enough to survive summary judgment.  *See Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).  Similarly, Mr. Dillon's layoff resulted from his removal from the NSF project and his inability to find another SAIC position.  *See supra* ¶ 64.  Mr. Dillon admits there is "no evidence" to suggest that any of the hiring managers for the SAIC jobs to which Mr. Dillon applied after his removal from the NSF program had any knowledge of the alleged "complaints" he had made or "concerns" he had raised about timecharging, or that they rejected him on that basis.  *See supra* ¶ 74.  Given these failures of proof, Mr. Dillon's causation argument cannot withstand summary judgment.

## CONCLUSION

For the reasons set forth above, SAIC respectfully asks this Court to grant summary judgment in its favor on Plaintiff's FCA retaliation claim.

Respectfully submitted,


Dated: December 19, 2012

/s/ Jason C. Schwartz
Jason C. Schwartz, Va. Bar No. 43635
Greta B. Williams (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
jschwartz@gibsondunn.com
gbwilliams@gibsondunn.com
Telephone:      202.955.8500
Facsimile:      202.467.0539

*Attorneys for Defendant SAIC, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of December, 2012, I will electronically file the

foregoing with the Clerk of the Court for the Eastern District of Virginia using the CM/ECF

system, which will then send a notification of such filing (NEF) to the following:

Carla D. Brown
CHARLSON BREDEHOFT COHEN
BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
cbrown@charlsonbredehoft.com

/s/ Jason C. Schwartz
Jason C. Schwartz, Va. Bar No. 43635
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
jschwartz@gibsondunn.com
Telephone:       202.955.8500
Facsimile:       202.467.0539

101401699.10