IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

_____
                                          )
MARK DILLON                               )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        CA No. 1:12CV390
                                          )            (LO/TRJ)
SAIC, INC.                                )
                                          )
        Defendant.                        )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Mark Dillon ("Mr. Dillon"), by counsel and pursuant to Fed. R. Civ. P. 56

hereby opposes Defendant SAIC, Inc.'s ("SAIC") Motion for Summary Judgment.

**SUMMARY OF ARGUMENT**

While the purpose of SAIC's summary judgment motion should be to present to the

Court the material facts not genuinely in dispute, it is not appropriate to simply ignore evidence

that supports Mr. Dillon's claims and renders SAIC's claims questionable.  Throughout its

Motion for Summary Judgment, SAIC relies upon facts that are heavily disputed referring to

them as "Undisputed Material Facts."  SAIC simply ignores Mr. Dillon's history of good

performance evaluations, pay increases, bonus and stock awards, promotions, and the testimony

of the witnesses in this case.

The reason that Harold Dobbs gave Mr. Dillon for his layoff was that Lisa Daniels said

the customer had requested that Mr. Dillon be removed from the project and he would be laid off

if he could not secure another position within SAIC.  This reason was pretextual for multiple

reasons: both Mr. Dobbs and Ms. Daniels desired to get rid of Mr. Dillon based on the fact that

he had raised timecharging issues with both of them and that they presented him as a problem

employee following his complaints.  In fat, a similarly qualified individual had submitted his

resignation to SAIC even before Mr. Dillon was presented with the January 27, 2012 Layoff

Notice, but the Business Unit General Manager, Rick Reynolds, told Mr. Dillon that he could not

hire him back as indirect or in business development after he was removed from the NSF

contract because of overhead problems.

SAIC engaged in retaliation in violation of the False Claims Act ("FCA") 31 U.S.C. §

3730(h), after Mr. Dillon investigated and reported three different Timecharging practices that he

had first-hand knowledge of and filed a corporate ethics complaint.  Mr. Dobbs took away all

Mr. Dillon's managerial authority the day that Mr. Dillon alerted him that he had investigated

Mr. Dobbs' Timecharging directives.   There is ample evidence from which a jury may conclude

that SAIC retaliated against Mr. Dillon for engaging in protected conduct.

<u>**GENUINE MATERIAL FACTS IN DISPUTE**</u>

**A.     SAIC'S Background**

SAIC provides scientific, engineering, systems integration, and technical services, and

solutions to all branches of the U.S. military, agencies of the U.S. Department of Defense

("DOD"), the intelligence community, the U.S. Department of Homeland Security ("DHS"), and

other U.S. Government civil agencies, state and local government agencies, foreign governments

and customers in selected commercial markets.  SAIC's business is centered upon solving issues

of national and global importance in the areas of defense, intelligence, homeland security,

logistics and product support, energy, environment and health. *See* Compl. ¶ 7; Att. 1 (SAIC,

Inc. – 2011 10-K); & Att. 2 (SAIC, Inc. – 2012 10-K).

**B.     Mr. Dillon Joins SAIC and Excels from the Beginning of His Employment**

Prior to his termination on April 10, 2012, Mr. Dillon enjoyed a 16 year career with SAIC.  SAIC hired Mr. Dillon in 1996 as a "key" employee and awarded him a substantial share of SAIC stock.  Compl. ¶ 25.  He started out as a Senior Telecomm Engineer/Program Manager and went on to work as a Division Manager achieving 250 percent growth in Revenue, a Commercial Sales and Marketing Business Unit Manager I, a Business Development Manager II, an Assistant Vice President/Business Development Manager II, and a Business Developer Level IV/Program Manager.  *See* Summary of Achievements and Performance Evaluations, Att. 3.  Mr. Dillon enjoyed receiving bonuses, stock, and promotions throughout the duration of his employment. *Id.*

### C.      Mr. Dillon's Involvement with DCISS

#### i.      Mr. Dillon's Achievements and Recognition

In 2009, Mr. Dillon participated in SAIC's successful bid for the National Science Foundation's ("NSF") Data Center Infrastructure Support Services ("DCISS") contract through his role in the business development department.  *See* Att. 4, Performance Evaluation (SAIC_000327, (SAIC_000333), andAtt. 5, DCISS Contract Solicitation (SAIC_0000012).  Mr. Dillon was assigned as the Infrastructure Manager on the NSF DCISS contract and designated a "Key Person" on the contract.  *Id.*  In or around February 2010, Harold Dobbs became Mr. Dillon's supervisor after assuming the role of Program Manager on the DCISS contract.

In Mr. Dobbs' first performance assessment of Mr. Dillon for the period from February 1, 2010 to January 31, 2011, Mr. Dobbs states in his 'Overall Rating' of Mr. Dillon,

> "Mark has been able to step up to the plate when the project needed seasoned and mature leadership.  Mark has done an outstanding job of managing and supporting complex changes in infrastructure requirements.  **Through Mark's effort, the customer was able to refine requirements and set the court for ITIL best practices and tools**. He has done an outstanding job in managing and assisting with changes in staff positions, and **kept an eye on satisfying the customer**.

Mark's advisory role helped to overcome some of the difficulty associated with finding critical skills, such as a storage expert.  Mark's technical performance is truly untouchable and worthy of emulation.  **The customer expressed a high level of satisfaction with Mark's performance.  This was particularly noted in previous Client Assessments that discussed SAIC heroic efforts to respond to crisis and "out of control" outages.  All deliverables were on time and exceedingly high quality.**

**Mark was proactive in coordinating with the customer** regarding the details of the network and infrastructure improvements.  Mark's management and technical inputs to the technical proposals were exemplary: **1) describing SAIC's deep understanding of the customer and the customer's business process and evolution of those processes**, 2) SAIC role in the customer's accomplishments, 3) evidence of SAIC's accomplishments, flexibility in response to changes, and thought leadership, and 4) SAIC's recommendations for continued enhancements to the ITIL process.

Mark makes an effort to keep informed of the latest trends and developments.  He actively seeks assistance from others who have the knowledge, as well as self development and applies it to his project.  In addition to this project, **Mark has managed to maintain a long term BD relationships and supported them**."

Att. 6, Performance Evaluation (SAIC_000325).  (Emphasis added.)

      ii.    <u>Mr. Dobbs' Unlawful Timecharging Guidance</u>
               <u>and Mr. Dillon's Demotion from Management</u>

In April 2011, Mr. Dillon and Mr. Dobbs began having issues because of Mr. Dobbs'

fraudulent Timecharging directive.  Att. 7, Dillon Dep. (October 9, 20120) at 125: 2-17, 128:19-

129:3, 140:15-18,141:2-4, 142:12-13, 15-22, 143:1-17, 148:19-22, 149:8-15, 163:21-164:2.  On

April 13, 2011, Mr. Dobbs e-mailed Mr. Dillon stating that it was unnecessary for Mr. Dillon to

bill overhead for timekeeping.  Att. 8, Email from Mr. Dobbs to Mr. Dillon of April 13, 2011

(Plf.'s Tr. Ex. 61).  Mr. Dobbs was aware that Mr. Dillon was charging 45 minutes to one hour

toward his timekeeping activities and was suggesting that Mr. Dillon bill the time directly to the

customer as part of a task instead of to overhead.  This fraudulent direction prompted Mr. Dillon

to email Scott Sorensen, SAIC's Deputy Director for Strategic Regulatory Finance on April 14,

4

2011, to investigate whether it was proper to charge overhead for any period of 15 minutes or more in which he is performing timekeeping duties, including time spent administering his own timecard and administering the timesheet process for his direct reports, Mr. Lipscomb and Mr. Pasini, and their direct reports during their absences. Att. 8a, Email from Mr. Sorensen to Mr. Dillon of April 14, 2011 (Plf.'s Tr. Ex. 62).  Mr. Sorensen replied to Mr. Dillon's email stating, "You have been correctly charging your time to overhead for the time spent on the timesheet administration tasks." *Id.*

On April 28, 2011, Mr. Dobbs continued to put pressure on Mr. Dillon to not bill overhead and invoice the client for his timesheet administration as evidenced by the two e-mails he sent to Mr. Dillon with the subject line "Timecharging."  In the first email sent at 6:00 pm, he complained:

> I'm still having issues with why you charge OH to complete you[r] timecard? Accounting for you[r] time is part of the task area you work. That time to record you[r] effort can be invoiced. We need to review you[r] rationale for using OH to complete your timecard. Let's discuss and fix.
>
> Please review https://issaic.saic.com/policy/ah/SC/02.html"[1]

*See* Att. 9, Email from Mr. Dobbs to Mr. Dillon of April 28, 2011 (Plf.'s Tr. Ex. 64).

Mr. Dobbs sent a second e-mail at 6:05 p.m. stating:

> Just clarification .... I noted that part of you[r] time was cleaning up e-mail ... How much of that was related to NSF related or PMO related activities? Training is ok .... Is this mandatory training? BD [business development] is BD.

*See* Att. 10, Email from Mr. Dobbs to Mr. Dillon of April 28, 2011 (Plf.'s Tr. Ex. 65).

On the morning of April 29, 2011, Mr. Dillon notified Mr. Dobbs that he had investigated the correctness of Mr. Dobbs' Timecharging guidance and had confirmed that Mr. Dobbs'

---

[1] The hyperlink provided in Mr. Dobbs' e-mail was a link to the SAIC timekeeping policy on the company's intranet site.  SAIC_0003835.

Timecharging guidance was unlawful.  Att. 7, Dillon Dep. at 146:9-147:1.  He offered to show

Mr. Dobbs Mr. Sorensen's April 14th e-mail, but Mr. Dobbs told him that he did not need to see

the e-mail.  *Id.*  Mr. Dobbs was visibly displeased during their conversation.  *Id.*

Shortly after telling Mr. Dobbs that he had contacted Mr. Sorensen regarding Mr. Dobbs'

Timecharging guidance, Mr. Dobbs took away all of Mr. Dillon's managerial responsibilities

over his direct reports, Mr. Pasini and Mr. Lipscomb.  Att. 11, NSF-DCISS Organizational

Chart.  Unlike the other managers in the DCISS Organizational Structure, Mr. Dillon was the

only manager whose managerial responsibility was taken away.  *Id.*  Mr. Dobbs' removal of Mr.

Dillon's direct reports affected his job roles because he no longer had responsibility for 60

percent of the staff on the DCISS program.  *Id.*

iii.      <u>DCISS Assignments: Further Actions Against Mr. Dillon</u>

In April 2011, Mr. Dobbs gave Mr. Dillon the lead role in a project; the Single Integrated

Operations Concept of Operations ("CONOPS") document.  NSF's IT Project Manager, Colleen

Coyne, was already displeased because SAIC was already several years late in completing the

document prior to even assigning the project to Mr. Dillon.  Att. 7, Dillon Dep. at 148:9-22,

163:19-164:2;  Att. 12, Coyne Dep. (November 14, 2012) at 34:22-35:6.  Ms. Coyne testified

that she was frustrated with Mr. Dillon for not completing the Capacity Plan or CONOPS.  Att.

12, Coyne Dep. 13:20-14:1.  However, she testified that she was frustrated with Mr. Dobbs for

not being professionally accountable on the project.  Att. 12, Coyne Dep. 35:2-12.  When asked

whether she was frustrated with anyone else, Ms. Coyne replied, "No." *Id.*

Mr. Dobbs never made a formal announcement, but allowed Mr. Dillon to send an email

out announcing the change.  Mr. Dobbs drafted an announcement for his SAIC colleagues, as

6

well as to several NSF staff members on April 29, 2012.  Att. 13, Email from Mr. Dillon to Mr.

Lipscomb and Mr. Pasini of May 2, 2011 (Plf.'s Tr. Ex. 71).  The announcement stated:

> Infrastructure Teammates; Please pass on to your troops that for some period TBD I will be detailed away from day-to-day operational responsibility for Infrastructure Operations; your Data Center and Networks teams. This is to focus upon completion of an Integrated IT Service Operations Concept of Operations (CONOPS) supporting the Single Integrated Operations announcement that Harold made April 7, 2011. It will involve some extensive negotiations with our colleagues supporting Service Desk, Security, and Software Development[.]
>
> I'll be in need of your support (input, advice and critique) during this task of memorializing the important tasks performed by our DCISS staff.
>
> Since the initial preparation and coordination of the CONOPS will be a front-loaded activity, with Harold's approval, I'll continue to participate in a lesser number of DIS projects where I can make a contribution to bring them to closure successfully. I'll work up that list shortly. Upon completion of the CONOPS, we'll reintegrate my work into either the "As Is" or "To Be" states, in some capacity.
>
> And I'm always available for any information that I have that may be of value to you, tucked away here in the back corner of Rm 357. I'll also drop by to visit you from time to time when I need a break from authorship.

*Id.*  Mr. Dillon sent the announcement out to save face because he thought that it would be less

humiliating to send it out himself than for Mr. Dobbs to send it out and have people speculating

about him being demoted.

In September 2011, Mr. Dillon became aware of more Timecharging issues after learning

that SAIC employees and DCISS subcontractors were working on the Research.gov ("R.Gov")

contract, but not billing the R.Gov contract for their work and vice-versa.  Att. 7, Dillon Dep. at

260:1-5, 314:18-22, and 315:7-15; Att. 14, Dart Dep. (November 5, 2012) at 154:20-155:4, 16-

18, and 157:2-10, 13-14;  Att. 15, Collier Dep. (November 1, 2012) at 17:16-22, 34:14-35:4, 8-

20, 45:10-16, 47:8-11, and 53:21-54:8.  Also in September 2011, Mr. Dobbs assigned Mr. Dillon

another project that Ms. Coyne was not satisfied with SAIC's performance on, the Capacity Plan.

Att. 12, Coyne Dep. at 36: 9-12, 37:7-9, 17-19, 38:16-18, 39:1-3, 6-20.  Mr. Dillon was also assigned the Performance Management Plan.

In November 2011, only less than a month after assigning Mr. Dillon the task of working on the Capacity Plan and Performance Management projects, Mr. Dobbs removed the projects from Mr. Dillon and reassigned him to the CONOPS document.  Att. 7, Dillon Dep. at 230:11-231:18.

According to Ms. Coyne, both the CONOPS and the Capacity Plan projects "are very big projects" that require "the input of many people in order to complete."  Att. 12, Coyne Dep. at 41:3-13.  However, Mr. Dillon did not get the feedback he needed to complete the projects.  *See* Att. 7, Dillon Dep. at 215: 21-216:14, 19-22, 217: 10-15.  As of November 14, 2012, been SAIC project had still not completed the projects despite the fact that other SAIC employees had been tasked with the projects both prior to and after Mr. Dillon was assigned to the projects.  *Id.* at 29:1-30:8, 36:5-20, 37:1, 10-19.

Ron Nicholas was assigned to work on the CONOPS document prior to Mr. Dillon, yet despite not completing the project, Mr. Nicholas was able to do other work and the project was passed on to someone else.  *Id.* at 29.  Mike Ohlis was assigned to work on the Capacity Plan after Mr. Dillon and has not completed it, yet he continues to be assigned to the project.  Mr. Dillon was drummed out of NSF for not completing the CONOPS and Capacity and Performance Management Projects, yet Mr. Nicholas and Mr. Ohlis continue to work for SAIC and the NSF customer.  Mr. Dillon was singled out and retaliated against because of his timecharging complaints.

iv.    <u>The Appearance of Fraud in R.Gov Timecharging</u>

On November 22, 2011, there was a major failure at the Research.gov data center in Ashburn, Virginia. Compl. ¶ 75. There had been a similar failure at Research.gov in November of 2010. In the interests of repairing the NSF's view of SAIC, Ms. Daniels, Senior Vice President and Operations Manager for Mr. Dillon's business unit announced that the work to remediate the outage (the "Ashburn Remediation" project) would not be charged to the NSF customer. Att. 13a, Email from Mr. Dillon to Mr. Dobbs and Ms. Marshall of December 29, 2011 (Plf.'s Tr. Ex. 123). On December 29, 2011, Mr. Dillon emailed Harold Dobbs, Ashley Marshall, Lisa Daniels and John Dart with the subject line "May I please have Ashburn Remediation Charge Number for today's T/S (and modify previous)?" *Id.*

Mr. Dillon also learned from Mr. Collier that DCISS subcontractors, including Mr. Collier supplied services in support of the R.Gov Ashburn remediation without a discrete charge number for the R.Gov contract. Att. 15, Collier Dep. 45:10-46:2, 49:1-4, and 54:5-8. Mr. Collier confirmed in his deposition that he had a conversation with Mr. Dillon possibly in late 2011, regarding Timecharging and the fact that Mr. Collier reported his time worked on various projects to a single charge code, instead of breaking up the time by individual projects he worked on. *Id.* at 55:1-9, 12-13, 15-22, and 56:1-4. Mr. Collier also admitted to not using a separate time charge number for work he performed on the R.Gov major failure remediation. *Id.* He also conceded that that he did not know how SAIC would be able to look at his charges with the single code and determine what projects he had been working on. *Id.*

v.    <u>Facts Surrounding Mr. Dillon's<br>Retaliatory Removal from the NSF Contracts</u>

SAIC attempts to mask Mr. Dillon's retaliatory firing by claiming that he was laid off because of a customer complaint. While Mr. Dobbs was out of the office on vacation in mid-

9

January 2012, Mr. Schmid filled in for him.  Ms. Coyne testified in her deposition that she told

Mr. Schmid that both her and her supervisor Dorothy Aronson, Acting Division Director for the

Division of Information Systems in the Office of Information Resource Management, wanted

Mr. Dillon off the NSF engagement. Att. 12, Coyne Dep. 26:3-10.

Ms. Aronson was three levels above Ms. Coyne in the NSF chain of command.   Att. 12,

Coyne Dep. 27:1-3.  Ms. Aronson testified in her deposition that she never asked for Mr.

Dillon's removal from either of NSF's DCISS or R.Gov contracts.  Att. 16, Aronson Dep.

(December 14, 2012) at 48:12-19.  She also stated, "In conversations with Harold, I may have

said 'this project is not going well. . .' So I may have made -- you know, expressed concern

about something or other or one person's participation or not. **I would not have asked him -- I**

**would not have directed him to remove a person from a project**." *Id.* at 47:7-13.  (Emphasis

added.)  When asked why, Ms. Aronson stated:

> Because I don't know enough about the inner workings of a project team to know specific
> contributions of people. My insight into how project teams work is periodic. **So a person**
> **may not be able to give a good briefing, but they may be an excellent contributor on**
> **the team.** I'm not -- I'm not in a position to make that determination.

*Id.* at 47:15-21. (Emphasis added.)

Ms. Aronson also went on to say that she would not advise any of her staff to request the

removal of a person from a contract because it was not her or her staff's job to do so.  *Id.* at

56:17- 57:1.

Ms. Aronson acknowledged speaking to Ms. Coyne about Ms. Coyne's frustration with

Mr. Dillon not finishing the Backups(storage) project, but said she could not remember any other

projects that he had not performed well on.  *Id.* at 34:5-8, 50:15-51:3.  Ms. Aronson even

testified that Mr. Dillon and his team did well in general, behaved professionally, and

participated in meetings in a healthy way.  *Id.* at 35:17-22, 36:5-9, 12-20, 37:18-19.

vi.    <u>Facts Surrounding Mr. Dillon's Retaliatory Layoff</u>

After Mr. Dillon learned from Mr. Dobbs on January 16, 2012, that NSF was planning to

lay him off, he spoke to Mr. Reynolds on January 18, 2012.  Att. 17, Email from Mr. Reynolds to

Mr. Dobbs and Ms. Daniels of January 19, 2012 (Plf.'s Tr. Ex. 126).  Mr. Reynolds told Mr.

Dillon, "[W]e have OH problems in the BU and can't 'take' [you] back on indirect/in-BD." *Id.*

A few days later, Mr. Dobbs presented Mr. Dillon with an official layoff letter dated

January 27, 2012 and told Mr. Dillon he was being laid off the program because the customer

wanted him removed and did not see value in his work.  Att. 18, Letter from Mr. Dobbs to Mr.

Dillon of January 27, 2012 (Plf.'s Tr. Ex. 137).  The letter stated, in part, "As previously

discussed, the customer has requested that you be removed from the program therefore your

position is no longer available due to lack of work.  Regretfully, I must advise you that unless

another suitable position within SAIC can be identified, you will be laid off effective February

24, 2012." *Id.*

Unbeknownst to Mr. Dillon, Ron Schier was an SAIC employee of similar status in the

same business unit as Mr. Dillon who had given HR notice of his resignation prior to Mr. Dobbs

giving Mr. Dillon the January 27, 2012 layoff letter.  Att. 19, Email from Ms. McConnell to Mr.

O'Day of January 17, 2012 (Plf.'s Tr. Ex. 127).  Mr. Dillon was not given the opportunity to

apply for Mr. Schier's position.

vii.    <u>Mr. Dillon's Ethics Committee Report</u>

Mr. Dillon contacted Roy White, a former executive commission member, on January 24,

2012 regarding filing a corporate ethics complaint.  Mr. Dillon also e-mailed and spoke with Joel

Andrews, Deputy Director of the Ethics Council/Senior Security Engineer, on January 25, 2012.

Att. 20 (PL500), Email from Mr. White to Mr. Andrews of January 25, 2012.  Mr. Dillon feared

facing heightened retaliation and even asked Mr. Andrews in an email, "Has there been any discussion of transferring me out of the line of fire?  Att. 21 (PL509), Email from Mr. Dillon to Mr. Andrews of January 25, 2012 (Plf.'s Tr. Ex. 147).  I'm working from home, merging some CM data for my program today." *Id.*

viii.   SAIC Staff Awareness of Mr. Dillon's Complaints and Termination

SAIC was well aware of Mr. Dillon's Timecharging complaints.  Att. 7, Dillon Dep. at 149:8-15, 253:4-9.  On February 28, 2012, Caroline McConnell, SAIC's Vice President of HR and the HR director for the Enterprise & Missions Solutions Business Unit, emailed Mr. Dixon in reference to Mr. Dillon stating, "Lisa is very concerned that this layoff not have any glitches." Att. 22, Email from Ms. McConnell to Mr. Dixon of February 28, 2012 (Plf.'s Tr. Ex. 192).  On March 9, 2012, Mr. Dixon sent Ms. McConnell an email stating in reference to Mr. Dillon, "I know but Dede had made a comment to me that she didn't think that under the circumstances we could term him!"  Att. 23, Chain of emails between Mr. Dixon to Ms. McConnell of March 9, 2012 (Plf.'s Tr. Ex. 192).  Ms. McConnell responded to Mr. Dixon stating, "Probably not if we want to stop the litigation." *Id.*

SAIC carefully orchestrated Mr. Dillon's termination and as a result, Mr. Dillon was unable to secure another position within SAIC during his redeployment despite applying for multiple positions within SAIC that he was qualified for.  *See* Att. 21, (PL509).  Mr. Dillon was forced to resign his position on April 9, 2012 after dedicating 16 years to a company that he hoped to retire from.  *See* Att. 24, Email from Mr. Dillon to Mr. Dixon of April 9, 2012 (Plf.'s Tr. Ex. 225).

## STANDARD OF REVIEW

In considering a movant's motion for summary judgment, the court must view the facts and draw inferences in a light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986).  The party seeking summary judgment seeks the initial burden to show an absence of evidence to support the non-moving party's position.  *Celotex Corat v. Catrett*, 477 U.S. 317, 325 (1986).   Summary judgment must be denied when the non-moving party can demonstrate that a triable issue of fact exists.  *Anderson*, 477 U.S. at 248.

## ARGUMENT

Congress sought to promote enforcement of the FCA by halting companies and individuals from using the threat of economic retaliation to silence whistleblowers.  *Mann v. Heckler & Koch Def., Inc*., 630 F.3d 338, 343 (4th Cir. Va. 2010) (discussing the enactment of § 3730(h)).  Congress recognized that few individuals would expose fraud if they feared that their disclosures would lead to harassment, demotion, and loss of employment.  *Id.*

There are three basic elements that must be met in order to bring a Section 3730 action: (1) the employee engaged in "protected conduct," (2) the employer knew about the protected conduct, and (3) the employer retaliated against the employee because of the protected conduct. *Id.*  The Fourth Circuit allows for the first and second elements to be combined.  *Id.* at 344.

Under the combined version, to establish a retaliation claim under the FCA, an employee must demonstrate that the employer had knowledge that the employee was engaged in protected conduct; and the employer's retaliation was motivated, at least in part, by the employee's protected conduct.  *Mann*, 630 F.3d at 344 (4th Cir. Va. 2010).  In such a scenario, the Court considers the facts known to the employee at the time of the alleged protected activity, as well the facts known to the employer at the time of the alleged retaliation to determine whether the

13

protected activity relates to the company conduct that involves an objectively reasonable possibility of an FCA Action.  Glynn, 807 F. Supp. 2d 391, (D. Md. 2011).

Mr. Dillon has a viable claim under the FCA because SAIC knew that he was engaged in protected conduct, and SAIC terminated Mr. Dillon for pretextual reasons.

### A.    SAIC Knew that Mr. Dillon Was Engaged in Protected Conduct

An employee need not file an actual *qui tam* suit to engage in protected conduct. *Eberhardt v. Integrated Design & Constr., Inc*., 167 F.3d 861, 867 (4th Cir. 1999).  Protected conduct encompasses measures taken "in furtherance of an action . . . filed or to be filed under this section." 31 U.S.C. § 3730(h).  The "to be filed" language "manifests Congress' intent to protect employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Mann*, 630 F.3d at 343-344 (citing *United States ex rel. Yesudian v. Howard Univ*., 153 F.3d 731, 740, 332 U.S. App. D.C. 56 (D.C. Cir. 1998).

Fourth Circuit cases stand for the proposition that a protected activity occurs when an employee's opposition to fraud takes place in a context where litigation is a distinct possibility, when the conduct could reasonably lead to a viable FCA action or when litigation is a reasonable possibility.  *Mann,* 630 F.3d at 344 (citing *Eberhardt*, 167 F.3d at 869).  *Mann* also highlights Congress' intent to protect even employees who do not yet have all the pieces of the puzzle together to bring a *qui tam* claim.  *Mann*, 630 F.3d at 343-344; *Glynn*, 807 F. Supp. 2d at 402 (recognizing that the most typical conduct that is considered action in furtherance of an FCA claim occurs when an employee investigates conduct by his employer); *Yesudian v. Howard Univ*., 153 F.3d 731, 740, 332 U.S. App. D.C. 56 (D.C. Cir. 1998) (plaintiff collected evidence from other employees to corroborate his claims of false billing);

14

"To articulate an FCA claim, there must be some suggestion of impropriety or illegality by the employer that the employee is attempting to uncover." *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 731-33 (7th Cir. 1999); United States ex rel. *Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010) (stating that a protected activity must evince some attempt to expose possible fraud).

SAIC cites *Eberhardt* and *Mann* arguing that Mr. Dillon's conduct never rose to the level of protected activity and did not put SAIC on notice that he was acting in furtherance of a potential claim.  Mot. Summ. J. 15.  Unlike the facts in Mr. Dillon's case; however, *Eberhardt* dealt with a unique situation where the plaintiff's job function was to investigate internal fraud. The Court held, "[A]n employee tasked with the internal investigation of fraud against the government cannot bring a section 3730(h) action for retaliation unless the employee puts the employer on notice that a *qui tam* suit under section 3730 is a reasonable possibility." *Eberhardt,* 167 F.3d at 868.  The Court went on to require that such employees take further actions to put the employer on notice of the protected conduct, such as characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved in order to engage in protected conduct.  *Id.*

SAIC argues that further actions are required of Mr. Dillon in order to put the employer on notice of his protected conduct.  However, all that is required for Mr. Dillon to engage in protected conduct is for him to oppose fraud in a context where litigation is a distinct or reasonable possibility, since he is not an employee who investigates fraud as part of his job function.  *Mann,* 630 F.3d at 344 (citing *Eberhardt*, 167 F.3d at 869).  Mr. Dillon investigated the timecharging fraud by making inquiries to gather evidence of fraud.

15

## I.        Mr. Dillon's Protected Conduct

Mr. Dillon's protected conduct consisted of investigating Mr. Dobbs' defective Timecharging guidance which he believed would lead to fraud on the government.  Att. 21 (PL510-511).  In his conversations with and emails to Mr. Dobbs, Mr. Dillon expressed concerns about fraudulently charging the government client for timesheet administration that lasted 15 minutes or more.  *Id.*  He also spoke with other SAIC employees and subcontractors to ascertain how they billed their time on the Ashburn remediation project and more generally on the DCISS and R.Gov contracts.  The culmination of his investigations led to his final submission of an ethics complaint.  *Id.*

Mr. Dillon's first protected activity was investigating Mr. Dobb's defective Timecharging guidance for timesheet administration that lasted 15 minutes or more.  Mr. Dillon testified that he and Mr. Dobbs had multiple conversations on this matter in addition to exchanging emails on the topic.  *See* emails, Atts. 25-28; Att. 7, Dillon Dep. at 149: 8-19.  Mr. Dobbs knew that Mr. Dillon was taking 15 minutes or more on timecard administration, yet he continued to try and coerce Mr. Dillon to fraudulently bill the government client instead of billing to overhead.  *Id.*  In response, Mr. Dillon contacted Mr. Sorensen in SAIC's corporate office to investigate whether Mr. Dobbs' Timecharging guidance was defective.  Att. 26.

On April 28, 2012, Mr. Dobbs continued to pressure Mr. Dillon to bill the government client for timesheet administration taking 15 minutes or longer.  Atts. 28 and Att. 29, Email from Mr. Dillon to Ms. Rush of February 18, 2012 (Pl.'s Tr. Ex. 174).  The next day Mr. Dillon notified Mr. Dobbs that Mr. Sorensen had confirmed that Mr. Dillon was charging his time correctly. Att. 26.  Mr. Dobbs acknowledged Mr. Sorensen's confirmation that Mr. Dillon was billing his time properly, but seemed disgruntled.  Att. 7, Dillon Dep. at 146:9-147:1.

*Mann* is distinguishable from the facts in Mr. Dillon's case.  Mr. Mann's actions regarding his employer's bid submission did not constitute opposing fraud because his employer was forthright and open with the government regarding its regulatory violations in submitting its bid to the government, thus there was no fraud.  *Mann,* 630 F.3d at 346, 347 (finding that Mr. Mann merely voiced disagreement concerning the bid strategy and what component part features were most suitable for the bid.).  Disagreements do not rise to the level of fraud unless there is a claim made on the public treasury that misrepresents the services or products that the government is paying for.  *Id; see also Glynn*, 807 F. Supp. 2d at 407.

Mr. Dillon was intent on uncovering fraud and his actions to this end provide him with protection as someone engaged in conduct raising a distinct possibility of fraud against the United States. *Mann,* 630 F.3d at 350.

SAIC cites to *United States ex rel. Parks v. Alpharma, Inc.*, No. 11-1498, 2012 WL 3291705, at *8 (4th Cir. Aug. 14, 2012), and erroneously characterizes Mr. Dillon's conduct as mere "concerns and suggestions" instead of acts in furtherance of a *qui tam* action.  Mr. Dillon's objective in speaking with Mr. Sorensen was to gather supporting evidence so he could inform Mr. Dobbs and get him to stop giving defective Timecharging directing and from pressuring him to fraudulently bill the customer for overhead.

The second protected activity was Mr. Dillon's investigation into the validity of Mr. Dobbs' defective Timecharging directive that SAIC employees and subcontractors should bill the government client directly for contract compliance review on the Ashburn remediation project instead of using an unbillable charge code because reasoning that it would be to the benefit of the government customer.  Att. 7, Dillon Dep. at 244:15-245:20, 246:1-9.  As with his first protected activity, Mr. Dillon believed that following Mr. Dobbs' defective directive would

lead to fraudulent billing of the government customer.  While Mr. Dobbs was on leave, Mr.

Dillon reached out to Mr. Schmid and Ms. Daniels to ascertain whether Mr. Dobbs directive was

valid. *Id.* at 247:4-8.  Ms. Daniels countermanded Mr. Dobbs' defective guidance and instructed

Mr. Dillon that he should charge the unbillable remediation number.  Att. 30.

Mr. Dillon's third protected activity was investigating the cross-charging of SAIC

employees and subcontractors do not charge their time to the right contract, e.g. billing to the

DCISS contract when they were working on the R.Gov contract and vice-versa. SAIC policy

instructs employees to charge their time to the contract that they work on. Att. 31, Sorenson Dep.

at 37:11-14.  Mr. Dillon has direct knowledge of unlawful cross-billing to the government

customer because of his investigation into the matter.  Att. 15, Collier Dep. at 53:21-54:8, 55:18-

56:5.  Mr. Hughes confirmed that Mr. Collier did not appear on the R.Gov invoices, despite

performing work under the R.Gov contract.  Att. 22, Hughes Dep. at 26:7-9, and 27:14-28:9.

Mr. Dillon believed cross-charging was fraudulent based on what he had learned from attending

16 years worth of SAIC's annual Timecharging training.

In his case closeout memo, Mr. Oakes, the ethics investigator recommended that Mr.

Dobbs issue written Timecharging guidance to SAIC employees and subcontractors.  Att. 33

(SAIC_098904), Ethics Case Close-Out Report Template (Plf.'s Ex. 239).   The fact that he

made such recommendations lends credence to the reasonableness of Mr. Dillon's belief that

employees were fraudulently billing their time.

SAIC maintains that NSF did not find any discrepancies in their invoices. Mot. Summ. J.

21.  Just because the R.Gov Contracting Officer's Technical Representative, Paul Hughes,

testified in his deposition that he was unaware of any discrepancies in the invoices for R.Gov

does not mean that there was no fraud on either the R.Gov or DCISS contracts.  Att. 32, Hughes

Dep. at 30.  NSF has no way of knowing how much time and for which projects each SAIC employee or subcontractor worked to see if they accurately reported their time.

Mr. Dillon's final protected activity was pursuing a corporate ethics complaint on or before January 24, 2012.  Att. 18, 20 and 21.  In his ethics complaint, Mr. Dillon exposed his findings regarding Mr. Dobbs' Timecharging directives; the cross-charging of time and SAIC's failure to provide unbillable charge codes for the remediation efforts.  Att. 21; Att. 7, Dillon Dep. at 306:2-7.  In an email to Mr. Andrews, Mr. Dillon alluded to his layoff being retaliatory when he expressed that he was "offered up in the interests of customer satisfaction."  Att. 21 at 3.  Mr. Dillon goes on to ask, "Will you be able to offer any reprisal protection, transfer out of my current BU?"  *Id.*  Mr. Dillon was concerned about suffering from further retaliatory actions by SAIC and in particular by Ms. Daniels and Mr. Dobbs.

In order to fully understand the nature of Mr. Dillon's protected conduct, SAIC should have examined all four of Mr. Dillon's protected activities altogether, instead of examining the facts piecemeal.  Given the nature of Mr. Dillon's investigations into fraudulent Timecharging and the fact that he put Mr. Dobbs, Ms. Daniels, Mr. Andrews, Ashley Marshall and Mr. Dixon on notice that he was investigating these issues, SAIC had notice that litigation was a reasonable possibility.

SAIC differentiates between Mr. Dillon's pre- and post- removal protected conduct arguing that Mr. Dillon's post-removal complaints[sic] could not have caused his removal from the NSF contract.  Mot. Sum. J. 24-25; *United States ex rel. Scott v. Metro Health Corp*, 375 F. Supp. 2d 626, 646 (W.D. Mich. 2005), aff'd, 234 F. App'x. 341 (6th Cir. 2007) and *Tolman v. Am. Red Cross*, --- F.Supp.2d---, No. 10-628, 2012 WL 892312, at *6 (D. Idaho Mar. 14, 2012), and SAIC has confused the issues.  Unlike the plaintiffs in *Scott* and *Tolman*, one of the

allegations in Mr. Dillon's Complaint is that SAIC terminated his 16 year career at SAIC by not

rehiring him despite there being several open positions for which he applied to, but was never

hired.  *See* Att. 34 (SAIC_0145186), Email from Mr. Dillon to Mr. Dixon of January 31, 2012

(Plf.'s Tr. Ex. 142), Att. 35 (SAIC_0003409), Email from Mr. Dillon to Mr. Dixon of February

2, 2012 (Plf.'s Tr. Ex. 145), and Att. 36 ( SAIC_0003418), Email from Mr. Dillon to Mr. Dixon

of February 25, 2012 (Plf.'s Tr. Ex. 186).  Thus, Mr. Dillon's post-removal complaint is relevant

to evaluating his claims under the FCA.

### B.  SAIC Retaliated Against Mr. Dillon for Engaging in Protected Conduct.

SAIC retaliated against Mr. Dillon from April 2011 until April 2012 when he was finally

terminated from his employment.  SAIC claims that it did not take any adverse actions against

Mr. Dillon as a result of his protected activity and also claims it had business reasons for

changing the scope of his role as Infrastructure Manager.  Mot. Summ. J. 15.  For the reasons

that follow, these arguments are merely pretext.  Key determinations required to decide the

pretext issue involve credibility and should be determined by a jury.  *Gries v. Zimmer, Inc.*, 1991

U.S.App. LEXIS 16729, 23 (4th Cir. 1991) *relying upon Herold v. Hajoca Corat*, 864 F.2d 317,

320-321 (4th Cir. 1988).

### I.   Mr. Dillon Was Demoted Immediately After Raising Billing Concerns with Mr. Dobbs

The Fourth Circuit recognizes that a decrease in level of responsibility could constitute an

adverse employment action.  *James v. Booz-Allen & Hamilton, Inc.* 368 F.3d 371, 375-76 (4th

Cir. 2004).  SAIC admits that Mr. Dobbs stripped Mr. Dillon of his managerial authority[2] soon

after he reported the results of his investigation to Mr. Dobb's on April 29, 2011, but denies that

Mr. Dillon was ever demoted.  Att. 37, Rush Dep. at 86:14-17, 87:1-17; Att. 7, Dillon Dep. at

---

[2] Prior to being stripped of his managerial authority he had supervised 60 percent of the staff on the DCISS contract. Att. 11.

147:20-148:22.  Mr. Dillon continued to work on the Backups, Performance Management, Capacity Planning, and Service Recovery projects after Mr. Dobbs assigned him to the Single Integrated Operations and CONOPS projects, but his leadership roles on those projects was taken away after the April 29, 2012 Timecharging discussion with Mr. Dobbs.  Att. 21 at 3-4.  Mr. Dillon was also removed from supervising the data center and network teams.  *Id.*  Altogether, the decrease in his level of managerial and overall leadership responsibility amounted to a demotion.

## II.    SAIC Had No Legitimate Business Reason For Terminating Mr. Dillon's Employment

SAIC argues that Mr. Dillon's removal from the NSF program by Ms. Daniels and his layoff were driven entirely by the customer's request to have him removed and were not connected to Mr. Dillon's protected conduct.  Mot. Summ. J. 27-28.  However, SAIC's stated business reason for terminating Mr. Dillon is: (1) SAIC claims that it terminated Mr. Dillon because the NSF customer requested his removal; (2) SAIC claims that it terminated Mr. Dillon because no other positions were available; and (3) Mr. Reynolds claimed that because the Business Unit was having overhead problems, he could not take Mr. Dillon back on indirect or in Business Development.  Mr. Dillon can establish that all of these reasons constitute pretext and that the real reason that SAIC terminated him was based on Mr. Dobbs' retaliatory animus which resulted from Mr. Dillon's ongoing investigations into fraudulent Timecharging guidance. Att. 21, 38.  Accordingly, all of the reasons that SAIC set forth as a basis for Mr. Dillon's termination are false.

SAIC's claim that Mr. Dillon was a weak performer on NSF projects is also pretextual. Mot. Summ. J. 29.  As discussed above, Mr. Dillon had a positive track record at SAIC and enjoyed promotions, bonuses, corporate stock, salary increases, and awards.  Att. 3.  Carsten

Schmid, the Deputy Program Manager even appointed Mr. Dillon as head of the Backup Tiger Team assignment while Mr. Dobbs was out on vacation.  Mr. Schmid said he felt that although the backup solution was not the option that the client chose, Mr. Dillon had had an intimate knowledge of how backups worked.  He went on to say, "[H]e had already been in that supervisory role for data center operations. So he had a rapport with all the people that made up that team already. So it seemed a very easy decision for me to make."  Att. 39, Schmid Dep. (November 19, 2012) at 169:4-15.  Ms. Aronson stated that she never saw anything unprofessional in Mr. Dillon's performance.  Aronson Dep. at 34:17-21.  She also said that aside from the Backups(storage) issue, there were no other issues with Mr. Dillon or his deliverables that she could recall.  Aronson Dep. at 34:5-8.  Mr. Hughes also testified that he had no knowledge that Mr. Dillon had any performance issues on R.Gov.  Hughes Dep. at 20:3-15.

Despite this 16 year positive track record at SAIC, on or around January 19, 2011, Mr. Dobbs informed Mr. Dillon that he would be laid off because "the position was no longer available due to lack of work."  Att. 18.  Mr. Dobbs also mentioned that this decision was based on the NSF customer requesting his removal and because the customer did not see the value in his work.  *Id.*  However, as argued above, the senior NSF customer did not request his removal and stated that it was not her or her staff's job to do so since they could not evaluate that person's contributions in other aspects of their job functions.  Aronson Dep. at 47:7-21, 56:19-21, 57:1. In light of the favorable comments above, Mr. Dobbs' statement appears to be pretextual.

Mr. Reynolds' comment regarding not being able to bring Mr. Dillon back in the business development unit because of overhead problems is also questionable in light of the fact that Mr. Schier had already submitted his resignation prior to Mr. Dillon's termination.  Att. 19.  Mr. Dillon is an experienced business development professional that should have been offered a job

22

opportunity within the business development department.  Mr. Dillon's success when he was Division Manager and oversaw 250 percent growth in revenue from new business and internal development within four years speaks for itself.  Att. 3 (PL00106).

As argued above, the fact that Mr. Nicholas and Mr. Ohlis were not removed from the NSF contract by Mr. Dobbs or Ms. Daniels after failing to complete the CONOPS document and Capacity Plan projects, respectively, shows that Mr. Dobbs and Ms. Daniels singled out and targeted Mr. Dillon for removal because of his investigations into fraudulent Timecharging practices, which they were well aware of after he expressed to them his concerns regarding fraudulent Timecharging.

After filing his corporate ethics complaint, things got worse for Mr. Dillon.  Mr. Dillon believes that Ms. Rush was not acting as an independent and unbiased party because of her former connections with key people in the business unit.  Att. 37, Rush Dep. at 13:5-14:12. SAIC contends that Mr. Dillon does not have evidence that any of the hiring managers for the SAIC jobs he applied for rejected him on the basis of his protected conduct.  However, that is not necessarily the case.  Mr. Dillon believes that it was no coincidence that he was unable to secure another job assignment within SAIC, let alone interviews after submitting numerous applications for employment and seeking the assistance of the redeployment office.  SAIC terminated his employment despite there being several open positions for which he applied.

## CONCLUSION

Defendant's Motion for Summary Judgment should be denied.

January 2, 2013

Respectfully submitted,

/s/ MONIQUE A. MILES

Carla D. Brown, Virginia Bar No. 44803
cbrown@cbcblaw.com
Monique A. Miles, Virginia Bar No. 996026
mmiles@cbcblaw.com
CHARLSON BREDEHOFT COHEN
  BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile

*Counsel for Plaintiff, Mark Dillon*

## CERTIFICATE OF SERVICE

I hereby certify on the 2nd day of January 2013 I electronically filed the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will send a notification of such filing to the following:

Jason Schwartz, Esq.
jschwartz@gibsondunn.com
Greta B. Williams, Esq.
gwilliams@gibsondunn.com
GIBSON DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500   Telephone
(202) 467-0539   Facsimile

*Counsel for Defendant SAIC, Inc.*

Monique A. Miles, Virginia Bar No. 996026
mmiles@cbcblaw.com
CHARLSON BREDEHOFT COHEN
BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile

*Counsel for Plaintiff, Mark Dillon*