**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| Mark Dillon, | |
| Plaintiff, | |
| v. | Civil Action No. 1:12-cv-390 (LO/TRJ) |
| SAIC, Inc., | |
| Defendant. | |

**DEFENDANT SAIC, INC'S REPLY**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Jason C. Schwartz, Va. Bar No. 43635
Greta B. Williams, admitted pro hac vice
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
jschwartz@gibsondunn.com
gbwilliams@gibsondunn.com
Telephone:  202.955.8500
Facsimile:   202.467.0539

*Attorneys for Defendant SAIC, Inc.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

I.      Plaintiff's So-Called "Genuine Material Facts in Dispute" Are Either Inaccurate, Immaterial Or Undisputed, As Demonstrated By The Record Evidence. ......................... 2

II.     Argument ........................................................................................... 11

        A.      Mr. Dillon's Conduct Did Not Rise To The Level Of Protected Activity........... 12

        B.      SAIC Was Not On Notice Of A Potential FCA Claim ....................................... 15

        C.      Mr. Dillon's Retaliation Theory Fails Because He Suffered No Adverse Employment Actions As A Result Of Any Protected Activity........................... 16

CONCLUSION ................................................................................................ 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ash v. UPS,*
   800 F.2d 409 (4th Cir.1986) ........................................................ 12

*Clinkscales v. Walgreen Co.,*
   No. 8:10–2290, 2012 WL 80543 (D.S.C. Jan. 11 2012) ...................... 17

*Eberhardt v. Integrated Design & Constr., Inc.,*
   167 F.3d 861 (4th Cir. 1999) ........................................... 13, 15, 16

*Felty v. Graves–Humphreys Co.,*
   818 F.2d 1126 (4th Cir.1987) ..................................................... 12

*Foglia v. Clapper,*
   --- F. Supp. 2d ---, 2012 WL 3242367 (E.D. Va. Aug. 7, 2012) ............... 1

*Glynn v. Impact Sci. & Tech., Inc.,*
   807 F. Supp. 2d 391 (D. Md. 2011)............................... 16, 17, 18, 19

*Gries v. Zimmer, Inc.,*
   No. 90-2430, 1991 WL 137243 (4th Cir. May 9, 1991)......................... 11

*Haywood v. Locke,*
   387 F. App'x 355 (4th Cir. 2010)................................................ 7

*Herold v. Hajoca Corp.,*
   864 F.2d 317 (4th Cir. 1988) ............................................. 11, 12

*JDS Uniphase Corp. v. Jennings,*
   473 F. Supp. 2d 705 (E.D. Va. 2007) ................................ 1, 2, 6, 19

*Mann v. Heckler & Koch Def., Inc.,*
   630 F.3d 338 (4th Cir. 2010) ........................................ 13, 14, 15, 16

*McKenzie v. BellSouth Telecomms., Inc.,*
   219 F.3d 508 (6th Cir. 2000) ................................................... 12

*Merritt v. Old Dominion Freight Line, Inc.,*
   601 F.3d 289 (4th Cir.2010) .................................................... 17

*O'Connor v. Consol. Coin Caterers Corp.,*
   56 F.3d 542 (4th Cir. 1995) .................................................... 18

*Smith v. Secretary of Army,*
   No. 1:11-cv-724, 2012 WL 3866487 (E.D. Va. Sept. 5, 2012)............ 1, 6, 12, 19, 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Stephens v. Gutierrez,*
No. 1:08-cv-870, 2010 WL 1005189 (E.D. Va. Mar. 15, 2010) ............................................ 12

*United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.,*
612 F.3d 724 (4th Cir. 2010) ................................................................................. 11, 13, 15, 16

*United States ex rel. Parks v. Alpharma, Inc.,*
No.11-1498, 2012 WL 3291705 (4th Cir. Aug. 14, 2012) ..................................................... 16

*United States ex rel. Yesudian v. Howard Univ.,*
153 F.3d 731 (D.C. Cir. 1998) .............................................................................................. 16

*Zahodnick v. IBM,*
135 F.3d 911 (4th Cir.1997) .................................................................................................. 12

**Other Authorities**

S. Rep. No. 99-345, reprinted in 1986 U.S.C.C.A.N. 5266, 5300 ............................................. 19

**Rules**

Local Civ. R. 56 ............................................................................................................................ 1

Local Civ. R. 56(B) ....................................................................................................................... 1

## **INTRODUCTION**

Notwithstanding Plaintiff's bald assertion that Defendant SAIC's Motion for Summary

Judgment "relies upon facts that are heavily disputed," Opp. 1, conspicuously absent from

Plaintiff's Opposition is the rebuttal to SAIC's Statement of Undisputed Material Facts

("SUMF"), in numbered paragraphs and supported by record evidence, required by this Court's

September 12, 2012 Order and Local Rule 56(B).  Accordingly, the "Court may assume that any

fact identified by [SAIC] in [SAIC's] brief that is not specifically controverted in [Mr. Dillon's]

brief in the manner set forth above is admitted for the purpose of deciding the motion for

summary judgment."  Sept. 12, 2012 Order; *see also* Local Civ. R. 56(B).  Indeed, this Court has

specifically rejected the same type of evasive narrative Plaintiff attempts to use here to defeat

summary judgment.  *See, e.g.*, *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D.

Va. 2007) (deeming admitted statement of facts because non-movant "responded with a narrative

that did not identify with any specificity which facts, if any, were disputed"); *see also, e.g.*,

*Foglia v. Clapper*, --- F. Supp. 2d ---, 2012 WL 3242367, at *1 (E.D. Va. Aug. 7, 2012).[1]

It is not surprising that Plaintiff failed to respond as required to SAIC's enumerated facts,

given that (1) SAIC relies upon Mr. Dillon's own sworn deposition testimony in nearly 50 of the

75 paragraphs in its SUMF, and (2) Mr. Dillon made material admissions under oath that

completely undercut his FCA retaliation claim.  Among other things, Mr. Dillon admitted that,

contrary to the allegations in his Complaint, he did not complain of fraud or illegality prior to his

removal from NSF and layoff from SAIC (SUMF ¶¶ 27, 31-32, 42, 67-68); his supervisor did not

give him unlawful timekeeping instructions (*id.* ¶¶ 24-25, 29); there were legitimate business

---

[1]  Further, as this Court has explained, "Rule 56 does not impose upon the [C]ourt a duty to sift
through the record in search of evidence to support a party's opposition to summary
judgment."  *Smith v. Secretary of Army*, No. 1:11-cv-724, 2012 WL 3866487, at *1 n.1 (E.D.
Va. Sept. 5, 2012) (O'Grady, J.).

reasons for assigning him to the CONOPS (to provide him with a greater challenge and to help facilitate a new business priority (*id.* ¶ 8)), the reassignment of his direct reports (they complained that his oversight was unnecessary and Mr. Dillon complained he felt underutilized supervising them (*id.* ¶¶ 5-6)), and his removal and layoff (he "butt[ed] heads" with the government customer, who specifically requested his removal after lodging multiple complaints about him (*id.* ¶¶ 44-45, 48, 55, 57-58)); and that he has no evidence that he was rejected for any other SAIC job opening on the basis of his supposed protected activity (*id.* ¶ 74).

Nowhere is his Opposition does Plaintiff address these fatal flaws in his case.  Instead, he asks this Court to allow the case to proceed to the jury not on the basis of disputed facts, but merely because Plaintiff purportedly "*believes* that it was *no coincidence* that he was unable to secure another job assignment within SAIC."  Opp. 23 (emphases added).  It is basic hornbook law that such speculation is insufficient to defeat summary judgment.

I.     **Plaintiff's So-Called "Genuine Material Facts in Dispute" Are Either Inaccurate, Immaterial Or Undisputed, As Demonstrated By The Record Evidence.**

Because the Opposition does not address each of the separately numbered facts, SAIC addresses below Plaintiff's "Genuine Material Facts in Dispute" section.

*Sections A & B*:  None of the material in Sections A or B of Plaintiff's Opposition contains material facts, nor was this material even mentioned in the SUMF.  Opp. 2-3.  It should therefore be disregarded, because Plaintiff is merely asserting his own narrative without responding in any way to the SUMF.  *See JDS Uniphase Corp.*, 473 F. Supp. 2d at 707.

*Section C*:  Section C contains Plaintiff's self-serving discussion of his involvement with the DCISS contract, and material inaccuracies that are directly refuted by the record evidence.

*Section C(i)*:  Plaintiff excerpts a portion of the performance evaluation Mr. Dobbs gave to him for 2010.  Opp. 3-4.  As a legal matter, this evaluation is wholly irrelevant to how Mr.

Dillon was performing when he was removed from NSF in January 2012. *See discussion infra* at p. 18. And, as a factual matter, it is clear that Mr. Dillon's performance deteriorated from the time of this 2010 performance evaluation to his separation from SAIC. *See* Williams Decl. Ex. 1 166:3 – 171:21. As Mr. Dobbs explained:

- He was not "able to walk through, lay out tasks, schedule, and see that they are done. That didn't happen in his assignment to the Single Integrated Operation. That is what he was supposed to implement." *Id.* 169:22 – 170:7.

- "It was [the NSF customer's] assessment, during the course of this period, that Mark failed to show value for all that he was cracked out to be at the beginning. It changed, and it got increasingly worse." *Id.* 170:15-21.

- "The things that the customer observed were starting to come to my attention increasingly and frequently. Saying what value is this guy delivering. And I think we certainly got into a situation where I could not cover or give Mark enough to stay out of trouble." *Id.* 171:3-15.

Indeed, Mr. Dillon cannot and does not dispute that his performance was the subject of repeated, serious criticism from numerous NSF government customers during the period leading up to his removal. *See* SUMF ¶¶ 43-55.

*Section C(ii)*: Although Section C(ii) refers to "Mr. Dobbs' fraudulent Timecharging directive" in connection with Mr. Dobbs' e-mails to Mr. Dillon about timekeeping overhead charges on April 13 and 28, 2011 (Opp. 4-5), Mr. Dillon admitted in deposition that there was "nothing wrong" with Mr. Dobbs e-mailing Mr. Dillon about these issues and that nothing in the April 13 e-mail instructed Mr. Dillon to charge the time spent administering other people's timesheets to a billable number; Mr. Dobbs was referring only to time spent by Mr. Dillon on his own sheets—time that Mr. Dillon admits can be charged to the task on which one is working, provided it takes less than 15 minutes. SUMF ¶¶ 18, 23. Likewise, with respect to the two e-mails Mr. Dobbs sent Mr. Dillon on April 28, Mr. Dillon admitted that there is nothing in the text of these e-mails that instructs Mr. Dillon to charge time incorrectly; indeed, he admitted that Mr.

Dobbs' instruction that the "time to record your effort can be invoiced" is a correct statement of policy and, notably, the e-mail itself instructs Mr. Dillon to review SAIC policy, hardly the type of instruction one would expect if the e-mail were intended to promote fraud.  *Id.* ¶¶ 28-29 (brackets omitted).  These admissions completely undermine Mr. Dillon's unsupported contention in his Opposition that Mr. Dobbs gave him "fraudulent" timecharging instructions.

The assertions in Plaintiff's Opposition about Mr. Dillon's April 29, 2011 conversation with Mr. Dobbs are also wholly unsupported by the record.  There is no evidence whatsoever that Mr. Dillon told Mr. Dobbs that he had confirmed his timecharging guidance was "unlawful." Opp. 5-6.  In fact, Mr. Dillon admits that during this discussion—the only discussion he can recall having with Mr. Dobbs about accounting for timekeeping activities (SUMF ¶¶ 31-32)—all he did was offer to show Mr. Dobbs Mr. Sorensen's e-mail stating that Mr. Dillon's overhead charges for timekeeping in excess of 15 minutes were consistent with SAIC policy.  *Id.* ¶ 31. Mr. Dillon also admitted—contrary to the allegations in his Complaint—that he did not even mention Mr. Dobbs' timecharging instructions to Mr. Sorensen, let alone complain about any alleged impropriety.  *Id.* ¶ 27.  And, Mr. Sorensen certainly never suggested that Mr. Dobbs' instructions were unlawful.  Memo. Schwartz Decl. Ex. 13.

Next, while Plaintiff contends in his Opposition that "[s]hortly after" this April 29 conversation with Mr. Dobbs, Mr. Dobbs removed Mr. Dillon's supervisory responsibility over Messrs. Pasini and Lipscomb, the only record evidence cited in support of this statement is a DCISS Organizational Chart from September 6, 2011.  Opp. 6; *id.* Att. 11.  This chart certainly does not show that this shift occurred "shortly after" the April 29 conversation, or suggest that the two were somehow related.  In fact, the record evidence shows they were wholly unrelated; Mr. Dobbs reassigned Messrs. Pasini and Lipscomb because they did not require Mr. Dillon's

supervision and in order to give Mr. Dillon more time to focus on his new assignment.[2]  SUMF

¶ 7.  Nowhere in the Opposition does Plaintiff dispute this.  *See also id.* ¶¶ 5-6.

*Section C(iii)*:  Plaintiff does not dispute that Ms. Coyne was frustrated with Mr. Dillon

for not completing the Capacity Plan or CONOPS project, but instead of addressing Ms. Coyne's

myriad other criticisms of his performance (*see id.* ¶¶ 43-45, 47-49, 52, 55), Plaintiff ignores

those and focuses on a stray comment that Ms. Coyne made about Mr. Dobbs—which was not

referenced in the SUMF, nor is it material.  Opp. 6.  Further, any attempt by Plaintiff to suggest

that Ms. Coyne was equally frustrated with Messrs. Dobbs and Dillon is wholly controverted by

Ms. Coyne's deposition testimony detailing her many criticisms of Mr. Dillon and her specific

request that Mr. Dillon (not Mr. Dobbs) be removed from NSF.[3]  *See* SUMF ¶¶ 43-45, 47-49, 52,

55); *see also* Williams Decl. Ex. 2 50:3-11 (Ms. Aronson testifying that Ms. Coyne's "frustration

was specific to Mark [Dillon]," and that her "energy around Mark's issues was heightened").

Next, Plaintiff concedes that Mr. Dobbs allowed Mr. Dillon to announce his new

assignment on the CONOPS, that Mr. Dillon did e-mail his SAIC colleagues and several NSF

staff members, announcing this change, and that the allegations in his Complaint to the contrary

are false.  Opp. 6-7 (citing *id.* Att. 13); *see also* SUMF ¶ 9.  And, while the Opposition states that

"Mr. Dillon sent the announcement out to save face," Plaintiff cites no record evidence to

support this.  Opp. 7.

Mr. Dillon also claims in his Opposition that in September 2011, he "became aware . . .

that SAIC employees and DCISS subcontractors were working on the Research.gov ('R.gov')

---

[2]  At approximately the same time, Mr. Dobbs made other similar reporting structure changes, and many of Leroy Dominique's direct reports began reporting directly to Mr. Dobbs.  Dobbs Decl. ¶ 3.

[3]  In any event, Mr. Dobbs, too, has now been removed from the contract and laid off from SAIC.  Dobbs Decl. ¶ 2.

contract, but not billing the R.Gov contract for their work and vice-versa." *Id.*  Even if Mr. Dillon did become aware of this purported "timecharging issue" in September, which none of the cited record evidence supports, this is wholly immaterial, because Mr. Dillon admits he did not raise any concerns about this supposed cross-charging until he filed his complaint with SAIC's Employee Ethics Council on January 25, 2012—after he had learned he was being removed from NSF and laid off from SAIC.  SUMF ¶¶ 67-69.

And, while it is true that Mr. Dobbs removed Mr. Dillon from the Capacity Plan in November 2011, Mr. Dillon admits that he was removed because Ms. Coyne was dissatisfied with his work on the project.  *Id.* ¶ 48; *see also id.* (Ms. Coyne testifying that Mr. Dillon "had caused an undue amount of money and time" and that she "wanted somebody else put on this project and Mark [Dillon] to be removed").  His removal was therefore not retaliatory.

Plaintiff also incorrectly asserts that he was "drummed out of NSF for not completing the CONOPS and Capacity and Performance Management Projects," and that he was "singled out and retaliated against because of his timecharging complaints." Opp. 8.  However, it is clear that Mr. Dillon was removed from NSF because the NSF customer complained about him repeatedly, and ultimately requested his removal.  *See* SUMF ¶¶ 43-45, 47-49, 52-55, 57-58.  Mr. Dillon's attempt to compare himself to Mr. Nicholas and Mr. Ohlis in an effort to show he was somehow "singled out" fails.  Mr. Dillon cites nothing in the record to support his contentions about Mr. Ohlis, nor is there any evidence that the customer complained about Mr. Ohlis or requested his removal; any attempted comparison is therefore meaningless.  *See JDS Uniphase Corp.*, 473 F. Supp. 2d at 712 (holding that the "comparator is inadequate as a matter of law because he is not similarly situated"); *Smith*, 2012 WL 3866487, at *8 (similarly-situated employees must have "'dealt with the same supervisor, were subject to the same standards *and engaged in the same*

*conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it'"*) (O'Grady, J.) (emphasis added) (citing *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010)).  As for Mr. Nicholas, Plaintiff is wrong that he continues to work for SAIC and NSF.  Opp. 8.  In fact, like Mr. Dillon, Mr. Nicholas was removed from NSF because the customer specifically requested his removal, and despite having previously received a favorable performance review.  Williams Decl. Ex. 1 196:9 – 199:4, 200:18-21.  Thus, to the extent the comparison is meaningful at all, it demonstrates that Mr. Dillon was not singled out for any supposed protected activity, but instead was treated like the other individual about whom the customer complained and requested his removal.

   *Section C(iv)*:  This section is wholly irrelevant to Mr. Dillon's retaliation claim because Mr. Dillon himself admits that he did not raise concerns about cross-charging between DCISS and R.Gov until after he learned he was being removed from NSF and laid off from SAIC. SUMF ¶¶ 67-69.  But, to be clear, Mr. Dillon has absolutely no evidence of any fraudulent billing on these contracts; all evidence on this point is to the contrary.  *First*, NSF did not find any discrepancies in SAIC's invoices.  *Id.* ¶ 73.  *Second*, SAIC's representative who investigated Mr. Dillon's timecharging complaint filed with SAIC's Employee Ethics Council found no evidence that improper timecharging occurred.  *Id.* ¶ 72; Memo. 21 & n.10.  *Third*, while Mr. Collier did not have a separate charge number for the Ashburn remediation project, he separately tracked his time for the Ashburn remediation work because the hours worked on this project were not billed back to NSF.  Williams Decl. Ex. 3 41:1-17; SUMF ¶ 36.[4]  Thus, it is clear that Plaintiff's allegations of fraudulent cross-charging between R.Gov and DCISS are unfounded.

---

   [4]  Mr. Collier is an SAIC subcontractor employed by Compuware.  Williams Decl. Ex. 3 12:10-13, 15:8-10.  He does not record his time directly to SAIC's timekeeping system; he generally charges his time to a Compuware account code.  *Id.* 34:4-21.

*Section C(v)*:  It is undisputed that Mr. Dillon was removed from NSF after Ms. Coyne approached Mr. Schmid, SAIC's Deputy Program Manager on the NSF program, and requested his removal from the contract.  *See* Opp. 10; SUMF ¶ 57.  Although Plaintiff points out that Ms. Aronson testified that she never asked for Mr. Dillon's removal, while Ms. Coyne testified that both she and Ms. Aronson wanted him removed, Opp. 10, there is no material dispute here, because what may have been said between Ms. Aronson and Ms. Coyne is irrelevant.[5]  It is SAIC's state of mind that it relevant here, and it is undisputed that SAIC knew that Ms. Coyne told Mr. Schmid to remove Mr. Dillon from NSF.  *Id.*; SUMF ¶ 57.

Plaintiff also mischaracterizes Ms. Aronson's deposition testimony, ignoring the many significant criticisms she had about Mr. Dillon's performance on the contract.  For example, she noted that she herself "had expressed frustration to Harold [Dobbs] . . . about Mark [Dillon]'s participation," and also characterized working with Mr. Dillon on the data storage back up and recovery project as a "frustrating experience."  *Id.* ¶ 55(b) (ellipsis in original).  She also noted his "pattern of not completing projects," the "continuous need to follow-up on taskings . . . in [Mr. Dillon's] court," and the consistent pattern of Mr. Dillon failing to timely deliver satisfactory work product for longer term projects.  *Id.* (ellipsis and alteration in original). Not surprisingly, Mr. Dillon does not dispute any of these statements.  And, because it is undisputed that Ms. Coyne asked SAIC (via Mr. Schmid) to remove Mr. Dillon from NSF, any disagreement between Ms. Coyne and Ms. Aronson here is irrelevant, given that it was unknown to SAIC.

---

[5]  In any event, Ms. Coyne's account of that conversation and Ms. Aronson's are quite similar. Ms. Aronson testified that when Ms. Coyne approached her and expressed frustration to her about Mr. Dillon, she "asked her to express that same frustration to [Mr. Schmid] so that they could take action, if necessary."  Williams Decl. Ex. 2 50:15 – 51:3.

*Section C(vi)*:  This section of the Opposition attempts to show that Mr. Dillon's layoff

from SAIC was "retaliatory," but, once again, this assertion is utterly baseless, and in fact, is

contradicted by the evidence in the record.

Mr. Dillon admitted in deposition that he had "no direct evidence" that Mr. Reynolds had

more budget in overhead than he represented to Mr. Dillon when Mr. Reynolds told him on

January 18, 2012 that he could not take Mr. Dillon back in business development due to

overhead budget problems.  Opp. Att. 17; Williams Decl. Ex. 4 294:2-5.[6]  And, while the

Opposition attempts to suggest that SAIC retaliated against Mr. Dillon by not giving him Mr.

Schier's position in business development, Opp. 11, this contention is completely

unsubstantiated.  In reality, after Mr. Schier resigned from SAIC on January 31, 2012, SAIC did

not fill his role; his position was eliminated.  McConnell Decl. ¶¶ 8-9.  And, in any event, Mr.

Schier had a particular expertise in the Middle East, and in his role as Senior Business

Development Manager at SAIC, he worked on a bid for the Operations, Maintenance, and

Defense of Army Communications, *id.* ¶¶ 5-6; Mr. Dillon was therefore not similarly-situated

with respect to his qualifications for Mr. Schier's job even if it had been available.  *Id.* ¶ 7.

*Section C (vii):*  Here, Mr. Dillon does not dispute that he filed his complaint with

SAIC's Employee Ethics Council on January 25, 2012, which was after he learned he was being

removed from NSF and laid off from SAIC.  Opp. 11; SUMF ¶ 67.  And, while Mr. Dillon

claims he "feared facing heightened retaliation and asked Mr. Andrews in an email, 'Has there

been any discussion of transferring me out of the line of fire?'" (Opp. 11-12), the cited e-mail

was sent on February 2, 2012—not on January 25, as Plaintiff represents (*id.* Att. 21 at

---

[6]  In fact, Mr. Dillon testified that he "underst[ood] that they have overhead problems," but in
Mr. Dillon's (self-serving) opinion, SAIC was "sacrificing their future if they don't keep
people in business development."  Williams Decl. Ex. 4 293:19-22.

PL00509)—approximately two weeks after Mr. Dillon learned he was being removed from NSF and one week after he had received his layoff notice.  SUMF ¶¶ 62, 64, 67.  It is therefore impossible for the filing of his Ethics complaint or this subsequent e-mail to Mr. Andrews to have motivated the prior decision to remove him from NSF or lay him off from SAIC.

*Section C(viii)*:  While Mr. Dillon claims in his Opposition that "SAIC carefully orchestrated Mr. Dillon's termination and as a result, Mr. Dillon was unable to secure another position within SAIC" despite applying for multiple positions within SAIC, Opp. 12, Mr. Dillon's sworn deposition testimony completely contradicts this statement.  Mr. Dillon admitted that there is "no evidence" that any of the hiring managers for the SAIC jobs to which Mr. Dillon applied after his removal from NSF had any knowledge of any timecharging concerns he raised, or that they rejected him on that basis.  SUMF ¶ 74.

Furthermore, the cited e-mails between Ms. McConnell and Mr. Dixon do not support Mr. Dillon's assertion that "SAIC was well aware of Mr. Dillon's Timecharging complaints." Opp. 12.  While Mr. Dillon suggests that Ms. McConnell's statement in a February 28, 2012 e-mail to Mr. Dixon that "Lisa [Daniels] is very concerned that [Mr. Dillon's] layoff not have any glitches" somehow shows a retaliatory motive (*id.*), the record evidence shows otherwise.  The sentiment attributed to Ms. Daniels was innocuous; as Mr. Dixon stated in deposition, he understood Ms. Daniels to mean that it was important to ensure "that we follow the proper process on our layoff notice . . . .You need to make sure that the dates and everything on them are correct. Dot the I's and . . . cross the T's."  Williams Decl. Ex. 5 118:3-19. "[I]n the past . . .we've . . . had to pay attention to what was on these letters. Whether it be Mark Dillon or anybody, just . . . make sure you're doing what you need to do with the letters[.]"  *Id.* 120:2-7.

With respect to Mr. Dixon's statement in a March 9, 2012 e-mail to Ms. McConnell that "Dede [O'Donnell] had made a comment to me that she didn't think that under the circumstances we could term [Mr. Dillon]," and Ms. McConnell's response, "Probably not if we want to stop the litigation," Opp. 12, Mr. Dixon explained the circumstances to which Ms. O'Donnell was referring, noting that Mr. Dillon was on short-term disability and that he had asked for comp leave.  Williams Decl. Ex. 5 124:20 – 125:6.  Mr. Dixon further explained that short-term disability "is something everybody has a right to . . . everything stops until that is over.  And then you draft up new dates for a layoff notice."  *Id.* 127:15-19.  These e-mails certainly provide Mr. Dillon no evidence of any pretext or retaliatory motive for his layoff from SAIC.

## II.    Argument

Plaintiff has failed to establish a genuine issue of material fact upon which a jury could find that he satisfied *any* of the three requisite elements of an FCA retaliation claim – (1) that he engaged in protected activity, (2) that SAIC had notice of his protected activity, *or* (3) that SAIC took any adverse action against him as a result of his protected activity.  *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010).

While Mr. Dillon claims he was terminated "for pretextual reasons," this claim rests on sheer speculation.[7]  As this Court has recognized, "'[u]nsupported speculation is not sufficient to

---

[7]   Mr. Dillon relies on two age discrimination cases, *Gries v. Zimmer, Inc.*, No. 90-2430, 1991 WL 137243 (4th Cir. July 29, 1991) and *Herold v. Hajoca Corp.*, 864 F.2d 317 (4th Cir. 1988) for the proposition that "[k]ey determinations required to decide the pretext issue involve credibility and should be determined by a jury."  Opp. 20.  Neither case involved the question of whether summary judgment was proper, and both cases are distinguishable in any event.  In *Gries*, the Court reversed a JNOV, holding that a reasonable jury could have found that the defendant's stated reasons for terminating the plaintiffs were pretextual.  1991 WL 137243, at *7.  Unlike Mr. Dillon, the plaintiffs had specific evidence supporting their pretext claim—that their performance evaluations had been altered to support their termination decisions, and that their former duties had been reassigned to men under forty.  *Id.* at *7-8.  In *Herold*, the Court held that the jury could properly have found that the employer's reasons for dismissing the plaintiff were mere pretext.  864 F.2d at 321.  The

defeat a summary judgment motion.'" *Stephens v. Gutierrez*, No. 1:08-cv-870, 2010 WL

1005189, at *6 (E.D. Va. Mar. 15, 2010) (O'Grady, J.) (alteration in original) (quoting *Felty v.*

*Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)).  Rather, "[t]o defeat a summary

judgment motion, the existence of specific material evidentiary facts must be shown."  *Smith*,

2012 WL 3866487, at *3 (O'Grady, J.) (quoting *Ash v. UPS*, 800 F.2d 409, 411-12 (4th

Cir.1986)).  Because Mr. Dillon has failed to do so, SAIC is entitled to summary judgment.

### A.    Mr. Dillon's Conduct Did Not Rise To The Level Of Protected Activity

In Mr. Dillon's view, any time an employee asks a routine question about timecharging,

he is investigating a fraud and engaging in protected activity.  But, this is not the law in the

Fourth Circuit, and allowing Mr. Dillon's claim to proceed to a jury would set a precedent in

which an FCA retaliation plaintiff can survive summary judgment merely by showing that he

asked for a billing code or did so much as mention the word "timecharging" to a supervisor.

As the Fourth Circuit recently confirmed, "'[s]imply reporting [a] concern of a

mischarging to the government to [a] supervisor does not suffice to establish that [an employee]

was acting in furtherance of a qui tam action.'"  *Owens*, 612 F.3d at 735 (fourth ellipsis in

original) (internal quotation marks omitted) (quoting *Zahodnick v. IBM*, 135 F.3d 911, 914 (4th

Cir.1997); *see also McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000)

(plaintiff who informed supervisors and auditors about the falsification of records was not

engaged in protected activity because "internal reports must allege fraud on the government").

Rather, "an employee's opposition to fraud [must] take[] place in a context where 'litigation is a

distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . .

---

Court relied on the plaintiff's specific evidence of pretext, including evidence from his
supervisor and co-workers that his job performance had been good, and evidence that when
faced with cutbacks, the employer laid off an older truck driver while retaining two younger
ones in the same job category.  *Id.* at 320-21.  Unlike the plaintiffs in *Gries* and *Herold*, Mr.
Dillon does not have any specific evidence of pretext—just speculation.

litigation is a reasonable possibility.'" *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344

(4th Cir. 2010) (ellipsis in original) (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167

F.3d 861, 869 (4th Cir. 1999)).

Here, aside from his Ethics complaint, which is irrelevant given that it was admittedly

filed after the decision to remove Mr. Dillon had been made and communicated to him, *see*

SUMF ¶¶ 67-68; *supra* pp. 9-10, there is no evidence that Mr. Dillon did so much as "report" a

"concern of a mischarging" to Mr. Dobbs or anyone else at SAIC management, and even if he

did, this would not qualify as protected activity under binding Fourth Circuit precedent.  Rather,

his routine questions about timecharging were "entirely quotidian," *Owens*, 612 F.3d 736, and

did not even hint at the fraudulent timecharging that he now claims he was investigating.

The Opposition identifies four instances in which Mr. Dillon purportedly engaged in

protected activity, but none of these satisfy the "distinct possibility" standard.

*First*, Mr. Dillon points to his purported "investigation" of Mr. Dobbs' defective

timecharging guidance for timesheet administration activities.  Opp. 16.  While Plaintiff

references his "multiple conversations," with Mr. Dobbs on this matter, *id.*, in deposition, he

could only remember one such conversation—the one on April 29, 2011, in which he offered to

show him Mr. Sorensen's April 14, 2011 e-mail stating that Mr. Dillon's overhead charges for

timekeeping activities taking 15 minutes or more were consistent with SAIC policy.  SUMF

¶¶ 31-32.  Mr. Dillon does not even allege that he told Mr. Dobbs—or even suggested—during

this conversation that he believed Mr. Dobbs' timecharging guidance was in any way working a

fraud on the government.  And, it is undisputed that Mr. Dillon never complained to Mr.

Sorensen about Mr. Dobbs' timecharging guidance, and Mr. Dillon admitted that the allegation in his Complaint to the contrary was false.[8] *Id.* ¶¶ 26-27.

Furthermore, because Mr. Dobbs was—by Mr. Dillon's own admission—not giving improper timecharging guidance in the first instance, *id.* ¶¶ 25, 28-29, 39, Mr. Dillon could not have engaged in protected activity by questioning it, as there was no "distinct possibility" of litigation flowing from a non-fraudulent instruction from his supervisor. *See Mann*, 630 F.3d at 345-46. Mr. Dillon attempts to distinguish *Mann* on the grounds that there was no fraud involved. Opp. 17. There was no fraud here either; Mr. Dillon himself admitted that he never mischarged his time, SUMF ¶ 22, and there is no evidence that SAIC fraudulently billed NSF.

*Second*, Mr. Dillon alleges that he engaged in protected activity by investigating "Mr. Dobbs' defective Timecharging directive that SAIC employees and subcontractors should bill the government client directly for contract compliance review on the Ashburn remediation project," which Ms. Daniels had previously stated was to be unbillable. Opp. 17.[9] And while Mr. Dillon claims that he "reached out to Mr. Schmid and Ms. Daniels to ascertain whether Mr. Dobbs['] directive was valid," the evidence Plaintiff cites in support of this statement reveals that all Mr. Dillon did was ask them for an unbillable charge number. *Id.* 18; *see also* SUMF ¶¶ 41-42. To suggest that this workaday e-mail amounts to protected activity is simply frivolous. And,

---

[8] While Mr. Dillon now claims that he contacted Mr. Sorensen "to gather supporting evidence so he could inform Mr. Dobbs and get him to stop giving defective Timecharging directing [*sic*] and from pressuring him to fraudulently bill the customer for overhead," Opp. 17, this statement is contradicted by Paragraph 47 of Mr. Dillon's Complaint, where he states that he e-mailed Mr. Sorensen "[t]o confirm his own experience and knowledge," and his deposition testimony, where he says he "wanted to be critical of [his] own knowledge and understanding." Williams Decl. Ex. 4 137:4-7.

[9] While Mr. Dillon has previously alleged that Mr. Dobbs told him to bill the customer for contractor compliance review associated with the Ashburn remediation review, SUMF ¶ 38, this assertion in his Opposition is the first time he has alleged that Mr. Dobbs gave this instruction to anyone else. He cites no evidence for this unfounded allegation, nor could he.

given that Plaintiff admitted in deposition that he never complained to Mr. Dobbs or Ms. Daniels that any of their remediation timecharging instructions were illegal or otherwise improper, SUMF ¶ 42, he cannot possibly show that he engaged in protected activity here.

*Third*, Mr. Dillon claims that he was engaged in protected activity when he was "investigating the cross-charging of SAIC employees and subcontractors [who] do not charge their time to the right contract." Opp. 18. But, Mr. Dillon admits that he did not complain about cross-charging until after he was told he was being removed from NSF. SUMF ¶ 69. Because these complaints could not have motivated the already-made and communicated decision to remove him from the contract or lay him off from SAIC, and because Mr. Dillon has admitted that he has "no evidence" that any of the hiring managers for the SAIC jobs to which he subsequently applied had any knowledge of his timecharging complaints or rejected him on that basis, these complaints are irrelevant to the FCA retaliation analysis. *See* Memo. 24-25.

The same is true of Mr. Dillon's fourth purported protected activity—the filing of Mr. Dillon's Ethics complaint—given that it also occurred after he knew he was being removed.

Even examining all of his purported protected activities together, as Plaintiff would have it, *see* Opp. 19, these activities do not qualify as protected activity under the "distinct possibility" standard because they do not "rise above the level of ordinary critique and constitute a step in preparation for an FCA claim." *Owens*, 612 F.3d at 735; *Mann*, 630 F.3d 338.

## B.      SAIC Was Not On Notice Of A Potential FCA Claim

For similar reasons, Plaintiff cannot meet the notice prong, which requires an employee to show that the employer was "on notice that a *qui tam* suit" was "a reasonable possibility." *Eberhardt*, 167 F.3d at 868. "[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What defendant must know is that plaintiff is engaged in . . . activity that reasonably could lead to a False Claims Act case." *United States ex*

*rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998); *see also, e.g.*, *Glynn v.

Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 414  (D. Md. 2011) ("Glynn did not express a

concern to management that IST was engaging in fraud or failing to comply with its contractual

requirements . . . management thus had no knowledge that [he] was investigating what he

perceived to be false certification") (citation omitted).

Although Plaintiff suggests that the *Eberhardt* standard is higher than the one that should

apply in this case, Opp. 15, the Fourth Circuit soundly rejected a nearly identical argument in

*United States ex rel. Parks v. Alpharma, Inc.*, No.11-1498, 2012 WL 3291705, at *7-8 (4th Cir.

Aug. 14, 2012), noting that the *Eberhardt* Court specifically explained that the employee must

show that his actions "'let the employer know, *regardless of whether the employee's job duties

include investigating potential fraud*, that litigation is a reasonable possibility.'"[10]  *Id.* at *7

(quoting *Eberhardt*, 167 F.3d at 868).  The *Eberhardt* standard applies in this case, and Plaintiff

cannot come close to satisfying it.  *See* SUMF ¶¶ 27, 41-42.

### C.  Mr. Dillon's Retaliation Theory Fails Because He Suffered No Adverse Employment Actions As A Result Of Any Protected Activity.

Mr. Dillon's layoff and his earlier reassignment, which he improperly characterizes as a

"demotion," were not in retaliation for any protected activity on his part.  SAIC has put forth

legitimate, non-retaliatory reasons for each of these decisions.[11]  And while Mr. Dillon claims in

his Opposition that SAIC's reasons are "merely pretext," Opp. 20, he has admitted their factual

accuracy in sworn deposition testimony, SUMF ¶¶ 5-6, 8, and the Opposition, Opp. 10.

District courts in this Circuit have analyzed the issue of pretext in FCA retaliation cases

under the familiar *McDonnell Douglas* framework.  *See, e.g.*, *Clinkscales v. Walgreen Co.*, No.

---

[10]  Further, the *Eberhardt* standard has been applied in numerous cases in the Fourth Circuit that
      do not involve such employees.  *See, e.g.*, *Owens*, 612 F.3d at 735; *Mann*, 630 F.3d 338.
[11]  *See* SUMF ¶¶ 7, 8, 60; *see also supra* pp. 1-2.

8:10–2290, 2012 WL 80543, at *6 (D.S.C. Jan. 11 2012); *Glynn*, 807 F. Supp. 2d at 415 n.16. Once a plaintiff establishes a prima facie case of discrimination, the burden of production, not persuasion, shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Clinkscales*, 2012 WL 80543, at *6.  "Once a defendant demonstrates a legitimate, nondiscriminatory reason, the plaintiff must demonstrate *by a preponderance of the evidence* that the proffered reason was 'not its true reason[ ], but [was] a pretext for discrimination.'"  *Id.* (emphasis added) (alteration in original) (quoting *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir.2010)).  Plaintiff has failed to identify evidence to create a jury issue regarding pretext under this framework (or, even in the absence of this framework, to create a jury issue with respect to this key element of his claim).

    With respect to Mr. Dillon's purported "demotion," Mr. Dillon does not dispute SAIC's reasons for reassigning him.  *See* Opp. 20-21.  He instead states, apparently in support of his pretext argument, that he was "[d]emoted [i]mmediately [a]fter [r]aising [b]illing [c]oncerns with Mr. Dobbs," *id.*  But, Mr. Dillon has already admitted that—contrary to the admittedly false allegations in his Complaint—he was reassigned *before* his April 29, 2011 conversation with Mr. Dobbs about timekeeping overhead charges—the only conversation on the subject he recalls— and there is no evidence that his direct reports were removed "immediately after" this conversation.  SUMF ¶¶ 8, 31-32.  In fact, Mr. Dobbs removed them in connection with assigning Mr. Dillon the CONOPS project (in order to give him more time to focus on it), *id.* ¶ 7, which, Mr. Dillon admits Mr. Dobbs did *before* their April 29 discussion.  *Id.* ¶ 8.

    Mr. Dillon also argues in his Opposition that Mr. Dobbs was "visibly displeased" and "seemed disgruntled" during their April 29, 2011 conversation about timekeeping overhead charges, Opp. 6, 16; in deposition, Mr. Dillon testified that Mr. Dobbs "made a face like he was

displeased." SUMF ¶ 31.  Mr. Dillon's interpretation of Mr. Dobbs' facial expression or temperament is insufficient to advance his wholly speculative case to the jury.  *See, e.g., Glynn*, 807 F. Supp. at 416 (FCA retaliation plaintiff's proffered evidence of pretext, including that management was "angry," "frustrated" and "upset" upon learning that plaintiff had raised concerns with the government, did "not supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of the activity").

Mr. Dillon's pretext argument also relies heavily on his "positive track record at SAIC," and his "history of good performance evaluations." Opp. 1, 3-4, 21-22.  But, the old performance evaluations are irrelevant to how Mr. Dillon was performing at the time of his removal from SAIC in January 2012.[12]  *See O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 547 (4th Cir. 1995) (holding that a favorable performance review eight months prior to plaintiff's termination was irrelevant to establishing that the plaintiff was performing well at the time of termination), *rev'd on other grounds,* 517 U.S. 308 (1996); *Glynn*, 807 F. Supp. 2d 391 (granting summary judgment to employer in FCA retaliation case where employee terminated in December 2006 received a positive performance review in April 2006).  Mr. Dillon cannot and does not dispute that his performance was the subject of heightened criticism from numerous NSF government customers prior to his removal, and that NSF manager Colleen Coyne

---

[12]  In any event, Mr. Dillon's evaluations show that he did not have the sterling record he claims.  *See, e.g.*, Opp. Att. 3 at SAIC_0000321 (2010 evaluation) ("Collaboration between SAIC and government procurement offices were sometimes confused and may have been mitigated by a finessed approach, planning and management"), SAIC_0000325 ("on occasion he over-analyzes and produces a solid technical product that is not so concise and meaningful, converting complex information into more complex information").  In fact, Mr. Dillon's 2007 performance evaluation notes that another government customer had previously "requested [Mr. Dillon's] removal from project" and that "[c]ollaboration with department staff is not always at a level it should be for a senior level staff member. To be successful going forward, Mark will have to demonstrate his ability/willingness to take complex problems and make them less complex - without upper management intervention. At times during this past year he has done the opposite." *Id.* at SAIC_0000484 – 489.

ultimately requested his removal.  *See* SUMF ¶¶ 43-55.  Accordingly, Mr. Dillon's claim that

SAIC's assertion that "Mr. Dillon was a weak performer is . . . pretextual" clearly has no merit.

Mr. Dillon also notes that Ms. Aronson testified that she never asked for Mr. Dillon's

removal from the contract, while Ms. Coyne testified that both she and Ms. Aronson wanted him

removed.  Opp. 10, 22.  But, as explained *supra* at p. 8, what may have been said between Ms.

Aronson and Ms. Coyne is irrelevant; it is SAIC's state of mind that it relevant here, and it is

undisputed that SAIC knew that Ms. Coyne told Mr. Schmid to remove Mr. Dillon from the NSF

program.  Opp. 10; SUMF ¶ 57.  And, as also noted above, Ms. Aronson and Ms. Coyne's

versions of their own internal conversation are quite similar.  *See supra* p. 8.

Mr. Dillon's attempt to compare himself to Mr. Ohlis or Mr. Nicholas certainly does not

show that he was "singled out and targeted . . . for removal because of his investigations into

fraudulent [t]imecharging."  Opp. 23.  As demonstrated above at pp. 6-7, the Ohlis-Dillon

comparison is irrelevant, because there is no evidence that the customer ever requested Mr.

Ohlis' removal from the contract, or even complained about him.  *See Smith*, 2012 WL 3866487,

at *8; *JDS Uniphase Corp.*, 473 F. Supp. 2d at 712.  And, Mr. Dillon's discussion of Mr.

Nicholas actually undermines his theory that he was "singled out," because Mr. Nicholas was

also removed from NSF at the request of the customer.  *See supra* pp. 6-7.[13]

Lastly, any claim in the Opposition of retaliation or pretext based on the fact that Mr.

Dillon was unable to secure another job at SAIC during his redeployment should be disregarded

entirely given that Mr. Dillon admitted under oath that he has "no evidence" that any of the

---

[13]  Even if Mr. Dillon could create a triable issue of material fact that Mr. Dillon's layoff was
retaliatory, SAIC would be entitled to summary judgment because it would have made the
same decision even if Mr. Dillon had not engaged in protected activity.  *See Glynn*, 807 F.
Supp. 2d at 415 (citing FCA anti-retaliation provision's legislative history, at S. Rep. No. 99-
345, at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300)).

hiring managers for the SAIC jobs to which Mr. Dillon applied after his removal from NSF had any knowledge of any concerns he may have raised about timecharging, or that they rejected him on that basis.  SUMF ¶ 74.  And, while Mr. Dillon claims he "should have been offered a job opportunity within the business development department," Opp. 22-23, this self-serving statement does not demonstrate that Mr. Reynolds or anyone else at SAIC was retaliating against him by not offering him such a position.  Mr. Dillon admits that he had no reason to believe that Mr. Reynolds was being untruthful; Mr. Dillon simply believes Mr. Reynolds should have had a larger budget for business development.  *See supra* p. 9.  And the supposed opening Mr. Dillon identifies was not, in fact, open; Mr. Schier's position was eliminated.  *See id.*

Plaintiff's retaliation claim rests solely on "[f]anciful inferences and bald speculations of the sort no rational trier of fact could draw or engage in at trial," insufficient to survive summary judgment.  *Smith,* 2012 WL 3866487, at *3 (O'Grady, J.) (alteration in original).

## CONCLUSION

For the reasons set forth above, SAIC respectfully asks this Court to grant summary judgment in its favor on Plaintiff's FCA retaliation claim.

Respectfully submitted,

Dated: January 8, 2013

 /s/ Jason C. Schwartz
Jason C. Schwartz, Va. Bar No. 43635
Greta B. Williams, admitted pro hac vice
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
jschwartz@gibsondunn.com
gbwilliams@gibsondunn.com
Telephone:          202.955.8500
Facsimile:          202.467.0539

*Attorneys for Defendant SAIC, Inc.*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of January, 2013, I will electronically file the

foregoing with the Clerk of the Court for the Eastern District of Virginia using the CM/ECF

system, which will then send a notification of such filing (NEF) to the following:

Carla D. Brown
CHARLSON BREDEHOFT COHEN
BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
cbrown@charlsonbredehoft.com

/s/ Jason C. Schwartz
Jason C. Schwartz, Va. Bar No. 43635
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
jschwartz@gibsondunn.com
Telephone:      202.955.8500
Facsimile:      202.467.0539