

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MARK DILLON,

    Plaintiff,

-v-

SAIC, INC.,

    Defendant.

Civil Action No. 1-12-CV-390

## MEMORANDUM OPINION

This matter comes before the Court on Defendant SAIC, Inc.'s Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Plaintiff Mark Dillon, a former employee of SAIC, Inc., brings this action against Defendant for retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). On January 11, 2012, this Court held a hearing on Defendant's Motion and heard oral arguments from both parties. For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

## Background

Mark Dillon was an employee of SAIC, Inc. from 1996 until his termination on April 10, 2012. Dillon began as a Senior Engineer/Program Manager and enjoyed strong performance evaluations for most of his tenure. In 2009, Dillon was part of SAIC's successful bid for a Data Center Infrastructure Support Services (DCISS) contract to serve the National Science Foundation ("NSF"). In February 2010, Harold Dobbs became Dillon's direct supervisor and his first evaluation of Dillon was glowing. Initially, Dillon worked as the Infrastructure Manager on the contract and supervised two employees, considered direct reports. Eventually, Dillon's supervisory responsibility was removed and Dillon no longer had any employees reporting

1

directly to him.

## A. Initial Time Charging Controversy

According to Defendant, Dillon's supervisory duties were removed because his supervision was not necessary and he could be better utilized elsewhere. The two employees that reported to Dillon, Mr. Pasini and Mr. Liscomb, informed Dobbs and a Deputy Program Manager that they did not require Dillon's supervision. Dillon also admits that he complained to the HR Director that he felt underutilized in the role. Dillon's salary and benefits remained the same in the new assignment, but his managerial responsibilities ended.

Plaintiff claims that the change in his employment was a demotion and that it was in retaliation for reporting Dobbs for giving Dillon improper instructions for tracking his billable and non-billable hours in accordance with SAIC policy, a practice known as "time charging." In April 2011, Dobbs sent Dillon two emails questioning the manner in which Dillon charged his time. He asked Dillon about "timekeeping" overhead charges, which indicated that Dillon was charging more than 15 minutes to an administrative overhead billing code.[1] Dobbs informed Dillon that he should not be spending so much time billing to administrative overhead and should be able to invoice that time to the client. Dillon took issue with those communications and believed that Dobbs was instructing him to unlawfully charge time spent on non-billable tasks to the client.

Believing Dobbs' instructions were improper, Dillon reached out to Scott Sorensen ("Sorensen"), SAIC's Deputy Director for Strategic Regulatory Finance, to ask about the

---

[1] April 13, 2011, email from Dobbs to Dillon: "Mark, Please see me about 'timekeeping' overhead charges. My general impression is that this is an unnecessary overhead charge. This taken with your frequent floor check failures is alarming and requires immediate attention. Typically, accounting for your time charging is a part of the task…(sic) meaning 'I've worked these number of hours to be invoiced.' I don't understand how you can use one to ¾ hours to charging your time daily? We need to discuss. The amount of time you are charging to PMO should be sufficient?"

2

timekeeping policy. In his Complaint, Dillon initially claimed that he had informed Sorensen about Dobbs' instructions and confirmed that Dobbs' instructions were improper. Dillon later recanted this description of his communication with Sorensen in his deposition and admitted that his email only addressed how he, himself, completed time sheets and did not include a description of Dobbs' instructions. Unaware of any controversy, Sorensen emailed Dillon indicating that Dillon's method of charging periods of more than 15 minutes spent administering time sheets to overhead was proper.[2]

Again on April 28, 2011, Dobbs sent Dillon two emails with the subject line "Time Charging,"[3] which questioned Dillon's method for billing his time. The next morning, April 29, Dillon received Dobbs' emails and approached Dobbs to show him the email from Sorensen. Plaintiff maintains that he told Dobbs that his time charging instructions were unlawful, but that Dobbs appeared very displeased and refused to look at the email. According to Dobbs, he accepted Dillon's explanation and that was the end of the question. "It ended the question I had about his personal timekeeping." Dobbs Dep. at 101.

At some point either immediately following the confrontation or the day before, Dobbs informed Dillon that he was being reassigned and would no longer enjoy any managerial role. Plaintiff believed this was a demotion in retaliation for having challenged Dobbs' improper time charging instructions. Following the exchange, Dillon went to Donald Dixon, SAIC's Deputy

---

[2]Sorensen email response to Dillon, April 14, 2011: "You have been correctly charging your time to overhead for the time spent on the timesheet administration tasks."

[3] April 28, 2011 at 6:00pm, email from Dobbs to Dillon: "I'm still having issues with why you charge OH to complete you[r] timecard? Accounting for you[r] time is part of the task area you work. That time to record you[r] effort can be invoiced. We need to review you[r] rationale for using OH to complete your timecard. Let's discuss and fix. [Dobbs then pastes the link to SAIC's internal time charging policy].

April 28, 2011 at 6:05pm: "Just clarification…I noted that part of you[r] time was cleaning up e-mail…How much of that was related to NSF related or PMO related activities? Training is ok…is this mandatory training? BD [business development] is BD."

3

Human Resources Director for his business unit and reported that he felt his demotion was related to the time charging controversy.[4] There is no evidence that any actions were taken following Dillon's report to Dixon and no indication that Dixon had reason to believe Dobbs' time charging practices were unlawful.

Dobbs removed Dillon from his previous assignment and reassigned him as the lead for the Single Integrated Operations Concept of Operations ("CONOPS") document for the NSF. This role did not require any supervisory responsibility. Also, Plaintiff notes that SAIC was already several years late in completing the CONOPS document by the time he was assigned to the project. NSF's IT Project Manager, Colleen Coyne, was already displeased with SAIC's work to date. In fact, the project remains incomplete as of the writing of this Opinion, but neither Dillon's predecessor nor his successor has been fired as a result.

## B. Research.gov Time Charging Incident

By November 2011, Dillon became aware of another time charging discrepancy. On November 22, there was a major failure at the Research.gov data center, which was serviced by SAIC. It was a significant problem for the client and for SAIC. As a result, Lisa Daniels, SAIC Senior Vice President and Operations Manager responsible for the NSF program announced that the remedial work should not be billed to the customer. Dobbs passed along these instructions. At that point, Dillon learned that DCISS subcontractors had been supplying remediation support without a discrete charge number for the Research.gov contract. On December 29, 2011, Dillon emailed Dobbs, Ms. Daniels, and two other senior managers with the subject line "May I please have Ashburn Remediation Charge Number for today's T/S (and modify previously)." Daniels replied to Dillon with the appropriate code. According to Dillon, prior to that time, contractors

---

[4] It is unclear, and Dillon is not sure, what specific information he gave Dixon. Dillon does not recall what he said about Dobbs' time charging instructions or if he indicated that he felt those instructions were "unlawful."

4

were improperly withholding their times or reporting time worked on various projects to a single charge code. It would be impossible, Plaintiff concludes, for SAIC to properly charge those clients when only a single code was used.

According to Defendant, neither Dobbs nor Daniels viewed Dillon's request as a complaint about time charging. Plaintiff claims that he told Mr. Dixon that Dobbs had told him orally to charge direct for his contract compliance review in connection with the remediation work, but he could not say that he told Mr. Dixon Dobbs' instructions were unlawful.

### C. Dillon's Termination

According to Dillon, he was terminated by SAIC in retaliation for his time charging complaints. According to Defendant, however, Dillon was fired at the request of the client, who no longer wanted him working on the project. According to the Declaration from the client, Colleen Coyne, NSF IT Project Manager, Dillon's work was of "generally poor quality," and that he "failed to produce documents on a regular basis...he belabored points...fell asleep during meetings...[and] was not a productive employee." Ms. Coyne asked Dobbs on "several occasions to remove Dillon from the project."[5]

Ultimately, Defendant claims, Ms. Daniels determined that Dillon needed to be fired based on customer complaints and after having reviewed Dillon's work on the CONOPS document. In her declaration, Ms. Daniels stated that she reviewed Dillon's work on the CONOPS document and deemed it "worthless"—"no more than a cut-and-paste from the Statement of Work." On January 27, 2012, Dobbs provided Dillon with a Notification of Layoff. The reason provided stated that "the customer has requested that you be removed from the

---

[5] Dobbs was away on vacation when Ms. Coyne informed another SAIC Manager, Mr. Schmid, that she wanted Dillon off the NSF Program. Mr. Schmid told Ms. Daniels that the clients had asked for Dillon to be removed and Ms. Daniels, then, determined that Dillon should be removed from the project.

5

program therefore your position is no longer available due to lack of work." The Notification further advised Dillon that he would be laid off entirely if he was unable to secure another position within SAIC by February 24, 2012.[6]

Plaintiff argues that SAIC's justification for his firing was pretextual and was, in fact, the result of retaliation against him for his time charging complaints. Dillon attempted to obtain other employment within SAIC, but was unable to find any. He spoke with Mr. Reynolds, in SAIC's Business Development, about employment, but Mr. Reynolds informed him that they could not hire him due to overhead issues. Dillon later discovered, however, that Ron Schier, an SAIC employee he believed was of similar status in the same business unit as Dillon, had given his notice of resignation prior to Dillon being laid off. Dillon, however, claims he was not given the opportunity to apply for the position.

### D.     Post-Employment Complaints

After Dillon was informed by Dobbs that he would be terminated, he contacted Roy White, a former executive commission member, regarding a corporate ethics complaint. Dillon also spoke with Joel Andrews, Deputy Director of the Ethics Council/Senior Security Engineer, and raised concerns about time charging practices on the NSF project. It was the first time Dillon raised these concerns with someone on SAIC's Employee Ethics Council.

## Standard of Review

Federal Rule of Civil Procedure 56 provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[6] The parties later agreed to extend that date to April 9, 2012.

6

law." *Cortex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the initial burden of showing the court the basis for its motion and identifying the evidence that demonstrated the absence of a genuine issue of material fact. *Id.* Once the moving party satisfies its initial burden, the opposing party has the burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) ("To avoid summary judgment, the non-moving party's evidence must be of sufficient quantity as to establish a *genuine* issue of material fact for trial.") (emphasis original). A dispute of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party..." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, "[f]anciful inferences and bald speculations of the sort no rational trier of fact could draw or engage in at trial need not be drawn or engaged in at summary judgment." *Clinchfield Coal Co.*, 124 F.3d at 640. To defeat a summary judgment motion, the existence of specific material evidentiary facts must be shown. *Ash v. United Parcel Service, Inc.*, 800 F.2d 409, 411-412 (4th Cir. 1986).

## Analysis

Congress established § 3730(h) of the False Claims Act to ensure that individuals who may be considering exposing fraud are legally protected from retaliatory acts by their employer. *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 343 (4th Cir. 2010). The Fourth Circuit has recognized three elements that must be satisfied before an FCA claim for retaliation can be brought: (1) the employee must have taken action in furtherance of a *qui tam* suit, meaning it was a protected activity; (2) the employer must have had notice of those acts; and, (3) the employer took adverse action against the employee as a result of his or her acts. *Id.*; *see also U.S. ex Rel.*

7

*Ovens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010). The Fourth Circuit allows for the first and second elements to be combined, so that the "protected activity" and the "notice" elements may be considered together. *Mann* at 344. When considering the two elements in tandem, however, the court must consider the facts known to the employee at the time of the protected activity as well as the facts known to the employer at the time of the alleged retaliation. *Id.*

Plaintiff claims that there are four distinct acts that should be considered protected activities under the FCA. (1) First, Plaintiff claims that his investigation of Dobbs' improper time charging instructions for timesheet administration lasting more than 15 minutes was a protected activity. (2) Plaintiff's second protected activity consists of his investigation into Dobbs' improper instructions to employees and subcontractors directing them to bill the government client directly for the Research.gov remediation project (a/k/a the Ashburn remediation project), rather than using an unbillable charge code for the work. (3) Plaintiff's third protected activity included his investigation into cross-charging by SAIC employees and subcontractors, whereby time was charged to one client code when the work was, in fact, done for another client, in particular for the Research.gov remediation. (4) Finally, Plaintiff claims he engaged in protected activity when he pursued a corporate ethics complaint, which listed Dobbs' time charging directives and the cross-charging practice. Defendant claims that none of the four claimed activities satisfy the "protected activity" standard and that Plaintiff did not satisfy the notice requirement under the FCA.

I.   **Protected Activity and Notice**

In *Mann*, the Fourth Circuit applied the "distinct possibility standard" to test for the presence of a protected activity. *Id.* The Court, quoting an earlier decision from *Eberhardt v. Integrated Design & Constr., Inc.*, determined that a protected activity takes place when "an

8

employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct could reasonably lead to a viable FCA action, or when...litigation is a reasonable possibility.'" *Id.* (quoting *Eberhardt*, 167 F.3d 861, 869 (4th Cir. 1999)). Furthermore, there must be some suggestion of impropriety or illegality by the employer that the employee is attempting to uncover. *U.S. ex rel. Owens* at 735. It is not enough simply to report to the employee's supervisor that he has concerns about a mischarging to the government. *Zahodnick v. IBM*, 135 F.3d 911 (4th Cir. 1997). There must be some alleged fraud or illegal activity involved in order to rise to the level of a protected activity.

Under these standards, none of Plaintiff's activities rise to the level of protected activity because the element of fraud or illegality is not present and Plaintiff failed to provide notice that *qui tam* litigation was a reasonable or distinct possibility. The recent Fourth Circuit decision in *United States ex rel. Parks v. Alpharma, Inc.* distinguishes between situations whereby an employee's complaint is "clearly couched in terms of concerns or suggestions," which cannot be considered a protected activity; and, one in which the employee's complaint consists of a "threat or warnings of FCA litigation," which is sufficient to satisfy the protected activity element. *United States ex rel. Parks*, No. 11-1498, 2012 WL 3291705, at *8. As evidenced by the record, none of the actions taken by Plaintiff prior to being notified of his impending termination consisted of more than expressions of concern or suggestion. They cannot, therefore, satisfy either the protected activity element or the notice requirement.

### A. Initial Time Charging Complaint

First, Plaintiff alleged in his Complaint that he reported illegal acts and expressed his concerns about "serious accounting and technical issues related to timekeeping and contracting" to Sorensen. In his deposition, however, Dillon admitted that his only communication with Sorensen, an April 14, 2011 email, did not at all describe Dobbs' allegedly illegal instruction nor

9

notify Sorensen of Dillon's concerns about Dobbs' instructions. Instead, the email exchange between Dillon and Sorensen simply allowed Sorensen to confirm that Dillon was properly preparing his timesheets. The email did not address Dobbs' instructions or any potentially fraudulent time charging practices. Plaintiff's communications with Sorensen, therefore, cannot satisfy a standard requiring notice that a *qui tam* action is a reasonable possibility. To do so, the email from Dillon must have contained a complaint that, at a minimum, notified Sorensen that Dillon was contemplating or acting in the furtherance of a *qui tam* action. From the perspective of Sorensen, and the employer, the email more closely resembles a workday inquiry about a mundane administrative task. Sorensen had no reason to believe Dillon was reporting a potential fraud.

Additionally, Defendant argues that Dobbs' allegedly improper instructions were not improper, meaning that there could never be a distinct possibility of any FCA action. Plaintiff alleges that Dobbs was instructing him to bill time to the government that he was using to administer timesheets and which Plaintiff felt should not be billed to the client. Ultimately, this issue fits firmly in the category of a report of potential mischarging to the government and does not indicate that Dillon was investigating a potential fraud.

Defendant also cites the email exchanges between Dobbs and Dillon to support its position that Dobbs' acts were not part of any fraud against the government. In his April 13 email to Dillon, Dobbs addresses Plaintiff's timekeeping methods and late timesheets. It is an innocuous email from a supervisor to a subordinate that questions the efficiency of Plaintiff's timekeeping administration. Dillon's communications with Dobbs cannot, therefore, be considered part of an investigation by Plaintiff into SAIC's potential fraud. Furthermore, in Dobbs' April 28 email he provides Dillon with a link to SAIC's internal policy for time charging. Having specifically instructed Plaintiff to follow SAIC policy, as evidenced by the

10

link and accompanying instructions, Dobbs could not have been attempting to perpetrate fraud. As the Court held in *Mann*, without fraud there can be no possibility that Dillon's efforts could lead to a viable FCA action. *Mann* at 345. Ultimately, in this case, Plaintiff simply "failed to tie his opposition to fraudulent behavior." *Id.* at 347.

### B.     Research.gov Remediation Time Charging

Second, Plaintiff claims that his investigation into Dobbs' defective time charging instructions for employees and contractors working on the Research.gov (Ashburn) remediation project was his second protected activity. As previously noted, Ms. Daniels had informed SAIC's employees and subcontractors that they were not to bill the client for their work on remediation. At the time, however, no unbillable charge code had been provided that would allow for employees and subcontractors to properly track and charge their time. Without this code, Dillon believed that his superior's directions would result in fraudulent billing of the government. Plaintiff claims that to prevent this fraud, he questioned Ms. Daniels about the instructions and that Ms. Daniels "countermanded Dobbs' defective guidance and instructed Mr. Dillon that he should charge the unbillable remediation number." Opp. at 18. This so-called countermanding, Plaintiff implies, satisfies the notice element as well as the protected activity element.

Plaintiff's actions here also fail to rise to the level of protected activity, based primarily on Plaintiff's own admissions. Plaintiff states that his email exchange with Daniels countermanded Dobbs' defective guidance. *Id.* In reality, Plaintiff's email to Daniels simply asked for the appropriate unbillable remediation number to properly administer timesheets. The email did not threaten potential FCA action and cannot even be considered a complaint. As Defendant explains, under *United States ex rel. Owens*, the Court requires that the alleged protected activity rise *above* the level of an ordinary critique and constitute a step in preparation

11

for an FCA claim. *Owens,* 612 F.3d at 735. Without additional context or content in Dillon's email, it does not satisfy the notice or protected activity element for an FCA retaliation claim.

### C. Cross-Charging Investigation

The third protected activity involves Plaintiff's investigation into cross-charging by SAIC employees and subcontractors. Plaintiff alleges that he has direct knowledge of unlawful cross-charging to the government because of his investigation. He claims he investigated circumstances in which employees were charging one government client for work done on behalf of a different customer's project. Specifically, Dillon claims that at least one subcontracter, Mr. Collier, knowingly charged all of his work on at least two projects to one charge code. Plaintiff claims that Mr. Collier told him that he worked on the Research.gov account, yet Plaintiff was able to confirm that Mr. Collier's time does not appear on the Reserch.gov invoices. As such, Plaintiff's investigation was part of an attempt to uncover fraud against the government and should be considered a protected activity.

As Defendant points out, Plaintiff's claim that his investigation into this matter was protected fails because at no point prior to being informed of his termination did Plaintiff notify anyone at SAIC of his concern. Without having anyone at SAIC aware of his investigation or complaint about the underlying practice, it is not possible for SAIC to have retaliated against him for those alleged acts. The decision to fire Dillon had been made and communicated and could not, therefore, have been motivated by his cross-charging complaint.

### D. Corporate Ethics Complaint

Dillon's fourth and final alleged protected activity was his pursuit of the corporate ethics complaint on about January 24, 2012. This activity commenced after Dobbs had informed Dillon that he would be terminated. Similar to Plaintiff's third alleged protected activity, SAIC maintains that the Court should not consider the complaint because it is impossible for any post-

12

removal activity to be protected and, thus, retaliated against. It stands to reason that any protected activity must necessarily occur prior to any related retaliation. Plaintiff's only rebuttal to Defendant's argument is that the ethics complaint, which listed the Dobbs' time charging directives, the cross-charging of time, and SAIC's failure to provide unbillable charge codes for remediation, should be considered the culmination of Dillon's entire investigation of wrongdoing. The record is clear, however, that Plaintiff failed to satisfy the notice and protected activity elements because his ethics complaint was not filed until after he had been informed of his termination.

## II. Retaliation

The third element of a claim for retaliation under the FCA requires that the employer retaliated against the employee because of the protected activity. *Mann* at 344. Plaintiff's Complaint alleges that there were two instances of retaliation by SAIC against Plaintiff. First, Plaintiff alleges that SAIC demoted him immediately following the incident in which he investigated Dobbs' improper timekeeping directives and emailed Sorensen. The second retaliation occurred when SAIC ultimately terminated Plaintiff and did not allow him to find another position within the company. Defendant asserts that, notwithstanding its contention that Plaintiff did not satisfy the first two elements of retaliation, Dillon suffered no adverse employment action as a result of his activities. In addition, Defendant maintains that the decision to remove Plaintiff was a business decision and was not connected to the alleged protected activities.

### A. Demotion Following Time Charging Controversy

First, Plaintiff claims that he was demoted as a result of his protected activities around Dobbs' improper guidance for time charging. As discussed earlier, Plaintiff was reassigned from the DCISS project to the CONOPS project and had his managerial role stripped when he no

13

longer had two employees reporting directly to him. Plaintiff characterizes this reassignment as a demotion, while Defendant claims it is not a demotion because Plaintiff enjoyed the same salary, benefits and title. Undoubtedly, however, Plaintiff's managerial duties were removed. Notably, Plaintiff was reassigned in close proximity to the time he informed Dobbs that he had emailed Sorensen about his timekeeping practices.

As the record clearly indicates, the decision to remove Dillon's managerial duties was based on a sound business decision and not the product of retaliatory motives. In his deposition, Plaintiff admitted that shortly before his reassignment, he informed an employee in the Human Resources department that he felt underutilized in his role. Additionally, Dillon's two direct reports each reported to superiors that they did not feel Plaintiff's supervision was necessary. As such, Defendant effectively rebuts Plaintiff's claim and offers a valid business reason for the decision. Taking the evidence most favorable to Plaintiff, the fact remains that even Plaintiff admitted there was a legitimate business reason for his reassignment. No genuine issue remains in terms of whether or not the removal of Plaintiff's supervisory duties was an act of retaliation.

### B. Removal from SAIC

Finally, Plaintiff claims that his removal from the NSF project and his ultimate termination was in retaliation for his protected activities and that the reasons offered by Defendant constitute pretext. Defendant contends that it had a legitimate business reason for removing Dillon and that it was not related to any of his protected activities. Specifically, Defendant maintains that Dillon was terminated as a result of the NSF customer's request that he be removed from the project and because his removal from the project meant there was no work at SAIC for Dillon.

Many courts analyze the issue of retaliation and pretext in FCA cases in the context similar to the *McDonnell Douglas* test, which states that once a plaintiff establishes a prima facie

14

case of discrimination, the burden of production, not persuasion, shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *See, e.g., Glynn v. Impact Science & Technology Inc.*, 807 F.Supp.2d at 416 (D.Md. 2011); *Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 Fed.Appx. 137, 139 (2d Cir.2010). While Plaintiff maintains that he has established a prima facie case for retaliation, Defendant effectively rebuts this presumption. Defendant lays out significant evidence and testimony from its customer that tends to show Dillon was terminated based on legitimate business reasons.

Daniels was the SAIC manager who ultimately determined that Dillon should be fired. In her deposition, she testified that she had received complaints from the customer, who had asked that Dillon be removed from the project. Ms. Coyne, one of the NSF clients, stated that she was increasingly frustrated with Dillon's work. Additionally, Daniels reviewed the document produced by Plaintiff for the NSF client and determined the document was "worthless." She described the document as nothing more than a copy-and-paste of the client's own Statement of Work.

By this evidence, Defendant has satisfied its burden of demonstrating a legitimate business reason for the allegedly retaliatory firing. There is no evidence that suggests a genuine issue exists in terms of pretext or retaliation. According to the record, Dillon's customers and supervisors grew increasingly frustrated with his performance and his work continued to deteriorate until his termination. As such, Plaintiff was not retaliated against as a result of his allegedly protected activities.

## Conclusion

The record reflects that no genuine issues of material fact remain in terms of Plaintiff's claim of retaliation under the False Claims Act and no protection is owed to Dillon based on his activities. According to his deposition, Plaintiff admits that a number of the statements relied

upon in the Complaint were misleading. Taking all of the facts in the light most favorable to Defendant, there remains no evidence that Plaintiff engaged in protected activities. Furthermore, Defendant effectively rebuts any charges of pretext in terms of its firing Plaintiff. The record shows that a number of Plaintiff's clients and supervisors were unsatisfied with Dillon's performance and sought that he be removed. Plaintiff is unable to offer any evidence that demonstrates Defendant's legitimate business reasons for terminating him were pretext. As such, Defendant is entitled to Summary Judgment as a matter of law.

For the aforementioned reasons, Defendant's Motion for Summary Judgment is GRANTED. This constitutes the final appealable order of this case.

An appropriate Order shall follow.

January 28, 2013
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge